DAVID M. POITRAS – Bar No. 141309
SUSAN K. SEFLIN – Bar No. 213865
JESSICA L. BAGDANOV – Bar No. 281020
JESSICA S. WELLINGTON – Bar No. 324477
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:  (818) 827-9099
Email:      dpoitras@bg.law
            sseflin@bg.law
            jbagdanov@bg.law
            jwellington@bg.law

Attorneys for Chapter 11 Debtor and
Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:24-bk-11046-TA |
| MASHindustries, Inc., | Chapter 11 |
|        Debtor and Debtor in Possession. | **MOTION FOR ENTRY OF AN ORDER: (1) APPROVING COMPROMISE PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; AND (2) AUTHORIZING DEBTOR TO ASSUME LEASE PURSUANT TO 11 U.S.C. § 365; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF BERNARD BRUCHA IN SUPPORT THEREOF** |
| | **Hearing:** <br>Date:  October 23, 2024<br>Time: 10:00 a.m.<br>Place: Courtroom 5B<br>      United States Bankruptcy Court<br>      411 West Fourth Street<br>      Santa Ana, CA 92701 |

3007266

# **TABLE OF CONTENTS**

Page

I.    FACTUAL BACKGROUND ........................................................................3

    A.    Procedural Background ...............................................................3

    B.    Pre-Petition Litigation ...............................................................4

II.   TERMS OF THE AGREEMENT ..............................................................5

III.  ARGUMENT ..............................................................................................7

    A.    Assumption of the Lease is Beneficial to the Estate ..................7

    B.    The Requirements for Assumption Have Been Met ...................9

    C.    Approval of the Compromise is Beneficial to the Estate .........10

    D.    Application of the A&C Properties Factors Demonstrates that the Agreement Should Be Approved ...............................................................11

        1.    Probability of Success on the Merits / Complexity, Expense, and Inconvenience of Litigation ...........................................11

        2.    Potential Difficulties in Collection ...........................12

        3.    The Paramount Interests of Creditors ........................12

IV.   CONCLUSION ..........................................................................................12

i

# TABLE OF AUTHORITIES

Page

## CASES

*Agarwal v. Pomona Valley Med. Group (In re Pomona Valley Medical Group)*,
  476 F.3d 665 (9th Cir. 2006) .............................................................................9

*Anderson v. Elm Inn, Inc. (In re Elm Inn, Inc.)*,
  942 F.2d 630 (9th Cir. 1991) ..........................................................................6, 7

*Group of Institutional Investors v. Chicago, M., S. P. & P. R. Co.*,
  318 U.S. 523 (1943).............................................................................................7

*In re A&C Properties*,
  784 F.2d 1377 (9th Cir. 1986),
  *cert. denied*, 479 U.S. 854, 107 S. Ct. 189 (1986)......................................10, 11

*In re America Suzuki Motor Corp.*,
  494 B.R. 466 n.4 (Bankr. C.D. Cal. 2013)..........................................................8

*In re Cook*,
  2015 Bankr. LEXIS 1900, at *1-2 (Bankr. C.D. Cal. June 8, 2015) .................8

*In re FCX, Inc.*,
  60 B.R. 405 (Bankr. E.D.N.Y. 1986)..................................................................9

*In re G.I. Indus.*,
  204 F. 3d 1276 (9th Cir. 2000) ...........................................................................8

*In re Gardiner, Inc.*,
  831 F.2d 974 n.2 (11th Cir. 1987) ......................................................................8

*In re Health Science Products*,
  191 B.R. 895 n.15 (Bankr. N.D. Ala. 1995) .......................................................8

*In re Lubrizol*,
  756 F.2d 1043 (4th Cir. 1985) ............................................................................9

*In re Morrison*,
  69 B.R. 586 (Bankr. E.D. Pa. 1987) .................................................................10

*In re W.T. Grant Co.*,
  699 F.2d 599 (2d Cir. 1983),
  *cert. denied*, 464 U.S. 822 (1984)....................................................................10

*In re Waldron*,
  36 B.R. 633 (Bankr. S.D. Fla. 1984)..................................................................8

*In re Woodson*,
  839 F.2d 610 (9th Cir. 1988) ............................................................................10

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972),
  *cert. denied*, 409 U.S. 1039 (1972)..................................................................10

ii

*Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp).,*
        4 F.3d 1095 (2d Cir. 1993).................................................................................8

*Summit Land Co. v. Allen (In re Summit Land Co.),*
        13 B.R. 310 (Bankr. D. Utah 1981) ...................................................8

*The Defining Tension in Corporate Governance in America,*
        52 Bus Law 393, 394 (Feb. 1997) ....................................................8

## STATUTES

11 U.S.C. § 101 ...............................................................................................3

11 U.S.C. § 1184 .............................................................................................3

11 U.S.C. § 365 ...............................................................................................7

11 U.S.C. § 365(a) ..........................................................................................7

11 U.S.C. § 365(b)(1) .....................................................................................9

11 U.S.C. § 365(f)(2) ......................................................................................9

## RULES

Federal Rules of Bankruptcy Procedure 9019 ..........................................7, 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3007266

MASHindustries, Inc., the chapter 11 debtor and debtor in possession herein (the "Debtor" or "Industries"), hereby moves (the "Motion") this Court for an order: (1) approving a compromise with BSP VBP Propco, LLC ("BSP" or the "Landlord") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule"); and (2) authorizing the Debtor to assume the Standard Industrial Lease dated as of December 17, 2018 (the "Lease"), a true and correct copy of which is attached to the Declaration of Bernard Brucha ("Brucha Decl.") as **Exhibit 1,** for those certain premises containing approximately 67,290 rentable square feet located at 7150 Village Drive, Buena Park, California 90621 (the "Property") as amended by the First Amendment to Standard Industrial Lease (the "Amendment"), a true and correct copy of which is attached to the Brucha Decl. as **Exhibit 2**, pursuant to 11 U.S.C. § 365, Bankruptcy Rule 6006, and Local Bankruptcy Rules 9013-1(o).

The Debtor has determined in its business judgment that assumption of the Lease as amended by the Amendment (the "Agreement") is the best interests of the Debtor's bankruptcy estate and that its reorganization efforts are best served by remaining in possession of the Property.  Additionally, the Debtor has determined in its business judgment that resolution of the claims and disputes between the Debtor and Landlord without further litigation is in the best interests of its bankruptcy estate as set forth below.  The Landlord has been provided a copy of this Motion, and consents to the relief requested in this Motion.

The Motion is based upon the facts set forth therein, the attached memorandum of points and authorities and declaration of Bernard Brucha (the "Brucha Declaration"), the notice of the Motion, which will be served on  interested parties pursuant to the notice procedures applicable in this case [*See,* Docket Nos. 41 and 87], all pleadings and records on file in this bankruptcy case, all matters which are subject to judicial notice, and all other evidence which may be introduced at or prior to any hearing on this Motion.

**WHEREFORE**, the Debtor respectfully requests this Court enter an order:

1.     Approving the Agreement as being in the best interest of the Estate and an exercise of the Debtor's reasonable business judgment;

2.     Authorizing the Debtor to assume the Lease as amended by the Amendment;

1

3007266

3.      Authorizing the Debtor to execute any and all documents and take any and all actions necessary to effectuate the Agreement; and

4.      Granting the Debtor such other and further relief as may be just and proper under the circumstances.

DATED:  September 27, 2024                    BG LAW LLP


By:   /s/ Jessica S. Wellington
       David M. Poitras
       Susan K. Seflin
       Jessica S. Wellington
       Attorneys for MASHindustries, Inc., Chapter 11
       Debtor and Debtor in Possession

3007266

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.      FACTUAL BACKGROUND**

      **A.      Procedural Background**

On April 24, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its financial affairs as debtor in possession pursuant to section 1184 of the Bankruptcy Code.  No examiner, or committee has been appointed in the Debtor's chapter 11 case.

On April 25, 2024, Gregory K. Jones was appointed as the Subchapter V Trustee in the Debtor's bankruptcy case.

The Debtor's affiliate, Mash Studios, Inc. ("Studios") filed its own chapter 11 bankruptcy case on the Petition Date but its chapter 11 case was later dismissed pursuant to Court order entered on May 23, 2024 [Doc. No. 48].

Studios was formed in 2005 by Bernard Brucha and Mr. Brucha is the sole shareholder of Studios.  Studios designs custom office furniture for large corporations such as Nike, Chanel and Google.  In 2013, one of Studios suppliers went out of business and Mr. Brucha formed Industries to acquire those assets to begin a furniture and millwork manufacturing business.  Mr. Brucha is the sole shareholder of Industries.

Industries' manufacturing operations are located at 7150 Village Drive, Buena Park, California (previously defined as the "Property") and have been located there since 2019.  I.e., Industries' business has been operating at the Property since approximately May 2019 and Industries has continuously been paying rent since 2019 (which rent BSP and its predecessor in interest accepted).

Industries employs 34 people, 32 of whom work at the Property (and two are remote workers). Industries is a commercial furniture and millwork manufacturer and the majority of its employees work with large industrial machinery; it is therefore impossible for Industries to continue to operate without a physical manufacturing facility.

3

The Debtor filed its chapter 11 plan of reorganization on September 10, 2024 (the "Plan"). The Plan incorporates the terms of the settlement with the Landlord described in this Motion and provides full payment to all creditors over time (between the effective date of the Plan and the fourth quarter of 2027).

**B.    Pre-Petition Litigation**

Prior to February of 2024, Industries and Studios did not have the same address. Studios had studios and offices in Los Angeles, and Industries occupied the Property. As part of their effort to reduce expenses, Studios gave up its offices and studios in Los Angeles in February of 2024, and Studios' employees either work from home or at the Property as necessary. I.e., prior to February of 2024, Studios never occupied the Property.

Although Industries has occupied the Property with its manufacturing facility since the inception of the Lease, Studios is the named tenant on the lease. In 2023, Industries began having problems timely paying the rent of $86,000 a month on the Property and as of the petition date, Industries was seven months behind on rent though it paid March, April, May and June 2024 rent, which BSP has accepted.

On January 10, 2024, BSP, the landlord for the Property, served Studios with a three day notice to pay rent or quit. Thereafter, on February 16, 2024, BSP filed an unlawful detainer action and obtained a writ of possession for the Property against <u>Studios only</u>. Despite having actual knowledge that Industries occupied the Property, BSP failed to name Industries as a defendant in its unlawful detainer complaint, as made clear in the Motion and supporting evidence.

On Friday, April 19, 2024, Studios was served with a Notice to Vacate the Property on or before April 25, 2024 at 6:01 a.m.

Industries manufacturing facility (the "Facility") located at the Property is a 77,000 sq. ft. manufacturing facility, houses valuable equipment, and is vital to the Debtors' ongoing operations and return to profitability. Of Industries' thirty-four employees, thirty-two employees work out of the Facility and being locked out of the Facility by the Sheriff would have decimated Industries' business and operations. Therefore, the filing of this chapter 11 case was necessary to preserve the Debtor's business and operations and to keep its employees employed.

3007266

On June 4, 2024, the Debtor's Landlord filed a relief from stay motion [Doc. No. 93] seeking, among other things, to evict the Debtor from its only location.  On June 11, 2024, the Debtor filed its opposition [Doc. No. 99] (the "RFS Opposition") pursuant to which it alleged, among other things, (a) BSP failed to name Industries in the unlawful detainer action and therefore the unlawful detainer judgment was not effective against the Debtor, (b) BSP had actual knowledge that the Debtor was the tenant at the Property, and (c) BSP wrongly altered the mandatory Court form for relief from stay motions.  On June 18, 2024, BSP filed its reply [Doc. No. 107] to the RFS Opposition pursuant to which it disputed the Debtor's allegations.  In an effort to consensually resolve their disputes, the Debtor's principal met in person with the Landlord on June 21, 2024 and agreed upon various terms that would, among other things, resolve the relief from stay motion.  The terms of the Agreement are set forth below.

The Debtor has determined in its business judgment that assumption of the Lease as amended by the Amendment is the best interests of the Debtor's bankruptcy estate and that its reorganization efforts are best served by remaining in possession of the Property.  Additionally, the Debtor has determined in its business judgment that resolution of the claims and disputes between the Debtor and Landlord without further litigation is in the best interests of its bankruptcy estate as set forth below.  The Landlord has been provided a copy of this Motion, and consents to the relief requested in this Motion.[1]

## II.    TERMS OF THE AGREEMENT

A.    <u>Effectiveness</u>.  The terms and conditions of the Agreement are conditioned on, and shall become effective on the date (the "Effective Date") that is the latest of, (a) the execution of the Amendment by the parties and guaranties by the parties; (b) the entry of a final, non-appealable order (the "Assumption Order") in form and substance acceptable to BSP, which provides for, among other things, approval of the assumption of the Lease (i.e., the Lease, as amended by the Amendment), approval of the Amendment pursuant to Federal Rule of Bankruptcy Procedure 9019,

---

[1] The Landlord has informed the Debtor that, notwithstanding its consent to the relief requested in the Motion, the Landlord does not agree with certain of the factual statements made by the Debtor herein and reserves all rights to dispute those statements in the event that the Motion is denied or otherwise.

and the Bankruptcy Court retaining exclusive jurisdiction over any disputes relating to the Lease or

possession of the Property (including, if Landlord establishes appropriate cause, entering a surrender

order as permitted by *Anderson v. Elm Inn, Inc. (In re Elm Inn, Inc.)*, 942 F.2d 630 (9th Cir. 1991));

(c) the execution of a personal guaranty by Mr. Brucha, in form and substance acceptable to

Landlord, that provides for Brucha's guaranty of payment of the prepetition arrears owed under the

Lease (the "Brucha Guaranty"); and (d) the execution of a personal guaranty by Studios, in form and

substance acceptable to Landlord, that provides for Studios' guaranty of payment of the prepetition

arrears owed under the Lease (the "Studios Guaranty").  If these conditions are not satisfied, the

Amendment shall be deemed null and void and of no force and effect, and all parties to the

Amendment shall retain all rights, claims, or defenses that they may have against each other.  In no

event shall the Effective Date be a date that is later than November 1, 2024, unless that date is

extended by Landlord.

     **B.**    <u>Tenant</u>.  The Debtor shall be deemed the "Tenant" under the Lease for all purposes as

of April 1, 2019.

     **C.**    <u>Expiration Date</u>.  The Expiration Date under the Lease, which is currently scheduled

to occur on June 30, 2026, is hereby revised to be June 30, 2025.  The Debtor shall continue to be

obligated to pay to Landlord Base Rent, Tenant's Percentage Share of the Operating Expenses, and

all other charges and amounts payable under the Lease through and including the Expiration Date, in

accordance with the terms and provisions of the Lease.  On or prior to the Expiration Date, the

Debtor shall vacate and surrender to Landlord exclusive possession of the Property in the condition

in which the Property is required to be vacated and surrendered by the Debtor pursuant to the Lease.

If the Debtor fails to vacate and surrender exclusive possession of the Property to Landlord on or

prior to the Expiration Date, then the applicable indemnification provisions and the holdover

provisions of the Lease shall apply.

     **D.**    <u>Security Deposit</u>.  The Security Deposit held by Landlord ($268,275.53) shall be

deemed the Security Deposit given by the Debtor under the Lease.

     **E.**    <u>Cure Payments</u>.  The Prepetition Arrears shall, in connection with the assumption of

the Lease, be paid to Landlord as follows (collectively, the "Cure Payments"): (a) Industries shall

make eight monthly installment payments of $37,500.00 each, payable on the first day of each

month, from November 1, 2024, to June 30, 2025, (b) Studios shall make four monthly installment

payments of $20,000.00 each, payable on the first day of each month, from January 1, 2025, through

April 30, 2025, (c) Studios shall make a payment of $11,433.68, payable on May 1, 2025, and

(d) Industries shall make a payment of $238,000.00, payable on June 15, 2025 (the "Final Cure

Payment").  Landlord may apply the Security Deposit to the Final Cure Payment without further

order from the Bankruptcy Court.

       F.    <u>Enforcement of UD Judgment</u>.  Landlord shall forbear from exercising its remedies

against Studios to recover any amounts owed under the Lease, including enforcing any money

judgments entered against Studios, provided that all payments due under the Lease, including any

Cure Payments, are timely received by Landlord.

       G.    <u>Jurisdiction</u>.  This Court shall retain exclusive jurisdiction over any disputes relating

to the Lease or possession of the Property (including, if Landlord establishes appropriate cause,

entering a surrender order as permitted by *Anderson v. Elm Inn, Inc. (In re Elm Inn, Inc.)*, 942 F.2d

630 (9th Cir. 1991)).

       H.    <u>Plan of Reorganization</u>.  Any plan of reorganization filed by Industries in this case

shall be consistent with, and incorporate, the terms of the Agreement.

       I.    <u>Court Approval</u>.  As noted, the Agreement is subject to Court approval pursuant to

section 365 of the Bankruptcy Code and Bankruptcy Rule 9019.

## III.    ARGUMENT

### A.    <u>Assumption of the Lease is Beneficial to the Estate</u>

       Section 365(a) of the Bankruptcy Code provides that, "subject to the court's approval [a

debtor in possession] may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a). A debtor's decision to assume an executory contract or unexpired lease is

subject to review under the "business judgment standard." *Group of Institutional Investors v.

Chicago, M., S. P. & P. R. Co*., 318 U.S. 523, 550 (1943) ("[T]he question whether a lease should be

rejected and, if not, on what terms it should be assumed is one of business judgment."); *see Orion

Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp)*., 4 F.3d 1095, 1099 (2d Cir.

3007266

1993); *In re Gardiner, Inc.*, 831 F.2d 974, 975 n.2 (11th Cir. 1987); *In re America Suzuki Motor Corp.*, 494 B.R. 466, 475 n.4 (Bankr. C.D. Cal. 2013) ("Whether to assume or reject an executory contract is generally left to the business judgment of the trustee or debtor in possession.") (citing *In re G.I. Indus.*, 204 F. 3d 1276, 282 (9th Cir. 2000)); *In re Cook*, 2015 Bankr. LEXIS 1900, at *1-2 (Bankr. C.D. Cal. June 8, 2015) ("motions to assume or reject executory contracts under 11 U.S.C. § 365 should be summary proceedings focusing on whether the decision of the trustee, or debtor-inpossession, to assume or reject an executory contract is a good business decision or bad one.").

Bankruptcy courts must approve a debtor's decision to assume or reject an executory contract "unless there is bad faith or a gross abuse of discretion." In other words, the court must decide "whether the decision of the debtor is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim, or caprice." *In re Health Science Products,* 191 B.R. 895, 909 n.15 (Bankr. N.D. Ala. 1995). The business judgment rule can be simply stated: in making a business decision, the directors are presumed to have acted independently, on an informed basis, in good faith, and in the honest belief that the decision is in the best interests of the corporation.

Thus, a business decision will normally be sustained unless the presumption is rebutted in either of two ways: (i) the process, independence, or good faith of the directors is compromised; or (ii) the decision cannot be attributed to a rational business purpose. E. Norman Veasey, *The Defining Tension in Corporate Governance in America*, 52 Bus Law 393, 394 (Feb. 1997). In *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310 (Bankr. D. Utah 1981), the court concluded that a debtor's decision regarding the assumption or rejection of a lease should be granted as a matter of course:

> [C]ourt approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course. To begin, this rule places responsibility for administering the estate with the trustee, not the court, and

*Summit Land Co.*, 13 B.R. at 315; *see also In re Waldron*, 36 B.R. 633, 640 (Bankr. S.D. Fla. 1984).

Under the business judgment test, if assumption or rejection would benefit the debtor's estate, the court should approve the debtor's proposed assumption or rejection. *Agarwal v. Pomona*

3007266

*Valley Med. Group (In re Pomona Valley Medical Group)*, 476 F.3d 665, 670-71 (9th Cir. 2006) ("[The court] should approve the rejection of an executory contract under § 365(a) unless it finds that the debtor-in-possession's conclusion that rejection would be 'advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.'" (quoting *In re Lubrizol*, 756 F.2d 1043, 1047 (4th Cir. 1985)); *see also In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D.N.Y. 1986) ("the debtor must have a good business judgment reason for asking the Bankruptcy Court to permit it to assume the executory contract").

In this case, and as discussed hereinabove, the Debtor has determined in its sound business judgment that it is in the best interest of its estate and its creditors to assume the Lease pursuant to the terms of the Amendment.  The Debtor's assumption of the Lease has the approval and consent of the Landlord.  The Debtor, therefore, requests that the Court enter an order authorizing the assumption the Lease.

**B.**    **The Requirements for Assumption Have Been Met**

Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign its executory contracts and unexpired leases, provided the debtor first assumes such executory contracts and unexpired leases in accordance with section 365(b)(1), and provides adequate assurance of future performance by the assignee.  11 U.S.C. § 365(f)(2).

Section 365(b)(1) provides as follows:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . .;
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

In this case, the Debtor and BSP have reached an agreement that all amounts due in connection with the assumption the Lease will be satisfied by the payment of the Cure Payments as

set forth above.  The Debtor submits that sound business justifications exist to allow the Debtor to assume the Lease. The agreement between the parties with respect thereto demonstrates that the requirements of the Bankruptcy Code necessary to assume the Lease have been met. The Court, therefore, should approve the assumption the Lease, and the resolution of BSP's claims thereunder, as requested.

### C.    Approval of the Compromise is Beneficial to the Estate

Bankruptcy Rule 9019 provides that on motion by a trustee, the Court may approve a compromise or settlement.  Fed. R. Bankr. P. 9019(a).  The decision of whether to approve or reject a proposed compromise is addressed to the sound discretion of the Court and is to be determined by the particular circumstances of each case.  *In re Walsh Construction, Inc.,* 669 F.2d 1325, 1328 (9th Cir. 1982); *In re Woodson,* 839 F.2d 610, 620 (9th Cir. 1988); *In re A&C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986), *cert. denied*, 479 U.S. 854, 107 S. Ct. 189 (1986).

More specifically, a court should review the following factors in considering whether to approve a proposed settlement: (a) the probability of success in the litigation; (b) the difficulty, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interests of the creditors and a proper deference to their reasonable views in the premises.  *Woodson, supra*, 839 F.2d at 620 (quoting *A&C Properties, supra*, 784 F.2d at 1381).  A settlement negotiated by a trustee, as a representative of the estate, is entitled to deference.  *In re Morrison*, 69 B.R. 586, 592 (Bankr. E.D. Pa. 1987).

The Court need not conduct an exhaustive investigation into the validity or a mini-trial on the merits of the claims sought to be compromised.  *In re Walsh Construction, Inc., supra*, 669 F.2d at 1328.  In fact, the Court need not decide the questions of law and fact raised in the controversies sought to be settled and need not determine whether the settlement presented is the best one that could possibly have been achieved.  Instead, the Court's responsibility is only to "canvass the issues to see 'whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1984) (quoting *Newman v. Stein*, 464 F.2d 689, 698 (2d Cir. 1972), *cert. denied*, 409 U.S. 1039 (1972)).

3007266

1   The Debtor has the right to exercise reasonable business judgment in an effort to maximize

2   the value of assets of the bankruptcy estate.  So long as a proposed compromise results in a recovery

3   above the lowest point in the range of reasonable compromises, the Debtor should be authorized to

4   proceed with such compromise.  In light of the facts and circumstances in this case, the application

5   of the *A&C Properties* factors shows that the compromise set forth in the Agreement is fair and

6   equitable, is in the best interests of the Estate, and is well above the lowest point in the range of

7   reasonableness.

8       **D.    Application of the *A&C Properties* Factors Demonstrates that the Agreement**

9           **Should Be Approved**

10  The Debtor has evaluated the Agreement and has compared the benefits of entering into the

11  Agreement with the potential risks, expense, and detriment to the bankruptcy estate inherent in

12  litigating the dispute with BSP.  In evaluating its decision to enter into the Agreement, the Debtor

13  has reviewed the numerous documents and information available to it in this bankruptcy case and the

14  UD Action.  Based on this evaluation, the Debtor has determined that the Agreement is in the best

15  interests of its bankruptcy estate because it is fair and equitable, is a reasonable and appropriate

16  exercise of the Debtor's business judgment, and will avoid the time, expense, and risk inherent in

17  litigation.  The Debtor has evaluated the *A&C Properties* factors in exercising its business judgment

18  as to whether to agree to the terms of the Agreement, and has concluded that under these factors, the

19  Agreement should be approved.  The Debtor's analysis of the *A&C Properties* factors is as follows:

20      **1.    Probability of Success on the Merits / Complexity, Expense, and**

21          **Inconvenience of Litigation**

22  The Debtor has disputed the effectiveness of the unlawful detainer judgment as to the Debtor

23  because: (a) BSP failed to name Industries in the unlawful detainer action, and (b) BSP had actual

24  knowledge that the Debtor was the tenant at the Property.  However, the Debtor will be required to

25  litigate the dispute to judgment, which will increase the administrative expenses of the Debtor's

26  bankruptcy estate significantly.  Additionally, there is risk that the Debtor may not prevail on its

27  claims asserted against BSP as BSP asserts that it did not know the Debtor was the occupant of the

28  Property.

3007266

The Debtor is sensitive to the risks inherent in litigation, as well as the increased administrative costs necessarily associated with it.  The Debtor has determined in its business judgment that it is better to enter into the Agreement with BSP rather than incur increased administrative costs associated with further litigation.

### 2.    Potential Difficulties in Collection

Collection is not an issue with respect to the subject dispute.  The Agreement resolves a claim asserted by BSP against the Debtor.  Thus, should the Agreement not be approved, the Debtor will likely be required to litigate the dispute which will cause the Debtor's estate to incur further administrative fees and expenses and could possibly result in BSP having a greater claim against the Debtor's estate.

### 3.    The Paramount Interests of Creditors

The Debtor believes that approval of the Agreement is in the best interest of the Debtor's creditors because it resolves the dispute without the need for costly litigation.  The Debtor believes this result is in the best interest of the estate.  The Debtor believes that the Agreement is well above the "lowest range of reasonableness," is fair, and should be approved as being in the best interest of the Debtor's estate.

Based on the foregoing analysis, the Debtor has concluded that entering into the Agreement is the most prudent and economical method of maximizing the recovery for the estate and submits that the Agreement should be approved by the Court as in the best interests of the estate.

## IV.    CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that the Court enter an order granting this Motion and:

1.    Approving the Agreement as being in the best interest of the Estate and an exercise of the Debtor's reasonable business judgment;

2.    Authorizing the Debtor to assume the Lease as amended by the Amendment;

3.    Authorizing the Debtor to execute any and all documents and take any and all actions necessary to effectuate the Agreement; and

3007266

4.      Granting the Debtor such other and further relief as may be just and proper under the circumstances.

DATED:  September 27, 2024                    BG LAW LLP

                                              By:      /s/ Jessica S. Wellington
                                                    David M. Poitras
                                                    Susan K. Seflin
                                                    Jessica S. Wellington
                                              Attorneys for MASHindustries, Inc., Chapter 11
                                              Debtor and Debtor in Possession

13

## DECLARATION OF BERNARD BRUCHA

I, Bernard Brucha, declare:

1.      I am the founder, Chief Executive Officer and sole shareholder of the Debtor and Studios.  I have personal knowledge of the facts contained in this declaration and if called as a witness, I would and could testify thereto under oath.

2.      I make this declaration in support of the Motion to which it is appended.  All initial capitalized terms used but not defined herein have the same meanings ascribed to them in the Motion.

3.      I formed Studios in 2005.  The business designs custom office furniture for large corporations such as Nike, Chanel and Google.  In 2013, one of Studios suppliers went out of business and I formed Industries to acquire those assets to begin a furniture and millwork manufacturing business.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of the Standard Industrial Lease dated as of December 17, 2018 (the "Lease") for those certain premises containing approximately 67,290 rentable square feet located at 7150 Village Drive, Buena Park, California 90621 (the "Property").

5.      Industries' manufacturing operations are located at the Property and have been located there since 2019.  I.e., Industries' business has been operating at the Property since approximately May 2019 and Industries has continuously been paying rent since 2019 (which rent BSP and its predecessor in interest accepted).

6.      Industries employs 34 people, 32 of whom work at the Property (and two are remote workers).  Industries is a commercial furniture and millwork manufacturer and the majority of its employees work with large industrial machinery; it is therefore impossible for Industries to continue to operate without a physical manufacturing facility.

7.      The Debtor filed its chapter 11 plan of reorganization on September 10, 2024 (the "Plan").  The Plan incorporates the terms of the settlement with the Landlord described in this Motion and provides full payment to all creditors over time (between the effective date of the Plan and the fourth quarter of 2027).

3007266

8.      Prior to February of 2024, Industries and Studios did not have the same address, however Industries has occupied the Property since 2019.  Studios had studios and offices in Los Angeles, and Industries occupied the Property.  As part of their effort to reduce expenses, Studios gave up its offices and studios in Los Angeles in February of 2024, and Studios' employees either work from home or at the Property as necessary.  I.e., prior to February of 2024, Studios never occupied the Property.

9.      Although Industries has always occupied the Property with its manufacturing facility since the inception of the lease, Studios is the named tenant on the lease.  In 2023, Industries began having problems timely paying the rent of $86,000 a month on the Property and as of the petition date, Industries was seven months behind on rent though it paid March, April, May and June 2024 rent, which rent BSP has accepted.

10.     On January 10, 2024, BSP, the landlord for the Property, served Studios with a three day notice to pay rent or quit.  Thereafter, on February 16, 2024, BSP filed an unlawful detainer action and obtained a writ of possession for the Property against Studios only.  Despite having actual knowledge that Industries occupied the Property, BSP failed to name Industries as a defendant in its unlawful detainer complaint.

11.     On Friday, April 19, 2024, Studios was served with a Notice to Vacate the Property on or before April 25, 2024 at 6:01 a.m.

12.     Industries manufacturing facility (the "Facility") located at the Property is a 77,000 sq. ft. manufacturing facility, houses valuable equipment, and is vital to the Debtor's ongoing operations and return to profitability.  Of Industries' thirty-four employees, thirty-two employees work out of the Facility and being locked out of the Facility by the Sheriff would have decimated Industries' business and operations.

13.     To avoid the cost, delay, and uncertainty of further litigation of the disputes between the Debtor and BSP, I reached a mutually agreeable compromise of controversies existing between the Debtor and BSP as set forth in the Agreement and Amendment, subject to Court approval.  A true and correct copy of the Amendment is attached hereto as **Exhibit 2**.

14. In deciding whether to settle with BSP, I evaluated the Agreement in the context of the *A&C Properties* factors. In my business judgment, I believe that under these factors, the Agreement should be approved so that the estate will avoid the time, expense, and risk inherent in litigation. My analysis of the *A&C Properties* factors is as follows:

15. **Probability of Success on the Merits / Complexity, Expense, and Inconvenience of Litigation.** I am confident in the Debtor's claims against BSP. The Debtor has disputed the effectiveness of the unlawful detainer judgment as to the Debtor because: (a) BSP failed to name Industries in the unlawful detainer action, and (b) BSP had actual knowledge that the Debtor was the tenant at the Property. However, at a hearing held September 10, 2024, the Court ordered that the automatic stay be terminated as to the Landlord effective November 1, 2024 and the Debtor will be required to litigate the dispute to judgment, which will increase the administrative expenses of the Debtor's bankruptcy estate significantly. Additionally, there is risk that the Debtor may not prevail on its claims asserted against BSP as BSP asserts that it did not know the Debtor was the occupant of the Property. If the Debtor is forced to vacate the Facility at this time, it will be forced to cease all operations indefinitely, resulting in the loss of 34 jobs and a profitable business.

16. The Debtor is sensitive to the risks inherent in litigation, as well as the increased administrative costs necessarily associated with it. The Debtor has determined in its business judgment that it is better to enter into the Agreement with BSP rather than incur increased administrative costs associated with further litigation.

17. **Potential Difficulties in Collection.** I do not believe this factor is relevant to the subject dispute. The Agreement resolves a claim asserted by BSP against the Debtor. Thus, should the Agreement not be approved, the Debtor will likely be required to litigate the dispute which will cause the Debtor's estate to incur further administrative fees and expenses and could possibly result in BSP having a greater claim against the Debtor's estate.

18. **The Paramount Interests of Creditors.** I believe that approval of the Agreement is in the best interest of the Debtor's creditors because it resolves the dispute without the need for costly litigation. The Debtor believes this result is in the best interest of the estate. The Debtor

believes that the Agreement is well above the "lowest range of reasonableness," is fair, and should be approved as being in the best interest of the Debtor's estate.

19.    Based on the foregoing analysis, I have concluded that entering into the Agreement is the most prudent and economical method of maximizing the recovery for the estate and submits that the Agreement should be approved by the Court as in the best interests of the estate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of September, 2024 at Buena Park, California.


_____
Bernard Brucha

17

EXHIBIT "1"

**STANDARD INDUSTRIAL LEASE**
(Multiple Tenant – Tenant Pays its Percentage Share of Operating Expenses,
Real Property Taxes and Insurance Costs – NO Base Year)

1.    **BASIC LEASE PROVISIONS.**

| | | |
|---|---|---|
| 1.1 | **DATE FOR REFERENCE PURPOSES:** | December 17, 2018 |
| 1.2 | **LANDLORD:** | The Realty Associates Fund XI Portfolio, L.P., a Delaware limited partnership |
| 1.3 | **TENANT:** | MASH Studios, Inc., a California corporation |
| 1.4 | **PREMISES ADDRESS:** | 7150 Village Drive, Buena Park, California |
| 1.5 | **APPROXIMATE LEASABLE AREA OF PREMISES:** (in square feet) | 67,290 |
| 1.6 | **USE:** | Warehousing, manufacturing and distribution of custom office furniture |
| 1.7 | **TERM:** | Seven (7) years and three (3) months |
| 1.8 | **ESTIMATED COMMENCEMENT DATE:** | April 1, 2019 |
| 1.9 | **MONTHLY BASE RENT:** | |

| Period | Base Rent Due Each Month |
|---|---|
| Commencement Date – 12th full calendar month: | $50,467.50 |
| 13th – 24th month: | $51,981.53 |
| 25th – 36th month: | $53,540.97 |
| 37th – 48th month: | $55,147.20 |
| 49th – 60th month: | $56,801.62 |
| 61st – 72nd month: | $58,505.66 |
| 73rd – 84th month: | $60,260.83 |
| 85th – 87th month: | $62,068.66 |

| | | |
|---|---|---|
| 1.10 | **BASE RENT AND ESTIMATED OPERATING EXPENSES PAID UPON EXECUTION:** | |
| | **BASE RENT:** | $50,467.50 |
| | **APPLIED TO:** (insert month(s)) | First full calendar month of term of Lease |
| | **OPERATING EXPENSES:** | $16,822.50 |
| | **APPLIED TO:** (insert month(s)) | First full calendar month of term of Lease |
| 1.11 | **TENANT'S PERCENTAGE SHARE:** | See Section 6.4 |
| 1.12 | **SECURITY DEPOSIT:** | $268,275.53 (See Addendum) |
| 1.13 | **NUMBER OF PARKING SPACES:** | 137 |
| 1.14 | **REAL ESTATE BROKER:** | |
| | **LANDLORD:** | CBRE, Inc. |
| | **TENANT:** | CBRE, Inc. |
| 1.15 | **EXHIBITS ATTACHED TO LEASE:** | Exhibit A – "Premises;" Exhibit B – "Verification Letter;" |

1

Exhibit C – "Rules and Regulations;" Exhibit D – "Form of HazMat Certificate"; Exhibit E – "Addendum to Lease"

1.16  **ADDRESSES FOR NOTICES**:

     **LANDLORD**:

The Realty Associates Fund XI Portfolio, L.P.
c/o TA Realty
1301 Dove Street, Suite 860
Newport Beach, CA 92660
Attention:  Asset Manager/Village Business Park

and

The Realty Associates Fund XI Portfolio, L.P.
c/o TA Realty
28 State Street, Tenth Floor
Boston, MA 02109
Attention:  Asset Manager/Village Business Park

     **WITH A COPY TO**:

Davis Property Management, Inc.
2377 Crenshaw Boulevard, Suite 150
Torrance, CA 90501
Attention: Property Manager/Village Business Park

and

Davis Property Management, Inc.
1420 Bristol Street North, Suite 100
Newport Beach, CA 92660
Attention:  Property Manager/Village Business Park

     **TENANT**:

MASH Studios, Inc.
2611 West Exposition Boulevard
Los Angeles, CA 90018

2.  **PREMISES**.

2.1  **ACCEPTANCE**. Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, to have and to hold for the term of this Lease, subject to the terms, covenants and conditions of this Lease.  The Premises is depicted on Exhibit "A" attached hereto.  The Premises depicted on Exhibit "A" is all or a part of a building (the **"Building"**) and may contain areas outside of the Building to the extent such areas are specifically identified on Exhibit "A" as being a part of the Premises. Tenant accepts the Premises in its condition as of the Commencement Date, subject to all applicable laws, ordinances, regulations, covenants, conditions, restrictions and easements, and except as may be otherwise expressly provided herein, Landlord shall not be obligated to make any repairs or alterations to the Premises.  Tenant acknowledges that Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes.  The number of square feet set forth in Section 1.5 is an approximation, and the Base Rent shall not be changed if the actual number of square feet in the Premises is different than the number of square feet set forth in Section 1.5.

2.2  **CONDITION**.  Landlord represents and warrants to Tenant that on the date Landlord delivers possession of the Premises to Tenant (the "**Delivery Date**") the Premises shall be in broom swept condition and the following parts of the Premises shall be in working order: (a) plumbing systems, (b) electrical systems, (c) lighting systems and (d) all HVAC units (collectively, the **"Building Systems"**).  In the event that it is determined that this warranty is untrue, Landlord shall not be in default under the Lease if after Landlord receives written notice of the representation or warranty that is untrue, Landlord promptly takes the actions, at Landlord's sole expense, necessary to put the applicable Building System in working order.  The foregoing representation and warranty shall apply only to the condition of the Building Systems as of the Delivery Date and shall not apply to any point in time thereafter. Tenant shall notify Landlord in writing (the "**Warranty Notice**") within sixty (60) days after the Delivery Date, time being of the essence, (the "**Notice Date**") of each way, if any, that the forgoing representation and warranty was untrue on the Delivery Date (an "**Untrue Warranty**").  The Warranty Notice shall state the specific way in which one or more Building System was not in working order on the Delivery Date.  Landlord shall have no responsibility to repair any Building System unless Tenant notifies Landlord on or before the Notice Date in a Warranty Notice of the Untrue Warranty, and if Tenant notifies Landlord that a Building System was not in working order on the Delivery Date after the Notice Date, Landlord shall have no obligation pursuant to this section to repair the Building System that is not in working order.  Notwithstanding the forgoing, Landlord shall have no obligation pursuant to this section to repair a Building System if the repair is necessitated by the negligence or misuse of Tenant or by Alterations or other modifications made to the Premises by Tenant.

2

2.3     **COMMON AREAS**. Landlord hereby grants to Tenant for the benefit of Tenant and its employees, suppliers, shippers, customers and invitees during the term of this Lease, the nonexclusive right to use, in common with others entitled to such use (including Landlord), the Common Areas (as hereinafter defined) as they exist from time to time, subject to all rights reserved by Landlord hereunder and under the terms of all rules and regulations promulgated by Landlord from time to time with respect thereto. Landlord reserves the right from time to time to (a) make changes in the Common Areas, including, without limitation, changes in location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas and walkways; (b) close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available; (c) construct additional buildings, parking areas, loading dock facilities and other improvements within the Common Areas; and (d) do and perform such other acts and make such other changes in, to or with respect to the Common Areas as Landlord may deem appropriate. As used herein, the term "**Common Areas**" means all areas and facilities outside the Premises and within the exterior boundary lines of the land owned by Landlord that are provided and designated by Landlord as such from time to time for general nonexclusive use of Tenant and others, including, if designated by Landlord as Common Areas, parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, parkways and landscaped areas, and Tenant shall have no leasehold interest in the Common Areas. The Premises, the Building, the Common Areas, the land upon which the same are located, along with all other buildings and improvements designated by Landlord, are herein collectively referred to as the "**Project.**" Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas, including, without limitation, the storage of trucks or other vehicles. Any such storage shall be permitted only with the prior written consent of Landlord, which consent may be revoked at any time. In the event that any unauthorized storage shall occur then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Tenant, which cost shall be immediately payable upon demand by Landlord.

3.      **TERM**.

3.1     **TERM AND COMMENCEMENT DATE**. The term and Commencement Date of this Lease are as specified in Sections 1.7 and 1.8. The Commencement Date set forth in Section 1.8 is an estimated Commencement Date. Subject to the limitations contained in Section 3.3 below, the actual Commencement Date shall be the date possession of the Premises is tendered to Tenant in accordance with Section 3.4 below; provided, however, that the Commencement Date shall not occur prior to the date set forth in Section 1.8. If the actual Commencement Date does not occur on the first day of a calendar month, the term of this Lease shall be extended by the number of days between the actual Commencement Date and the first day of the next calendar month, it being the intention of Landlord and Tenant that the term of the Lease end on the last day of a calendar month. When the actual Commencement Date is established by Landlord, Landlord shall complete the letter attached hereto as Exhibit B and Tenant shall, within five (5) days after Landlord's request, execute the letter and deliver it to Landlord. Tenant's failure to execute the letter within said five (5) day period shall be a default hereunder and shall constitute Tenant's acknowledgment of the truth of the facts contained in the letter delivered by Landlord to Tenant.

3.2     **DELAY IN POSSESSION**. Notwithstanding the estimated Commencement Date specified in Section 1.8, if for any reason Landlord cannot deliver possession of the Premises to Tenant on said date or any other date, Landlord shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Tenant hereunder; provided, however, in such a case, Tenant shall not be obligated to pay rent or perform any other obligation of Tenant under this Lease, except as may be otherwise provided in this Lease, until possession of the Premises is tendered to Tenant, as defined in Section 3.4. If Landlord shall not have tendered possession of the Premises to Tenant within one hundred eighty (180) days following the estimated Commencement Date specified in Section 1.8, as the same may be adjusted in accordance with this Section 3.2 or Section 3.3 or in accordance with the terms of any work letter agreement attached to this Lease, Tenant may, at Tenant's option, by notice in writing to Landlord within ten (10) days after the expiration of the one hundred eighty (180) day period, terminate this Lease. If Tenant terminates this Lease as provided in the preceding sentence, the parties shall be discharged from all obligations hereunder, except that Landlord shall return any money previously deposited with Landlord by Tenant; and provided further, that if such written notice by Tenant is not received by Landlord within said ten (10) day period, Tenant shall not have the right to terminate this Lease as provided above unless Landlord fails to tender possession of the Premises to Tenant within three hundred sixty (360) days following the estimated Commencement Date specified in Section 1.8, as the same may be adjusted in accordance with this Section 3.2 or Section 3.3 or in accordance with the terms of any work letter agreement attached to this Lease. If Landlord is unable to deliver possession of the Premises to Tenant on the estimated Commencement Date specified in Section 1.8, as the same may be adjusted in accordance with this Section 3.2 or Section 3.3 or in accordance with any work letter agreement attached to this Lease, due to a Force Majeure Event (as defined below), such estimated Commencement Date shall be extended by the period of the delay caused by the Force Majeure Event. A "**Force Majeure Event**" shall mean fire, earthquake, weather delays or other acts of God, strikes, boycotts, war, riot, insurrection, embargoes, shortages of equipment, labor or materials, delays in issuance of governmental permits or approvals, or any other cause beyond the reasonable control of Landlord.

3.3     **DELAYS CAUSED BY TENANT**. There shall be no abatement of rent, and the one hundred eighty (180) day period and the three hundred sixty (360) day period specified in Section 3.2 shall be deemed extended, to the extent of any delays caused by acts or omissions of Tenant, Tenant's agents, employees and contractors, or for Tenant delays as defined in any work letter agreement attached to this Lease, if any (hereinafter "**Tenant Delays**"). Tenant shall pay to Landlord an amount equal to one thirtieth (1/30th) of the Base Rent and Tenant's Percentage Share of Operating Expenses due for the first full calendar month of the Lease term for each day of Tenant Delay. For purposes of the foregoing calculation, the Base Rent

3

21

payable for the first full calendar month of the term of this Lease shall not be reduced by any abated rent, conditionally waived rent, free rent or similar rental concessions, if any. Landlord and Tenant agree that the foregoing payment constitutes a fair and reasonable estimate of the damages Landlord will incur as the result of a Tenant Delay. Within thirty (30) days after Landlord tenders possession of the Premises to Tenant, Landlord shall notify Tenant of Landlord's reasonable estimate of the date Landlord could have delivered possession of the Premises to Tenant but for the Tenant Delays. After delivery of said notice, Tenant shall immediately pay to Landlord the amount described above for the period of Tenant Delay.

3.4 **TENDER OF POSSESSION**. Possession of the Premises shall be deemed tendered to Tenant when Landlord's architect or agent has determined that (a) the Improvements (as defined in the Addendum to this Lease) are substantially completed, (b) the Project utilities are ready for use in the Premises, (c) Tenant has reasonable access to the Premises, and (d) Landlord has offered Tenant possession of the Premises. The Improvements shall be deemed "substantially" completed when the Improvements have been completed except for minor items or defects which can be completed or remedied after Tenant occupies the Premises without causing substantial interference with Tenant's use of the Premises.

3.5 **EARLY POSSESSION**. If Tenant occupies the Premises prior to the Commencement Date, such occupancy shall be subject to all provisions of this Lease, such occupancy shall not change the termination date, and, except as provided below, Tenant shall pay Base Rent and all other charges provided for in this Lease during the period of such occupancy. Provided that Tenant does not interfere with or delay the completion by Landlord or its agents or contractors of the construction of any tenant improvements, and provided Landlord has possession of the Premises, Tenant shall have the right to enter the Premises up to sixteen (16) days prior to the anticipated Commencement Date for the sole purpose of installing furniture, trade fixtures, equipment, and similar items, and Tenant shall have no obligation to begin paying Base Rent or other charges based solely on its installation of these items. Tenant shall be liable for any damages or delays caused by Tenant's activities at the Premises. Prior to entering the Premises, Tenant shall obtain all insurance it is required to obtain by the Lease and shall provide certificates of said insurance to Landlord. Tenant shall coordinate such entry with Landlord's manager, and such entry shall be made in compliance with all terms and conditions of this Lease and the Rules and Regulations attached hereto.

4. **USE**.

4.1 **PERMITTED USE**. The Premises shall be used only for the purpose described in Section 1.6 and for no other purpose. In no event shall any portion of the Premises be used for retail sales. Tenant shall not initiate, submit an application for, or otherwise request, any land use approvals or entitlements with respect to the Premises or any other portion of the Project, including, without limitation, any variance, conditional use permit or rezoning, without first obtaining Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion. Tenant shall not (a) permit any animals or pets to be brought to or kept in the Premises, (b) install any antenna, dish or other device on the roof of the Building or outside of the Premises, (c) make any penetrations into the roof of the Building, (d) place loads upon floors, walls or ceilings in excess of the load such items were designed to carry, (e) place or store, nor permit any other person or entity to place or store, any property, equipment, materials, supplies or other items outside of the Building in which the Premises is located or (f) change the exterior of the Premises or the Building in which the Premises is located. In no event shall Tenant use all or any part of the Premises for the production, processing, sale or distribution of marijuana. Tenant acknowledges that it has satisfied itself by its own independent investigation that the Premises and the Project are suitable for its intended use and that its use is permitted by applicable laws and regulations, and that neither Landlord nor Landlord's agents have made any representation or warranty as to the present or future suitability of the Premises, or the Project for the conduct of Tenant's business.

4.2 **COMPLIANCE WITH LAWS**. Tenant shall, at Tenant's sole expense, promptly comply with all applicable laws, ordinances, rules, regulations, orders, certificates of occupancy, conditional use or other permits, variances, covenants, conditions, restrictions, easements, the recommendations of Landlord's engineers or other consultants, and requirements of any fire insurance underwriters, rating bureaus or government agencies, now in effect or which may hereafter come into effect, whether or not they reflect a change in policy from that now existing, during the term or any part of the term hereof, relating in any manner to the Premises or the occupation and use by Tenant of the Premises. Tenant shall, at Tenant's sole expense, comply with all accessibility requirements of State and Federal law that apply to the Premises, and all federal, state and local laws and regulations governing occupational safety and health. Tenant acknowledges that it will be responsible for complying with current and future laws and regulations even though such compliance requires Tenant to make substantial repairs or modifications (including structural modifications) to the Premises and even though the application of the law or regulation is unrelated to Tenant's specific use of the Premises. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance, create a dangerous situation, or would disturb, unreasonably interfere with or endanger Landlord or any other tenants of the Project. Tenant shall obtain, at its sole expense, any permit or other governmental authorization required to operate its business from the Premises. Landlord shall not be liable for the failure of any other tenant or person to abide by the requirements of this section or to otherwise comply with applicable laws and regulations, and Tenant shall not be excused from the performance of its obligations under this Lease due to such a failure. To Landlord's actual knowledge, the Premises has not undergone an inspection by a certified access specialist. In addition, to Landlord's actual knowledge, a disability access inspection certificate for the Premises has not been issued. Pursuant to Section 1938 of the California Civil Code, Landlord hereby provides the following notification to Tenant: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential

4

occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction related accessibility standards within the premises." Landlord's actual knowledge shall mean and be limited to the actual knowledge of the person who is the Building owner's asset manager (not the Building's property manager) on the date set forth in Section 1.1, without any duty of inquiry or investigation, and such asset manager shall have no personal liability if such representation or warranty is untrue.

4.3     **OCCUPANT DENSITY**.  Tenant shall maintain a ratio of not more than one Occupant (as defined below) for each four hundred ninety (490) square feet of leasable area in the Premises (hereinafter, the "**Occupant Density**").  If Landlord has a reasonable basis to believe that Tenant is exceeding the Occupant Density, upon request by Landlord, Tenant shall maintain on a daily basis an accurate record of the number of employees, visitors, contractors and other people that visit the Premises (collectively "**Occupants**").  Landlord shall have the right to audit Tenant's Occupant record and, at Landlord's option, Landlord shall have the right to periodically visit the Premises without advance notice to Tenant in order to track the number of Occupants working at the Premises.  For purposes of this section, "Occupants" shall not include people not employed by Tenant that deliver or pick up mail or other packages at the Premises, employees of Landlord or employees of Landlord's agents or contractors. Tenant's failure to comply with the requirements of this section shall constitute a default under Section 17.1 and Landlord shall have the right, in addition to any other remedies it may have at law or equity, to specifically enforce Tenant's obligations under this section.  Nothing contained in this section shall be interpreted to entitle Tenant to use more parking spaces than the number permitted by Section 1.13.

5.     **BASE RENT**.  Tenant shall pay Base Rent in the amount set forth on the first page of this Lease.  At the time Tenant executes this Lease it shall pay to Landlord the amounts set forth in Sections 1.10 and 1.12. Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent and Operating Expenses on or before the first day of each calendar month succeeding the Commencement Date.  Payments of Base Rent and Operating Expenses for any fractional calendar month shall be prorated.  All payments required to be made by Tenant to Landlord hereunder shall be payable at such address as Landlord may specify from time to time by written notice delivered in accordance herewith.  Tenant shall have no right at any time to abate, reduce, or set off any rent due hereunder except where expressly provided in this Lease.

6.     **OPERATING EXPENSE PAYMENTS**.

6.1     **OPERATING EXPENSES**.  Tenant shall pay Tenant's Percentage Share (as defined below) of the Operating Expenses for the Project.  For the purposes of this Lease, the term "**Operating Expenses**" shall mean all expenses and disbursements of every kind (subject to the limitations set forth below) which Landlord incurs, pays or becomes obligated to pay in connection with the ownership, operation, and maintenance of the Project (including the associated Common Areas), including, but not limited to, the following:

(a)     wages and salaries (including management fees) of all employees, agents, consultants and other individuals or entities engaged in the operation, repair, replacement, maintenance, and security of the Project, including taxes, insurance and benefits relating thereto;

(b)     all supplies and materials used in the operation, maintenance, repair, replacement, and security of the Project;

(c)     annual cost of all Capital Improvements (as defined below) made to the Project which although capital in nature can reasonably be expected to reduce the normal operating costs of the Project, as well as all Capital Improvements made in order to comply with any law now or hereafter promulgated by any governmental authority, as amortized over the useful economic life of such improvements as determined by Landlord in its reasonable discretion (without regard to the period over which such improvements may be depreciated or amortized for federal income tax purposes) together with an interest factor on the unamortized cost of such item equal to the lesser of twelve percent (12%) per annum or the maximum rate of interest permitted by applicable law;

(d)     cost of all utilities paid by Landlord;

(e)     cost of any insurance or insurance related expense applicable to the Project and Landlord's personal property used in connection therewith, including, but not limited to, the insurance costs described in Section 10.2;

(f)     cost of repairs, replacements and general maintenance of the Project (including all truck court areas, paving and parking areas, Common Area lighting facilities, fences, gates, water lines, sewer lines, rail spur areas and any other item Landlord is obligated to repair or maintain), other than costs necessary to assure the structural soundness of the roof, foundation and exterior walls of the Project which are payable solely by Landlord under Section 11;

(g)     cost of service or maintenance contracts with independent contractors for the operation, maintenance, repair, replacement or security of the Project (including, without limitation, alarm service, exterior painting, trash collection, snow, ice, debris and waste removal and landscape maintenance);

(h)    the cost of all accounting fees, management fees, legal fees and consulting fees attributable to the operation, ownership, management, maintenance or repair of the Project;

(i)    payments made by Landlord under any easement, license, operating agreement, declaration, restrictive covenant or other agreement relating to the sharing of costs among property owners;

(j)    reserves created by Landlord, in Landlord's sole discretion, for future Operating Expenses or the future replacement of Capital Improvements;

(k)    the cost of all business licenses, permits or similar fees relating to the operation, ownership, repair or maintenance of the Project;

(l)    the cost of all Real Property Taxes; and

(m)    the cost of any other item the cost of which is stated in this Lease to be an Operating Expense.

For purposes of this Lease, a "**Capital Improvement**" shall be an improvement to the Project that Landlord is obligated or permitted to make pursuant to this Lease, the cost of which is not fully deductible in the year incurred in accordance with generally accepted accounting principles; provided, however, that, at Landlord's option, the following items shall be treated as expenses and not Capital Improvements, and the entire cost of these items may be included in Operating Expenses in the year incurred:  (i) the cost of painting all or part of the Project, (ii) the cost of resurfacing and restriping roadways and parking areas, (iii) the cost of any items Tenant is obligated to pay for pursuant to Section 12 that Landlord elects, in its sole discretion, to include in Operating Expenses and (iv) the cost of Capital Improvements incurred in any calendar year to the extent the cost of the Capital Improvements are less than $25,000.  References to facilities, services, utilities or other items in this section shall not impose an obligation on Landlord to have said facilities or to provide said services unless such facilities and services already exist at the Project.

6.2    *OPERATING EXPENSE EXCLUSIONS.*  Notwithstanding anything to the contrary contained herein, for purposes of this Lease, the term "**Operating Expenses**" shall not include the following: (i) costs (including permit, license and inspection fees) incurred for tenant improvements for other tenants within the Project; (ii) legal and auditing fees (other than those fees reasonably incurred in connection with the maintenance and operation of all or any portion of the Project), leasing commissions, advertising expenses and similar costs incurred in connection with the leasing of the Project; (iii) depreciation of the Building or any other improvements situated within the Project; (iv) any items for which Landlord is actually reimbursed by insurance or by direct reimbursement by any other tenant of the Project; (v) costs of repairs or other work necessitated by fire, windstorm or other casualty (excluding any deductibles) and/or costs of repair or other work necessitated by the exercise of the right of eminent domain to the extent insurance proceeds or a condemnation award, as applicable, is actually received by Landlord for such purposes; provided, such costs of repairs or other work shall be paid by the parties in accordance with the provisions of Sections 11 and 12, below; (vi) other than any interest charges for Capital Improvements referred to in Section 6.1(c) hereinabove, any interest or payments on any financing for the Building or the Project and interest and penalties incurred as a result of Landlord's late payment of any invoice; (vii) costs associated with the investigation and/or remediation of Hazardous Materials (hereafter defined) present in, on or about any portion of the Project, unless such costs and expenses are the responsibility of Tenant as provided in Section 27 hereof, in which event such costs and expenses shall be paid solely by Tenant in accordance with the provisions of Section 27 hereof; (viii) overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for goods and/or services in the Project to the extent the same exceeds the costs of such by unaffiliated third parties on a competitive basis; (ix) any payments under a ground lease or master lease; and (x) except as provided above, the cost of Capital Improvements.

6.3    *PAYMENT.*  Tenant's Percentage Share of Operating Expenses shall be payable by Tenant within ten (10) days after a reasonably detailed statement of actual expenses is presented to Tenant by Landlord.  At Landlord's option, however, Landlord may, from time to time, estimate what Tenant's Percentage Share of Operating Expenses will be, and the same shall be payable by Tenant monthly during each calendar year of the Lease term, on the same day as the Base Rent is due hereunder.  In the event that Tenant pays Landlord's estimate of Tenant's Percentage Share of Operating Expenses, Landlord shall use its commercially reasonable efforts to deliver to Tenant within one hundred eighty (180) days after the expiration of each calendar year a reasonably detailed statement (the "**Statement**") showing Tenant's Percentage Share of the actual Operating Expenses incurred during such year.  Landlord's failure to deliver the Statement to Tenant within said period shall not constitute Landlord's waiver of its right to collect said amounts or otherwise prejudice Landlord's rights hereunder.  If Tenant's payments under this section during said calendar year exceed Tenant's Percentage Share as indicated on the Statement, Tenant shall be entitled to credit the amount of such overpayment against Tenant's Percentage Share of Operating Expenses next falling due.  If Tenant's payments under this section during said calendar year were less than Tenant's Percentage Share as indicated on the Statement, Tenant shall pay to Landlord the amount of the deficiency within thirty (30) days after delivery by Landlord to Tenant of the Statement.  Landlord and Tenant shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last calendar year for which Tenant is responsible for Operating Expenses, notwithstanding that the Lease term may have terminated before the end of such calendar year; and this provision shall survive the expiration or earlier termination of the Lease.

6.4    *TENANT'S PERCENTAGE SHARE*.    "**Tenant's Percentage Share**" as used in this Lease shall mean the percentage of the cost of Operating Expenses for which Tenant is obligated to reimburse Landlord pursuant to this Lease. Notwithstanding anything to the contrary contained in Section 1.11, Landlord shall have the right to determine Tenant's Percentage Share of the cost of Operating Expenses using any one of the following methods or any combination of the following methods, and Tenant hereby agrees that the following methods of allocation are reasonable: (a) by multiplying the cost of all Operating Expenses by a fraction, the numerator of which is the number of square feet of leasable space in the Premises and the denominator of which is the number of square feet of leasable space in all buildings in the Project; or (b) with respect to an Operating Expense attributable solely to the Building in which the Premises is located, requiring Tenant to pay that portion of the cost of the Operating Expense that is obtained by multiplying such cost by a fraction, the numerator of which is the number of square feet of leasable space in the Premises and the denominator of which is the number of square feet of leasable space in the Building in which the Premises is located or (c) by allocating an Operating Expense in any other reasonable manner, as determined by Landlord.

6.5    *AUDITS*.    If Tenant disputes the amount set forth in the Statement, Tenant shall have the right, at Tenant's sole expense, not later than one hundred eighty (180) days following receipt of such Statement, to cause Landlord's books and records with respect to the calendar year which is the subject of the Statement to be audited by a certified public accountant mutually acceptable to Landlord and Tenant. The audit shall take place at the offices of Landlord where its books and records are located at a mutually convenient time during Landlord's regular business hours. Tenant's Percentage Share of Operating Expenses shall be appropriately adjusted based upon the results of such audit, and the results of such audit shall be final and binding upon Landlord and Tenant. Tenant shall have no right to conduct an audit or to give Landlord notice that it desires to conduct an audit at any time Tenant is in default under the Lease. The accountant conducting the audit shall be compensated on an hourly basis and shall not be compensated based upon a percentage of overcharges it discovers. No subtenant shall have any right to conduct an audit, and no assignee shall conduct an audit for any period during which such assignee was not in possession of the Premises. Tenant's right to undertake an audit with respect to any calendar year shall expire one hundred eighty (180) days after Tenant's receipt of the Statement for such calendar year, and such Statement shall be final and binding upon Tenant and shall, as between the parties, be conclusively deemed correct, at the end of such one hundred eighty (180) day period, unless prior thereto Tenant shall have given Landlord written notice of its intention to audit Operating Expenses for the calendar year which is the subject of the Statement. If Tenant gives Landlord notice of its intention to audit Operating Expenses, it must commence such audit within sixty (60) days after such notice is delivered to Landlord, and the audit must be completed within one hundred twenty (120) days after such notice is delivered to Landlord. If Tenant does not commence and complete the audit within such periods, the Statement which Tenant elected to audit shall be deemed final and binding upon Tenant and shall, as between the parties, be conclusively deemed correct. Tenant agrees that the results of any Operating Expense audit shall be kept strictly confidential by Tenant and shall not be disclosed to any other person or entity. If as a result of an audit, it is determined that Landlord has overstated the Operating Expenses owed by Tenant on a Statement by more than five percent (5%) of the actual Operating Expenses owed by Tenant, Landlord shall reimburse Tenant for the reasonable out of pocket costs Tenant paid to unrelated third parties for the performance of the audit; provided, however, Landlord shall not be obligated to reimburse Tenant for more than $2,500.00of expenses with respect to any one audit.

7.    *SECURITY DEPOSIT*.    Tenant shall deliver to Landlord at the time it executes this Lease the security deposit set forth in Section 1.12 as security for Tenant's faithful performance of Tenant's obligations hereunder. If Tenant fails to pay Base Rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Lease, Landlord may use all or any portion of said deposit for the payment of any Base Rent or other charge due hereunder, to pay any other sum to which Landlord may become obligated by reason of Tenant's default, or to compensate Landlord for any loss or damage which Landlord may suffer thereby. If Landlord so uses or applies all or any portion of said deposit, Tenant shall within ten (10) days after written demand therefore deposit cash with Landlord in an amount sufficient to restore said deposit to its full amount. Landlord shall not be required to keep said security deposit separate from its general accounts. If Tenant performs all of Tenant's obligations hereunder, said deposit, or so much thereof as has not heretofore been applied by Landlord, shall be returned, without payment of interest or other amount for its use, to Tenant (or, at Landlord's option, to the last assignee, if any, of Tenant's interest hereunder) at the expiration of the term hereof, and after Tenant has vacated the Premises. No trust relationship is created herein between Landlord and Tenant with respect to said security deposit. Tenant acknowledges that the security deposit is not an advance payment of any kind or a measure of Landlord's damages in the event of Tenant's default. Tenant hereby waives the provisions of any law which is inconsistent with this section including, but not limited to, Section 1950.7 of the California Civil Code.

8.    *UTILITIES*.

8.1    *PAYMENT*.    Tenant shall pay for all water, gas, electricity, telephone, sewer, sprinkler services, refuse and trash collection and other utilities and services used on the Premises, together with any taxes, penalties, surcharges or the like pertaining thereto. At Landlord's option, Tenant shall (a) contract directly with the applicable public utility for such services, (b) Landlord shall pay the cost of such services and Tenant shall reimburse Landlord for such costs as part of Operating Expenses or (c) Landlord shall pay the cost of such services and Tenant shall reimburse Landlord for such costs based on Landlord's estimate of Tenant's consumption, as reasonably determined by Landlord. Tenant agrees to limit use of water and sewer for normal restroom use, and nothing herein contained shall impose upon Landlord any duty to provide sewer or water usage for other than normal restroom usage.

8.2     *INTERRUPTIONS*.  Tenant agrees that Landlord shall not be liable to Tenant for its failure to furnish water, gas, electricity, telephone, sewer, refuse and trash collection or any other utility services or building services when such failure is occasioned, in whole or in part, by repairs, replacements or improvements, by any strike, lockout or other labor trouble, by inability to secure electricity, gas, water, telephone service or other utility at the Project, by any accident, casualty or event arising from any cause whatsoever, including the negligence of Landlord, its employees, agents and contractors, by act, negligence or default of Tenant or any other person or entity, or by any other cause, and such failures shall never be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from the obligation of paying rent or performing any of its obligations under this Lease.  Furthermore, Landlord shall not be liable under any circumstances for loss of property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in connection with or incidental to a failure to furnish any such services or utilities. Landlord may comply with voluntary controls or guidelines promulgated by any governmental entity relating to the use or conservation of energy, water, gas, light or electricity or the reduction of automobile or other emissions without creating any liability of Landlord to Tenant under this Lease.

8.3     *RAILROAD SPURS*.  If the Premises is served by a railroad spur, Tenant shall execute any agreement required by the railroad company serving the railroad spur, and such agreement shall be satisfactory to Landlord, in Landlord's sole discretion.  Tenant shall pay the cost of maintaining the railroad spur, at Tenant's sole cost and expense.

8.4.    *ALTERNATIVE UTILITY PROVIDERS*.  If permitted by applicable laws, Landlord shall have the right at any time and from time to time during the term of this Lease to either contract for service from a different company or companies (each such company referred to as an "**Alternate Service Provider**") other than the company or companies presently providing electrical service for the Project (the "**Electric Service Provider**") or continue to contract for service from the Electric Service Provider, at Landlord's sole discretion.  Tenant agrees to cooperate with Landlord, the Electric Service Provider, and an Alternate Service Provider at all times and, as reasonably necessary, shall allow Landlord, the Electric Service Provider, and any Alternate Service Provider reasonable access to the Building's electric lines, feeders, risers, wiring and any other machinery within the Premises.

8.5     *ENERGY USE*.  Landlord shall have the right to require Tenant to provide Landlord with copies of bills from electricity, natural gas or similar energy providers (collectively, "**Energy Providers**") Tenant receives from Energy Providers relating to Tenant's energy use at the Premises ("**Energy Bills**") within ten (10) days after Landlord's written request.  In addition, Tenant hereby authorizes Landlord to obtain copies of the Energy Bills directly from the Energy Provider(s), and Tenant hereby authorizes each Energy Provider to provide Energy Bills and related usage information directly to Landlord without Tenant's consent.  From time to time within ten (10) days after Landlord's request, Tenant shall execute and deliver to Landlord an agreement provided by Landlord authorizing the Energy Provider(s) to provide to Landlord Energy Bills and other information relating to Tenant's energy usage at the Premises.

9.      *REAL AND PERSONAL PROPERTY TAXES*.

9.1     *PAYMENT OF TAXES*.  Tenant shall pay Real Property Taxes as part of Operating Expenses.

9.2     *DEFINITION OF REAL PROPERTY TAX*.  As used herein, the term "**Real Property Taxes**" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, improvement bond or bonds imposed on the Project or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Landlord in the Project or in any portion thereof.  Real Property Taxes shall not include income, inheritance and gift taxes.

9.3     *PERSONAL PROPERTY TAXES*.  Tenant shall pay prior to delinquency all taxes assessed against and levied upon trade fixtures, furnishings, equipment and all other personal property of Tenant contained in the Premises or related to Tenant's use of the Premises.  If any of Tenant's personal property shall be assessed with Landlord's real or personal property, Tenant shall pay to Landlord the taxes attributable to Tenant within ten (10) days after receipt of a written statement from Landlord setting forth the taxes applicable to Tenant's property.

9.4     *REASSESSMENTS*.  From time to time Landlord may challenge the assessed value of the Project as determined by applicable taxing authorities and/or Landlord may attempt to cause the Real Property Taxes to be reduced on other grounds. If Landlord is successful in causing the Real Property Taxes to be reduced or in obtaining a refund, rebate, credit or similar benefit (hereinafter collectively referred to as a "**Reduction**"), Landlord shall, to the extent practicable, credit the Reduction(s) to Real Property Taxes for the calendar year to which a Reduction applies and recalculate the Real Property Taxes owed by Tenant for that year based on the reduced Real Property Taxes.  All costs incurred by Landlord in connection with obtaining and/or processing the Real Property Tax reductions (e.g., consulting fees, accounting fees etc.) may be included in Operating Expenses or deducted from the Reduction.  Landlord shall have the right to compensate a person or entity it employs to obtain a Reduction by giving such person or entity a percentage of any Reduction obtained.

10.     *INSURANCE*.

10.1    *INSURANCE-TENANT*.

8

(a)      Tenant shall obtain and keep in force during the term of this Lease a commercial general liability policy of insurance with coverages acceptable to Landlord, in Landlord's reasonable discretion, which, by way of example and not limitation, protects Tenant and Landlord (as an additional insured) against claims for bodily injury, personal injury and property damage based upon, involving or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing coverage in an amount not less than $2,000,000 per occurrence and not less than $3,000,000 in the aggregate with an "Additional Insured-Managers and Landlords of Premises Endorsement" and contain the "Amendment of the Pollution Exclusion" for damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease.

(b)      Tenant shall obtain and keep in force during the term of this Lease "Causes of Loss – Special Form" extended coverage property insurance (previously known as "all risk" property insurance) with coverages acceptable to Landlord, in Landlord's reasonable discretion. Said insurance shall be written on a one hundred percent (100%) replacement cost basis on Tenant's personal property, all tenant improvements installed at the Premises by Landlord or Tenant, Tenant's trade fixtures and other property. By way of example, and not limitation, such policies shall provide protection against any peril included within the classification "fire and extended coverage," against vandalism and malicious mischief, theft and sprinkler leakage. Tenant's policy shall include endorsements to insure Tenant against losses to valuable papers, records and computer equipment and to compensate Tenant for the cost of recovering lost data. To the extent that Tenant's policy covers tenant improvements to the Premises, Landlord shall be a loss payee on such policy. Tenant shall also obtain earthquake insurance, and if the Project is in Flood Zone A or V, Tenant shall obtain flood insurance, and the terms of such insurance policies shall be reasonably acceptable to Landlord.

(c)      Tenant shall obtain and keep in force during the term of this Lease insurance for pollution liability and clean-up costs with coverages acceptable to Landlord, in Landlord's reasonable discretion, which by way of example and not limitation, protects against liability for cleanup costs, bodily injury and property damage, defense costs and contractual liability. Such insurance shall provide coverage of not less $3,000,000 per occurrence and $5,000,000 in the aggregate.

(d)      Tenant shall, at all times during the term hereof, maintain the following insurance with coverages reasonably acceptable to Landlord: (i) workers' compensation insurance as required by applicable law, (ii) employers liability insurance with limits of at least $1,000,000 per occurrence, (iii) automobile liability insurance for owned, non-owned and hired vehicles with limits of at least $1,000,000 per occurrence and (iv) business interruption and extra expense insurance. In addition to the insurance required in (i), (ii), (iii) and (iv) above, Landlord shall have the right to require Tenant to increase the limits of its insurance and/or obtain such additional insurance as is customarily required by landlords owning similar real property in the geographical area of the Project.

10.2    *INSURANCE-LANDLORD.*

(a)      Landlord shall obtain and keep in force a policy of general liability insurance with coverage against such risks and in such amounts as Landlord deems advisable insuring Landlord against liability arising out of the ownership, operation and management of the Project.

(b)      Landlord shall also obtain and keep in force during the term of this Lease a policy or policies of insurance covering loss or damage to the Project in the amount of the replacement cost thereof (excluding foundations and similar items), as determined by Landlord from time to time. The terms and conditions of said policies, their deductibles and the perils and risks covered thereby shall be determined by Landlord, from time to time, in Landlord's sole discretion. By way of example, and not limitation, Landlord may purchase flood and/or earthquake insurance. In addition, at Landlord's option, Landlord shall obtain and keep in force, during the term of this Lease, a policy of rental interruption insurance, with loss payable to Landlord, which insurance shall, at Landlord's option, also cover all Operating Expenses. Tenant will not be named as an additional insured in any insurance policies carried by Landlord and shall have no right to any proceeds therefrom. The policies purchased by Landlord shall contain such deductibles as Landlord may determine. Tenant shall pay at Tenant's sole expense any increase in the property insurance premiums for the Project over what was payable immediately prior to the increase to the extent the increase is specified by Landlord's insurance carrier as being caused by the nature of Tenant's occupancy or any act or omission of Tenant.

10.3    *INSURANCE POLICIES.* Tenant shall deliver to Landlord certificates of the insurance policies required under Section 10.1 concurrently with Tenant's execution of this Lease using an ACORD 28 form or a similar form approved by Landlord. Tenant's insurance policies shall not be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Landlord. Tenant shall, at least thirty (30) days prior to the expiration of such policies, furnish Landlord with renewals thereof. Tenant's insurance policies shall be issued by insurance companies authorized to do business in the state in which the Project is located, and said companies shall maintain during the policy term a "General Policyholder's Rating" of at least A and a financial rating of at least "Class X" (or such other rating as may be required by any lender having a lien on the Project) as set forth in the most recent edition of "Best Insurance Reports." All insurance obtained by Tenant shall be primary to and not contributory with any similar insurance carried by Landlord, whose insurance shall be considered excess insurance only. Landlord, Landlord's property manager and lender(s) and their respective officers,

9

shareholders, directors, partners, members, managers, employees, successors and assigns, shall be included as additional insureds under Tenant's commercial general liability policy, the pollution liability policy and under the Tenant's excess or umbrella policy, if any, using ISO additional insured endorsement CG 20 11 or a substitute providing equivalent coverage. Tenant's insurance policies shall not include deductibles in excess of $5,000.

10.4   **WAIVER OF SUBROGATION.**  Landlord waives any and all rights of recovery against Tenant and Tenant's employees and agents for or arising out of damage to, or destruction of, the Project to the extent that Landlord's insurance policies then in force insure against such damage or destruction (or to the extent of what would have been covered had Landlord maintained the insurance required to be carried under this Lease) and permit such waiver. Tenant waives any and all rights of recovery against Landlord and Landlord's employees and agents for or arising out of damage to, or destruction of, the Project to the extent that Tenant's insurance policies then in force insure against such damage or destruction (or to the extent of what would have been covered had Tenant maintained the insurance required to be carried under this Lease) and permit such waiver. Tenant shall cause the insurance policies it obtains in accordance with Section 10.1 relating to property damage to provide that the insurance company waives all right of recovery by subrogation against Landlord in connection with any liability or damage covered by Tenant's insurance policies.

10.5   **COVERAGE.**  Landlord makes no representation to Tenant that the limits or forms of coverage specified above or approved by Landlord are adequate to insure Tenant's property or Tenant's obligations under this Lease, and the limits of any insurance carried by Tenant shall not limit Tenant's obligations or liability under any indemnity provision included in this Lease or under any other provision of this Lease.

11.   **LANDLORD'S REPAIRS.**  Landlord shall maintain, at Landlord's expense, only the structural elements of the roof of the Building (excluding the roof membrane), the structural soundness of the foundation of the Building and the structural elements of the exterior walls of the Building. Tenant shall reimburse Landlord for the cost of any maintenance, repair or replacement of the foregoing necessitated by Tenant's misuse, negligence and alterations to the Premises or any breach of its obligations under this Lease. By way of example, and not limitation, the term "**exterior walls**" as used in this section shall not include windows, glass or plate glass, doors or overhead doors, special store fronts, dock bumpers, dock plates or levelers, or office entries. Tenant shall immediately give Landlord written notice of any repair required by Landlord pursuant to this section, after which Landlord shall have a reasonable time in which to complete the repair. Nothing contained in this section shall be construed to obligate Landlord to seal or otherwise maintain the surface of any foundation, floor or slab. Tenant expressly waives the benefits of any statute now or hereafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Premises in good order, condition and repair.

12.   **TENANT'S REPAIRS.**

12.1   **OBLIGATIONS OF TENANT.**  Subject to Section 12.2 below, Tenant shall, at its sole cost and expense, keep and maintain all parts of the Premises (except those listed as Landlord's responsibility in Section 11 above) in good and sanitary condition, promptly making all necessary repairs and replacements, including but not limited to, windows, glass and plate glass, doors, skylights, roof membranes, any special store front or office entry, walls and finish work, floors and floor coverings, heating and air conditioning systems, dock boards, bumpers, plates, seals, levelers and lights, plumbing work and fixtures (including periodic backflow testing), electrical systems, lighting facilities and bulbs, sprinkler systems, alarm systems, fire detection systems, termite and pest extermination, sidewalks, landscaped areas, fencing, tenant signage and regular removal of trash and debris. Tenant shall notify Landlord in writing prior to making any repair or performing any maintenance pursuant to this section, and Landlord shall have the right to designate the contractor Tenant shall use to make any repair or to perform any maintenance on the roof, heating, ventilation and air conditioning systems ("**HVAC**"), plumbing systems, electrical systems, sprinkler systems, fire alarm systems or fire detection systems located at the Premises. Tenant shall not paint or otherwise change the exterior appearance of the Premises without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion. The cost of maintenance and repair of any common party wall (any wall, divider, partition or any other structure separating the Premises from any adjacent premises occupied by other tenants) shall be shared equally by Tenant and the tenant occupying the adjacent premises; provided, however, if Tenant damages a party wall the entire cost of the repair shall be paid by Tenant, at Tenant's sole expense. Tenant shall not damage any party wall or disturb the integrity and support provided by any party wall. If Tenant fails to keep the Premises in good condition and repair, Landlord may, but shall not be obligated to, make any necessary repairs. If Landlord makes such repairs, Landlord may bill Tenant for the cost of the repairs as additional rent, and said additional rent shall be payable by Tenant within ten (10) days after demand by Landlord.

12.2   **PERFORMANCE OF WORK BY LANDLORD.**  Notwithstanding Tenant's obligation to keep the roof membranes, HVAC units, sprinkler systems, fire alarm systems, fire detection systems and exterior walls of the Premises in good condition and repair, Landlord shall employ contractors to perform all repairs, maintenance and replacements of the roof membranes, HVAC units, sprinkler systems, fire alarm systems, fire detection systems and exterior walls of the Premises. The items described in the previous sentence that Landlord will cause to be repaired, maintained and replaced are hereinafter referred to as the "**Landlord Maintenance Items.**" Tenant shall reimburse Landlord as additional rent for all costs Landlord incurs in performing the Landlord Maintenance Items within ten (10) days after written demand by Landlord. Landlord shall determine in its sole discretion the scope and timing of the performance of such Landlord Maintenance Items, and Tenant shall not perform such Landlord Maintenance Items. Landlord's maintenance of the exterior walls of the Premises shall include the right, but not the obligation, of Landlord to paint from time to time all or some of the exterior walls, canopies, doors, windows, gutters, handrails and other exterior parts of the Premises with colors selected by Landlord, and Tenant shall reimburse Landlord as

provided above for all costs incurred by Landlord in painting such items.   If the Premises contains landscaped areas ("**Landscaped Areas**"), Landlord shall maintain the Landscaped Areas, and Tenant shall reimburse Landlord for all costs incurred by Landlord in maintaining the Landscaped Areas within ten (10) days after written demand by Landlord; provided, however, Landlord shall have the right to estimate the monthly cost of maintaining the Landscaped Areas, and Tenant shall pay such amount to Landlord as additional rent each month at the same time Tenant pays Base Rent. Tenant shall immediately give Landlord written notice of any repair or maintenance required by Landlord pursuant to this section, after which Landlord shall have a reasonable time in which to complete such repair or maintenance.  Landlord shall have the right, but not the obligation, to include the cost of Landlord Maintenance Items and the cost of the maintenance of Landscaped Areas in Operating Expenses, and Tenant shall then pay Tenant's Percentage Share of such costs as determined by Landlord.  Landlord shall have the right at any time, and from time to time, to elect upon written notice to Tenant to have Tenant perform some or all of the Landlord Maintenance Items and/or the maintenance of the Landscaped Areas, in which event Tenant shall employ contractors designated by Landlord to perform such work and shall pay for all such work at Tenant's sole cost and expense, all in accordance with the requirements of Section 12.1.

12.3      *MAINTENANCE CONTRACTS*.   Landlord shall enter into regularly scheduled preventative maintenance/service contracts for some or all of the following: the HVAC units servicing the Premises, the sprinkler, fire alarm and fire detection systems servicing the Premises, backflow testing for the plumbing servicing the Premises and for the roof membrane of the Premises (the "**Maintenance Contracts**").   The Maintenance Contracts shall include maintenance services satisfactory to Landlord, in Landlord's sole discretion. Tenant shall reimburse Landlord for the cost of the Maintenance Contracts within ten (10) days after written demand by Landlord; provided, however, Landlord shall have the right to estimate the monthly cost of the Maintenance Contracts, and Tenant shall pay such amount to Landlord as additional rent each month at the same time Tenant pays Base Rent. Landlord shall have the right, but not the obligation, to include the cost of Maintenance Contracts in Operating Expenses, and Tenant shall then pay Tenant's Percentage Share of such costs as determined by Landlord.  Landlord shall have the right at any time, and from time to time, to elect upon written notice to Tenant to have Tenant purchase some or all of the Maintenance Contracts, in which event Tenant shall purchase such contracts from persons designated or approved by Landlord and shall pay for such Maintenance Contracts at Tenant's sole cost and expense.

13.      *ALTERATIONS AND SURRENDER*.

13.1      *CONSENT OF LANDLORD*.   Tenant shall have the right, subject to Landlord's reasonable requirements relating to construction at the Project, upon ten (10) days prior written notice to Landlord, to make alterations ("**Permitted Alterations**") to the inside of the Premises (e.g., paint and carpet, communication systems, telephone and computer system wiring) that do not (i) involve the expenditure of more than $5,000, (ii) affect the exterior appearance of the Building or the roof, (iii) affect the Building's electrical, plumbing, HVAC, life, fire safety or similar Building systems or the structural elements of the Building, (iv) affect the Common Areas or parking areas or (v) materially adversely affect any other tenant of the Project. Except with respect to Permitted Alterations, Tenant shall not, without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion, make any alterations, improvements, additions, utility installations or repairs (hereinafter collectively referred to as "**Non-Permitted Alterations**") in, on or about the Premises or the Project.  References in this Lease to "**Alterations**" shall mean both Permitted Alterations and Non-Permitted Alterations.  Within ten (10) business days after Tenant provides to Landlord a written notice requesting Landlord's decision concerning the approval of Non-Permitted Alterations (a "**Tenant Notice**"), Landlord shall respond to Tenant's request.  Tenant's Notice shall include the information reasonably required by Landlord to respond to Tenant's request (e.g., a detailed description of the Alterations), and the ten (10) business day period shall commence on the date that Landlord has received such information.  If Landlord fails to respond to Tenant's request within such ten (10) business day period, Tenant may give Landlord a second written notice (a "**Second Notice**") again requesting Landlord's decision concerning the approval of Non-Permitted Alterations.  The Second Notice shall expressly state that Landlord's failure to respond to the Second Notice within ten (10) business days will be deemed Landlord's approval of the Non-Permitted Alterations.  If Landlord fails to respond to Tenant's Second Notice within the second ten (10) business day period, Landlord shall be deemed to have approved the Non-Permitted Alterations.  At the expiration of the term, Landlord may require the removal of any Alterations installed by Tenant and the restoration of the Premises and the Project to their prior condition, at Tenant's expense.  If, as a result of any Alteration made by Tenant, Landlord is obligated to comply with the Americans With Disabilities Act or any other law or regulation, and such compliance requires Landlord to make any improvement or Alteration to any portion of the Project, as a condition to Landlord's consent, Landlord shall have the right to require Tenant to pay to Landlord prior to the construction of any Alteration by Tenant the entire cost of any improvement or alteration Landlord is obligated to complete by such law or regulation.  Should Landlord permit Tenant to make its own Alterations, Tenant shall use only such architect and contractor as has been expressly approved by Landlord, and Landlord may require Tenant to provide to Landlord, at Tenant's sole cost and expense, a lien and completion bond in an amount equal to one and one-half times the estimated cost of such Alterations, to insure Landlord against any liability for mechanic's and materialmen's liens and to insure completion of the work.  In addition, Tenant shall pay to Landlord a fee equal to the lesser of (i) the actual amount Landlord pays to its property manager to supervise such Alterations or (ii) three percent (3%) of the cost of the Alterations to compensate Landlord for the overhead and other costs it incurs in reviewing the plans for the Alterations and in monitoring the construction of the Alterations (the "**Landlord Fee**").   If Landlord incurs architectural, engineering or other consultant's fees in evaluating such Alterations, Tenant shall reimburse Landlord for these fees in addition to the Landlord Fee.  If Tenant proposes Alterations to Landlord but subsequently elects not to construct the Alterations, and Landlord has incurred costs in reviewing Tenant's proposed Alterations (e.g., architect's, engineer's or property management fees), Tenant shall reimburse Landlord for the costs incurred by Landlord within ten (10) days after written demand.  Should Tenant make any Alterations without the prior approval of Landlord, or use a contractor not expressly approved by Landlord, Landlord may, at any time during the term of this Lease,

require that Tenant remove all or part of the Alterations and return the Premises to the condition it was in prior to the making of the Alterations.  In the event Tenant makes any Alterations, Tenant agrees to obtain or cause its contractor to obtain, prior to the commencement of any work, "builders all risk" insurance in an amount approved by Landlord, workers compensation insurance and any other insurance requested by Landlord, in Landlord's sole discretion.

13.2    **PERMITS**.  Any Alterations in or about the Premises that Tenant shall desire to make shall be presented to Landlord in written form, with plans and specifications which are sufficiently detailed to obtain a building permit, if a building permit is required.  If Landlord consents to an Alteration and the Alteration requires a building permit, the consent shall be deemed conditioned upon Tenant acquiring a building permit from the applicable governmental agencies, furnishing a copy thereof to Landlord prior to the commencement of the work, and compliance by Tenant with all conditions of said permit in a prompt and expeditious manner.  Tenant shall provide Landlord with as-built plans and specifications for any Alterations made to the Premises.

13.3    **MECHANICS LIENS**.  Tenant shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Tenant at or for use in the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or the Project, or any interest therein.  If Tenant shall, in good faith, contest the validity of any such lien, Tenant shall furnish to Landlord a surety bond satisfactory to Landlord in an amount equal to not less than one and one-half times the amount of such contested lien claim indemnifying Landlord against liability arising out of such lien or claim.  Such bond shall be sufficient in form and amount to free the Project from the effect of such lien.  In addition, Landlord may require Tenant to pay Landlord's reasonable attorneys' fees and costs incurred as a result of any such lien.

13.4    **NOTICE**.  Tenant shall give Landlord not less than ten (10) days' advance written notice prior to the commencement of any work in the Premises by Tenant, and Landlord shall have the right to post notices of non-responsibility in or on the Premises or the Project.

13.5    **SURRENDER**.  Subject to Landlord's right to require removal or to elect ownership as hereinafter provided, all Alterations made by Tenant to the Premises shall be the property of Tenant, but shall be considered to be a part of the Premises.  Unless Landlord gives Tenant written notice of its election not to become the owner of the Alterations at the end of the term of this Lease, the Alterations shall become the property of Landlord at the end of the term of this Lease.  Landlord may require, on notice to Tenant, that some or all Alterations be removed prior to the end of the term of this Lease and that any damages caused by such removal be repaired at Tenant's sole expense.  On the last day of the term hereof, or on any sooner termination, Tenant shall surrender the Premises (including, but not limited to, all doors, windows, floors and floor coverings, skylights, heating and air conditioning systems, dock boards, truck doors, dock bumpers, plumbing work and fixtures, electrical systems, lighting facilities, sprinkler systems, fire detection systems and nonstructural elements of the exterior walls, foundation and roof (collectively the "**Elements of the Premises**")) to Landlord in the same condition as received, ordinary wear and tear and casualty damage excepted, clean and free of debris and Tenant's personal property, trade fixtures and equipment.  Tenant's personal property shall include all computer wiring and cabling installed by Tenant.  Provided, however, if Landlord has not elected to have Tenant remove the Alterations, Tenant shall leave the Alterations at the Premises in good condition and repair, ordinary wear and tear excepted.  Tenant shall repair any damage to the Premises occasioned by the installation or removal of Tenant's trade fixtures, furnishings and equipment.  Damage to or deterioration of any Element of the Premises or any other item Tenant is required to repair or maintain at the Premises shall not be deemed ordinary wear and tear if the same could have been prevented by good maintenance practices.  If the Premises are not surrendered at the expiration of the term or earlier termination of this Lease in accordance with the provisions of this section, at Landlord's option, Tenant shall continue to be responsible for the payment of Base Rent and all other amounts due under this Lease until the Premises are so surrendered in accordance with said provisions.  Tenant shall indemnify, defend and hold Landlord harmless from and against any and all damages, expenses, costs, losses or liabilities arising from any delay by Tenant in so surrendering the Premises including, without limitation, any damages, expenses, costs, losses or liabilities arising from any claim against Landlord made by any succeeding tenant or prospective tenant founded on or resulting from such delay and losses and damages suffered by Landlord due to lost opportunities to lease any portion of the Premises to any such succeeding tenant or prospective tenant, together with, in each case, actual attorneys' fees and costs.

13.6    **FAILURE OF TENANT TO REMOVE PROPERTY**.  If this Lease is terminated due to the expiration of its term or otherwise, and Tenant fails to remove its property, in addition to any other remedies available to Landlord under this Lease, and subject to any other right or remedy Landlord may have under applicable law, Landlord may remove any property of Tenant from the Premises and store the same elsewhere at the expense and risk of Tenant.

13.7    **ELECTRIC VEHICLE CHARGING STATIONS INSTALLED BY TENANT**.  Under certain circumstances Section 1952.7 of the California Civil Code ("**Section 1952.7**") may permit Tenant to install electric vehicle charging stations ("**Tenant Charging Stations**") in the Project's parking area.  In the event Section 1952.7 does permit Tenant to install Tenant Charging Stations and Tenant elects to install Tenant Charging Stations, the Section of the Rules and Regulations attached hereto that is entitled "Electric Vehicle Charging Stations" shall apply to the Tenant Charging Stations.

14.    **DAMAGE AND DESTRUCTION**.

14.1    **EFFECT OF DAMAGE OR DESTRUCTION**.  If all or part of the Project is damaged by fire, earthquake, flood, explosion, the elements, riot, the release or existence of Hazardous Materials (as defined below) or by any other cause

whatsoever (hereinafter collectively referred to as **"Casualty Damages"**), but the Casualty Damages are not material (as defined in Section 14.2 below), Landlord shall repair the Casualty Damages to the Project as soon as is reasonably possible, and this Lease shall remain in full force and effect. If all or part of the Project is destroyed or materially damaged (as defined in Section 14.2 below), Landlord shall have the right, in its sole and complete discretion, to repair or to rebuild the Project or to terminate this Lease. Landlord shall within ninety (90) days after the discovery of such material damage or destruction notify Tenant in writing of Landlord's intention to repair or to rebuild or to terminate this Lease. Tenant shall in no event be entitled to compensation or damages on account of annoyance or inconvenience in making any repairs, or on account of construction, or on account of Landlord's election to terminate this Lease. Notwithstanding the foregoing, if Landlord shall elect to rebuild or repair the Project after material damage or destruction, but in good faith determines that the Premises cannot be substantially repaired within three hundred sixty (360) days after the date of the discovery of the material damage or destruction, without payment of overtime or other premiums, and the damage to the Project will render the entire Premises unusable during said three hundred sixty (360) day period, Landlord shall notify Tenant thereof in writing at the time of Landlord's election to rebuild or repair, and Tenant shall thereafter have a period of thirty (30) days within which Tenant may elect to terminate this Lease, upon thirty (30) days' advance written notice to Landlord. Tenant's termination right described in the preceding sentence shall not apply if the damage was caused by the negligent or intentional acts of Tenant or its employees, agents, contractors or invitees. Failure of Tenant to exercise said election within said thirty (30) day period shall constitute Tenant's agreement to accept delivery of the Premises under this Lease whenever tendered by Landlord, provided Landlord thereafter pursues reconstruction or restoration diligently to completion, subject to delays caused by Force Majeure Events. If Landlord is unable to repair the damage to the Premises or the Project during such three hundred sixty (360) day period due to Force Majeure Events, the three hundred sixty (360) day period shall be extended by the period of delay caused by the Force Majeure Events. Subject to Section 14.3 below, if Landlord or Tenant terminates this Lease in accordance with this Section 14.1, Tenant shall continue to pay all Base Rent, Operating Expenses and other amounts due hereunder which arise prior to the date of termination.

14.2    *DEFINITION OF MATERIAL DAMAGE.* Damage to the Project shall be deemed material if, in Landlord's reasonable judgment, the uninsured cost of repairing the damage will exceed $25,000. If insurance proceeds are available to Landlord in an amount which is sufficient to pay the entire cost of repairing all of the damage to the Project, the damage shall be deemed material if the cost of repairing the damage exceeds $100,000. Damage to the Project shall also be deemed material if (a) the Project cannot be rebuilt or repaired to substantially the same condition it was in prior to the damage due to laws or regulations in effect at the time the repairs will be made, (b) the holder of any mortgage or deed of trust encumbering the Project requires that insurance proceeds available to repair the damage in excess of $25,000 be applied to the repayment of the indebtedness secured by the mortgage or the deed of trust, or (c) the damage occurs during the last twelve (12) months of the Lease term.

14.3    *ABATEMENT OF RENT.* In the event that Tenant is prevented from using, and does not use, the Premises or any portion thereof, for five (5) consecutive business days (the **"Eligibility Period"**) as a result of damage to the Premises, and the damage was not caused by the negligence or intentional acts of Tenant or its employees, agents, contractors or invitees, then Tenant's Base Rent and Tenant's Share of Operating Expenses shall be abated or reduced, as the case may be, after expiration of the Eligibility Period for such time that Tenant continues to be so prevented from using, and does not use, the Premises or a portion thereof, in the proportion that the leasable area of the portion of the Premises that Tenant is prevented from using, and does not use, bears to the total leasable area of the Premises.

14.4    *TENANT'S ACTS.* If such damage or destruction occurs as a result of the gross negligence or willful misconduct of Tenant or Tenant's employees, agents, contractors or invitees, and the proceeds of insurance which are actually received by Landlord are not sufficient to pay for the repair of all of the damage, Tenant shall pay, at Tenant's sole cost and expense, to Landlord upon demand, the difference between the cost of repairing the damage and the insurance proceeds received by Landlord.

14.5    *TENANT'S PROPERTY.* Landlord shall not be liable to Tenant or its employees, agents, contractors, invitees or customers for loss or damage to merchandise, tenant improvements, fixtures, automobiles, furniture, equipment, computers, files or other property (hereinafter collectively **"Tenant's property"**) located at the Project. Tenant shall repair or replace all of Tenant's property at Tenant's sole cost and expense. Tenant acknowledges that it is Tenant's sole responsibility to obtain adequate insurance coverage to compensate Tenant for damage to Tenant's property.

14.6    *WAIVER.* Landlord and Tenant hereby waive the provisions of any present or future statutes which relate to the termination of leases when leased property is damaged or destroyed and agree that such event shall be governed by the terms of this Lease.

15.    *CONDEMNATION.* If any portion of the Premises or the Project are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called **"condemnation"**), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs; provided that if so much of the Premises or Project are taken by such condemnation as would substantially and adversely affect the operation and profitability of Tenant's business conducted from the Premises, and said taking lasts for ninety (90) days or more, Tenant shall have the option, to be exercised only in writing within thirty (30) days after Landlord shall have given Tenant written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), to terminate this Lease as of the date the condemning authority takes such possession. If a taking lasts for less than ninety (90) days, Tenant's rent shall be abated during said period but Tenant shall not have the right to terminate this Lease. If Tenant does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect

as to the portion of the Premises remaining, except that the Base Rent shall be reduced in the proportion that the usable floor area of the Premises taken bears to the total usable floor area of the Premises. Common Areas taken shall be excluded from the Common Areas usable by Tenant and no reduction of rent shall occur with respect thereto or by reason thereof. Landlord shall have the option in its sole discretion to terminate this Lease as of the taking of possession by the condemning authority, by giving written notice to Tenant of such election within thirty (30) days after receipt of notice of a taking by condemnation of any part of the Premises or the Project. Any award for the taking of all or any part of the Premises or the Project under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Landlord, whether such award shall be made as compensation for diminution in value of the leasehold, for good will, for the taking of the fee, as severance damages, or as damages for tenant improvements; provided, however, that Tenant shall be entitled to any separate award for loss of or damage to Tenant's removable personal property and for moving expenses. In the event that this Lease is not terminated by reason of such condemnation, and subject to the requirements of any lender that has made a loan to Landlord encumbering the Project, Landlord shall to the extent of severance damages received by Landlord in connection with such condemnation, repair any damage to the Project caused by such condemnation except to the extent that Tenant has been reimbursed therefor by the condemning authority. This section, not general principles of law or California Code of Civil Procedure Sections 1230.010 et seq., shall govern the rights and obligations of Landlord and Tenant with respect to the condemnation of all or any portion of the Project.

16.    **ASSIGNMENT AND SUBLETTING.**

16.1    **LANDLORD'S CONSENT REQUIRED.**  Tenant shall not voluntarily or by operation of law assign, transfer, hypothecate, mortgage, sublet, or otherwise transfer or encumber all or any part of Tenant's interest in this Lease or in the Premises (hereinafter collectively a **"Transfer"**), without Landlord's prior written consent, which shall not be unreasonably withheld. Landlord shall respond to Tenant's written request for consent hereunder within thirty (30) days after Landlord's receipt of the written request from Tenant. Any attempted Transfer without such consent shall be void and shall constitute a default and breach of this Lease. Tenant's written request for Landlord's consent shall include, and Landlord's thirty (30) day response period referred to above shall not commence, unless and until Landlord has received from Tenant, all of the following information: (a) financial statements for the proposed assignee or subtenant prepared in accordance with generally accepted accounting principles for the lesser of (i) the past three (3) years or (ii) the time period the assignee or subtenant has been in existence, (b) federal tax returns for the proposed assignee or subtenant for the lesser of (i) the past three (3) years or (ii) the time period the assignee or subtenant has been in existence, (c) a credit report or similar report on the proposed assignee or subtenant, (d) a detailed description of the business the assignee or subtenant intends to operate at the Premises, (e) the proposed effective date of the assignment or sublease, (f) a copy of the proposed sublease or assignment agreement which includes all of the terms and conditions of the proposed assignment or sublease, (g) a detailed description of any ownership or commercial relationship between Tenant and the proposed assignee or subtenant, (h) a detailed description of any Alterations the proposed assignee or subtenant desires to make to the Premises, and (i) a Hazardous Materials Disclosure Certificate substantially in the form of Exhibit D attached hereto (the **"Transferee HazMat Certificate"**). If the obligations of the proposed assignee or subtenant will be guaranteed by any person or entity, Tenant's written request shall not be considered complete until the information described in (a), (b) and (c) of the previous sentence has been provided with respect to each proposed guarantor. **"Transfer"** shall also include the transfer (a) if Tenant is a corporation, and Tenant's stock is not publicly traded over a recognized securities exchange, of more than fifty percent (50%) of the voting stock of such corporation during the term of this Lease (whether or not in one or more transfers) or the dissolution, merger or liquidation of the corporation, or (b) if Tenant is a partnership, limited liability company, limited liability partnership or other entity, of more than fifty percent (50%) of the profit and loss participation in such partnership or entity during the term of this Lease (whether or not in one or more transfers) or the dissolution, merger or liquidation of the partnership, limited liability company, limited liability partnership or other entity. If Tenant is a limited or general partnership (or is comprised of two or more persons, individually or as co-partners), Tenant shall not be entitled to change or convert to (i) a limited liability company, (ii) a limited liability partnership or (iii) any other entity which possesses the characteristics of limited liability without the prior written consent of Landlord, which consent may be given or withheld in Landlord's sole discretion. Tenant's sole remedy in the event that Landlord shall wrongfully withhold consent to or disapprove any assignment or sublease shall be to obtain an order by a court of competent jurisdiction that Landlord grant such consent; in no event shall Landlord be liable for damages with respect to its granting or withholding consent to any proposed assignment or sublease. If Landlord shall exercise any option to recapture the Premises, or shall deny a request for consent to a proposed assignment or sublease, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all losses, liabilities, damages, costs and claims that may be made against Landlord by the proposed assignee or subtenant, or by any brokers or other persons claiming a commission or similar compensation in connection with the proposed assignment or sublease.

16.2    **STANDARD FOR APPROVAL.**  Landlord shall not unreasonably withhold its consent to a Transfer provided that Tenant has complied with each and every requirement, term and condition of this Section 16. Tenant acknowledges and agrees that each requirement, term and condition in this Section 16 is a reasonable requirement, term or condition. It shall be deemed reasonable for Landlord to withhold its consent to a Transfer if any requirement, term or condition of this Section 16 is not complied with or: (a) the Transfer would cause Landlord to be in violation of its obligations under another lease or agreement to which Landlord is a party; (b) in Landlord's reasonable judgment, a proposed assignee or subtenant has a smaller net worth than Tenant had on the date this Lease was entered into with Tenant or is less able financially to pay the rents due under this Lease as and when they are due and payable; (c) a proposed assignee's or subtenant's business will impose a burden on the Project's parking facilities, Common Areas or utilities that is greater than the burden imposed by Tenant, in Landlord's reasonable judgment; (d) the terms of a proposed assignment or subletting will allow the proposed assignee or subtenant to

14

exercise a right of renewal, right of expansion, right of first offer, right of first refusal or similar right held by Tenant; (e) a proposed assignee or subtenant refuses to enter into a written assignment agreement or sublease, reasonably satisfactory to Landlord, which provides that it will abide by and assume all of the terms and conditions of this Lease for the term of any assignment or sublease and containing such other terms and conditions as Landlord reasonably deems necessary; (f) the use of the Premises by the proposed assignee or subtenant is not permitted by this Lease; (g) any guarantor of this Lease refuses to consent to the Transfer or to execute a written agreement reaffirming the guaranty; (h) Tenant is in default as defined in Section 17 at the time of the request; (i) if requested by Landlord, the assignee or subtenant refuses to sign a non-disturbance and attornment agreement in favor of Landlord's lender; (j) Landlord has sued or been sued by the proposed assignee or subtenant or has otherwise been involved in a legal dispute with the proposed assignee or subtenant; (k) the assignee or subtenant is involved in a business which is not in keeping with the then-current standards of the Project; (l) the proposed assignee or subtenant is an existing tenant of the Project or is a person or entity then negotiating with Landlord for the lease of space in the Project; (m) the assignment or sublease will result in there being more than one subtenant of the Premises; (n) the assignee or subtenant is a governmental or quasi-governmental entity or an agency, department or instrumentality of a governmental or quasi-governmental agency; (o) the assignee or subtenant will use, store or handle Hazardous Materials in or about the Premises of a type, nature, quantity not acceptable to Landlord, in Landlord's sole discretion or (p) the assignee or subtenant is a person or entity to whom Landlord has agreed not to lease space in the Project pursuant to a lease with another tenant.

16.3     *ADDITIONAL TERMS AND CONDITIONS*.  The following terms and conditions shall be applicable to any Transfer:

(a)     Regardless of Landlord's consent, no Transfer shall release Tenant from Tenant's obligations hereunder or alter the primary liability of Tenant to pay the rent and other sums due Landlord hereunder and to perform all other obligations to be performed by Tenant hereunder or release any guarantor from its obligations under its guaranty.

(b)     Landlord may accept rent from any person other than Tenant pending approval or disapproval of an assignment or subletting.

(c)     Neither a delay in the approval or disapproval of a Transfer, nor the acceptance of rent, shall constitute a waiver or estoppel of Landlord's right to exercise its rights and remedies for the breach of any of the terms or conditions of this Section 16.

(d)     The consent by Landlord to any Transfer shall not constitute a consent to any subsequent Transfer by Tenant or to any subsequent or successive Transfer by an assignee or subtenant.  However, Landlord may consent to subsequent Transfers or any amendments or modifications thereto without notifying Tenant or anyone else liable on the Lease and without obtaining their consent, and such action shall not relieve such persons from liability under this Lease.

(e)     In the event of any default under this Lease, Landlord may proceed directly against Tenant, any guarantors or anyone else responsible for the performance of this Lease, including any subtenant or assignee, without first exhausting Landlord's remedies against any other person or entity responsible therefor to Landlord, or any security held by Landlord.

(f)     Landlord's written consent to any Transfer by Tenant shall not constitute an acknowledgment that no default then exists under this Lease nor shall such consent be deemed a waiver of any then-existing default.

(g)     The discovery of the fact that any financial statement relied upon by Landlord in giving its consent to an assignment or subletting was materially false shall, at Landlord's election, render Landlord's consent null and void.

(h)     Landlord shall not be liable under this Lease or under any sublease to any subtenant.

(i)     No assignment or sublease may be modified or amended without Landlord's prior written consent.

(j)     Any assignee of, or subtenant under, this Lease shall, by reason of accepting such assignment or entering into such sublease, be deemed, for the benefit of Landlord, to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Tenant during the term of said assignment or sublease, other than such obligations as are contrary or inconsistent with provisions of an assignment or sublease to which Landlord has specifically consented in writing.

(k)     At Landlord's request, Tenant shall deliver to Landlord, Landlord's standard consent to assignment or consent to sublease agreement, as applicable, executed by Tenant, the assignee or the subtenant, as applicable.

16.4     *ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO SUBLETTING*.  The following terms and conditions shall apply to any subletting by Tenant of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)     Tenant hereby absolutely and unconditionally assigns and transfers to Landlord all of Tenant's interest in all rentals and income arising from any sublease entered into by Tenant, and Landlord may collect such rent and

15

33

income and apply same toward Tenant's obligations under this Lease; provided, however, that until a default shall occur in the performance of Tenant's obligations under this Lease, Tenant may receive, collect and enjoy the rents accruing under such sublease. Landlord shall not, by reason of this or any other assignment of such rents to Landlord nor by reason of the collection of the rents from a subtenant, be deemed to have assumed or recognized any sublease or to be liable to the subtenant for any failure of Tenant to perform and comply with any of Tenant's obligations to such subtenant under such sublease, including, but not limited to, Tenant's obligation to return any security deposit. Tenant hereby irrevocably authorizes and directs any such subtenant, upon receipt of a written notice from Landlord stating that a default exists in the performance of Tenant's obligations under this Lease, to pay to Landlord the rents due as they become due under the sublease. Tenant agrees that such subtenant shall have the right to rely upon any such statement and request from Landlord, and that such subtenant shall pay such rents to Landlord without any obligation or right to inquire as to whether such default exists and notwithstanding any notice or claim from Tenant to the contrary.

(b)     In the event Tenant shall default in the performance of its obligations under this Lease, Landlord, at its option and without any obligation to do so, may require any subtenant to attorn to Landlord, in which event Landlord shall undertake the obligations of Tenant under such sublease from the time of the exercise of said option to the termination of such sublease; provided, however, Landlord shall not be liable for any prepaid rents or security deposit paid by such subtenant to Tenant or for any other prior defaults of Tenant under such sublease.

16.5     *TRANSFER PREMIUM FROM ASSIGNMENT OR SUBLETTING.*  Landlord shall be entitled to receive from Tenant (as and when received by Tenant) as an item of additional rent one-half of all amounts received by Tenant from the subtenant or assignee in excess of the amounts payable by Tenant to Landlord hereunder (the "**Transfer Premium**"). The Transfer Premium shall be reduced by the reasonable brokerage commissions, tenant improvement costs and legal fees actually paid by Tenant in order to assign the Lease or to sublet all or a portion of the Premises. "**Transfer Premium**" shall mean all Base Rent, additional rent or other consideration of any type whatsoever payable by the assignee or subtenant in excess of the Base Rent and additional rent payable by Tenant under this Lease. If less than all of the Premises is subleased, for purposes of calculating the Transfer Premium, the Base Rent and the additional rent due under this Lease shall be allocated to the subleased premises on a per-leasable-square-foot basis (e.g., if one-half of the Premises is subleased, for purposes of determining the amount of the Transfer Premium, one-half of the Base Rent and additional rent due under this Lease would be allocated to the subleased premises, and this amount would be subtracted from the base rent, additional rent and other monies payable to Tenant under the sublease). "**Transfer Premium**" shall also include, but not be limited to, key money and bonus money paid by the assignee or subtenant to Tenant in connection with such Transfer, and any payment in excess of fair-market value for services rendered by Tenant to the assignee or subtenant or for assets, fixtures, inventory, equipment or furniture transferred by Tenant to the assignee or subtenant in connection with such Transfer. Landlord and Tenant agree that the foregoing Transfer Premium is reasonable.

16.6     *LANDLORD'S OPTION TO RECAPTURE SPACE.*  Notwithstanding anything to the contrary contained in this Section 16, Landlord shall have the option, by giving written notice to Tenant within thirty (30) days after receipt of any request by Tenant to assign this Lease or to sublease space in the Premises, to terminate this Lease with respect to said space as of the date thirty (30) days after Landlord's election. In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Premises, the Base Rent, Tenant's Percentage Share of Operating Expenses and the number of parking spaces Tenant may use shall be adjusted on the basis of the number of leasable square feet retained by Tenant in proportion to the number of leasable square feet contained in the original Premises, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either party, the parties shall execute written confirmation of same. If Landlord recaptures only a portion of the Premises, it shall construct and erect at its sole cost such partitions as may be required to sever the space to be retained by Tenant from the space recaptured by Landlord. Landlord may, at its option, lease any recaptured portion of the Premises to the proposed subtenant or assignee or to any other person or entity without liability to Tenant. Tenant shall not be entitled to any portion of the profit, if any, Landlord may realize on account of such termination and reletting. Tenant acknowledges that the purpose of this section is to enable Landlord to receive profit in the form of higher rent or other consideration to be received from an assignee or subtenant, to give Landlord the ability to meet additional space requirements of other tenants of the Project and to permit Landlord to control the leasing of space in the Project. Tenant acknowledges and agrees that the requirements of this section are commercially reasonable and are consistent with the intentions of Landlord and Tenant.

16.7     *LANDLORD'S EXPENSES.*  In the event Tenant shall assign this Lease or sublet the Premises or request the consent of Landlord to any Transfer, then Tenant shall pay (a) $500 to Landlord to compensate Landlord for its internal administrative costs in processing the request plus (b) Landlord's reasonable out-of-pocket costs and expenses incurred in connection therewith, including, but not limited to, attorneys', architects', accountants', engineers' or other consultants' fees provided, however, Landlord shall not be entitled to recover more than $2,500.00 of attorneys' fees with respect to any one Transfer.

17.     **DEFAULT; REMEDIES.**

17.1     *DEFAULT BY TENANT.*  Landlord and Tenant hereby agree that the occurrence of any one or more of the following events is a default by Tenant under this Lease and that said default shall give Landlord the rights described in Section 17.2. Landlord or Landlord's authorized agent shall have the right to execute and to deliver any notice of default, notice to pay rent or quit or any other notice Landlord gives Tenant.

(a)     Tenant's failure to make any payment of Base Rent, Tenant's Percentage Share of Operating Expenses or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of three (3) days after written notice thereof from Landlord to Tenant. In the event that Landlord serves Tenant with a notice to pay rent or quit pursuant to applicable unlawful detainer statutes, such notice shall also constitute the notice required by this Section 17.1(a).

(b)     Subject to the requirements of California law, the abandonment of the Premises by Tenant coupled with the nonpayment of rent, in which event Landlord shall not be obligated to give any notice of default to Tenant.

(c)     The failure of Tenant to comply with any of its obligations under Sections 4, 10, 12, 13, 16, 19, 23, 25, 26, 27 and 28 where Tenant fails to comply with its obligations or fails to cure any earlier breach of such obligation within ten (10) days following written notice from Landlord to Tenant. In the event Landlord serves Tenant with a notice to quit or any other notice pursuant to applicable unlawful detainer statutes, said notice shall also constitute the notice required by this Section 17.1(c).

(d)     The failure by Tenant to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Tenant (other than those referenced in Sections 17.1(a), (b) and (c), above), where such failure shall continue for a period of ten (10) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's nonperformance is such that more than ten (10) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said ten (10) day period and thereafter diligently pursues such cure to completion. In the event that Landlord serves Tenant with a notice to quit or any other notice pursuant to applicable unlawful detainer statutes, said notice shall also constitute the notice required by this Section 17.1(d).

(e)     (i) The making by Tenant or any guarantor of Tenant's obligations hereunder of any general arrangement or general assignment for the benefit of creditors; (ii) Tenant or any guarantor becoming a "debtor" as defined in 11 U.S.C. 101 or any successor statute thereto (unless, in the case of a petition filed against Tenant or guarantor, the same is dismissed within sixty (60) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days; (iv) the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days; or (v) the insolvency of Tenant. In the event that any provision of this Section 17.1(e) is unenforceable under applicable law, such provision shall be of no force or effect.

(f)     The discovery by Landlord that any financial statement, representation or warranty given to Landlord by Tenant, or by any guarantor of Tenant's obligations hereunder, was materially false at the time given. Tenant acknowledges that Landlord has entered into this Lease in material reliance on such information.

(g)     If Tenant is a corporation, partnership, limited liability company or similar entity, the dissolution or liquidation of Tenant.

(h)     If Tenant's obligations under this Lease are guaranteed: (i) the death of a guarantor, (ii) the termination of a guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a guarantor's refusal to honor the guaranty, (v) a guarantor's breach of its guaranty obligation on an anticipatory breach basis or (vi) if the guarantor is a corporation, limited liability company or partnership, the dissolution of the guarantor or the termination of the guarantor's existence.

17.2    *REMEDIES.*

(a)     In the event of any default or breach of this Lease by Tenant, Landlord may, at any time thereafter, with or without notice or demand, and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such default:

(i)     terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease and the term hereof shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord. If Landlord terminates this Lease, Landlord may recover from Tenant (A) the worth at the time of award of the unpaid rent which had been earned at the time of termination; (B) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; (C) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; and (D) any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under the Lease or which in the ordinary course of things would be likely to result therefrom, including, but not limited to, the cost of recovering possession of the Premises, expenses of releasing, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, any real estate commissions actually paid by Landlord and the unamortized value of any free rent, reduced rent, tenant improvement allowance or other economic concessions provided by Landlord. The "worth at time of award" of the amounts referred to in Section 17.2(a)(i)(A) and (B) shall be computed by allowing

17

interest at the lesser of ten percent (10%) per annum or the maximum interest rate permitted by applicable law. The worth at the time of award of the amount referred to in Section 17.2(a)(i)(C) shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%). For purposes of this Section 17.2(a)(i), "rent" shall be deemed to be all monetary obligations required to be paid by Tenant pursuant to the terms of this Lease.

(ii)      maintain Tenant's right of possession, in which event Landlord shall have the remedy described in California Civil Code Section 1951.4 which permits Landlord to continue this Lease in effect after Tenant's breach and abandonment and recover rent as it becomes due. In the event Landlord elects to continue this Lease in effect, Tenant shall have the right to sublet the Premises or assign Tenant's interest in the Lease subject to the reasonable requirements contained in Section 16 of this Lease and provided further that Landlord shall not require compliance with any standard or condition contained in Section 16 that has become unreasonable at the time Tenant seeks to sublet or assign the Premises pursuant to this Section 17.2(a)(ii).

(iii)      collect sublease rents (or appoint a receiver to collect such rent) and otherwise perform Tenant's obligations at the Premises, it being agreed, however, that the appointment of a receiver for Tenant shall not constitute an election by Landlord to terminate this Lease.

(iv)      pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state in which the Premises are located.

(b)      No remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity. The expiration or termination of this Lease and/or the termination of Tenant's right to possession of the Premises shall not relieve Tenant of liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term of the Lease or by reason of Tenant's occupancy of the Premises.

(c)      If Tenant abandons the Premises, Landlord may re-enter the Premises, and such re-entry shall not be deemed to constitute Landlord's election to accept a surrender of the Premises or to otherwise relieve Tenant from liability for its breach of this Lease. No surrender of the Premises shall be effective against Landlord unless Landlord has entered into a written agreement with Tenant in which Landlord expressly agrees to (i) accept a surrender of the Premises and (ii) relieve Tenant of liability under the Lease. The delivery by Tenant to Landlord of possession of the Premises shall not constitute the termination of the Lease or the surrender of the Premises.

17.3      *DEFAULT BY LANDLORD.* Landlord shall not be in default under this Lease unless Landlord fails to perform obligations required of Landlord within thirty (30) days after written notice by Tenant to Landlord and to the holder of any mortgage or deed of trust encumbering the Project whose name and address shall have theretofore been furnished to Tenant in writing, specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for its cure, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently pursues the same to completion. In no event shall Tenant have the right to terminate this Lease as a result of Landlord's default, and Tenant's remedies shall be limited to damages and/or an injunction. Tenant hereby waives its right to recover consequential damages (including, but not limited to, lost profits) or punitive damages arising out of a Landlord default. This Lease and the obligations of Tenant hereunder shall not be affected or impaired because Landlord is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of a Force Majeure Event, and the time for Landlord's performance shall be extended for the period of any such delay. Any claim, demand, right or defense by Tenant that arises out of this Lease or the negotiations which preceded this Lease shall be barred unless Tenant commences an action thereon, or interposes a defense by reason thereof, within six (6) months after the date of the inaction, omission, event or action that gave rise to such claim, demand, right or defense.

17.4      *LATE CHARGES.* Tenant hereby acknowledges that late payment by Tenant to Landlord of Base Rent, Tenant's Percentage Share of Operating Expenses or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord by the terms of any mortgage or trust deed encumbering the Project. Accordingly, if any installment of Base Rent, Tenant's Percentage Share of Operating Expenses or any other sum due from Tenant shall not be received by Landlord when such amount shall be due, then, without any requirement for notice or demand to Tenant, Tenant shall immediately pay to Landlord a late charge equal to six percent (6%) of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder, including the assessment of interest under Section 17.5.

17.5      *INTEREST ON PAST-DUE OBLIGATIONS.* Except as expressly herein provided, any amount due to Landlord that is not paid when due shall bear interest at the lesser of ten percent (10%) per annum or the maximum rate permitted by applicable law. Payment of such interest shall not excuse or cure any default by Tenant under this Lease; provided, however, that interest shall not be payable on late charges incurred by Tenant nor on any amounts upon which late charges are paid by Tenant.

17.6    *PAYMENT OF RENT AND SECURITY DEPOSIT AFTER DEFAULT*. If Tenant fails to pay Base Rent, Tenant's Percentage Share of Operating Expenses, parking charges or any other monetary obligation due hereunder on the date it is due, after Tenant's fourth failure to pay any monetary obligation on the date it is due, at Landlord's option, all monetary obligations of Tenant hereunder shall thereafter be paid by cashier's check, and Tenant shall, upon demand, provide Landlord with an additional security deposit equal to three (3) multiplied by the monthly Base Rent due on the date of Landlord's demand. If Landlord has required Tenant to make said payments by cashier's check or to provide an additional security deposit, Tenant's failure to make a payment by cashier's check or to provide the additional security deposit shall be a default hereunder.

18.    **LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT**. All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of rent. If Tenant shall fail to perform any of its obligations under this Lease, Landlord may, but shall not be obligated to, after three (3) days' prior written notice to Tenant, make any such payment or perform any such act on Tenant's behalf without waiving its rights based upon any default of Tenant and without releasing Tenant from any obligations hereunder. Tenant shall pay to Landlord, within ten (10) days after delivery by Landlord to Tenant of statements therefore, an amount equal to the expenditures reasonably made by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the provisions of this section.

19.    *INDEMNITY*. Tenant hereby agrees to indemnify, defend and hold harmless Landlord and its employees, partners, agents, property managers, contractors, lenders and ground lessors (said persons and entities are hereinafter collectively referred to as the "**Indemnified Parties**" or **"Landlord Parties"**) from and against any and all liability, loss, cost, damage, claims, loss of rents, liens, judgments, penalties, fines, settlement costs, investigation costs, cost of consultants and experts, attorney's fees, court costs and other legal expenses, effects of environmental contamination, cost of environmental testing, removal, remediation and/or abatement of Hazardous Materials (as said term is defined below), insurance policy deductibles and other expenses (hereinafter collectively referred to as "**Damages**") arising out of or related to an Indemnified Matter (as defined below). For purposes of this section, an "**Indemnified Matter**" shall mean any matter for which one or more of the Indemnified Parties incurs liability or Damages if the liability or Damages arise out of or involve, directly or indirectly, (a) Tenant's or its employees', agents', contractors', invitees', subtenants' or other persons working in or visiting the Premises (all of said persons or entities are hereinafter collectively referred to as "**Tenant Parties**") use or occupancy of the Premises or the Project, (b) any act, omission or neglect of a Tenant Party, (c) Tenant's failure to perform any of its obligations under the Lease, (d) the existence, use or disposal of any Hazardous Materials (as defined below) brought on to the Project by a Tenant Party or (e) any other matters for which Tenant has agreed to indemnify Landlord pursuant to any other provision of this Lease. Tenant's obligations hereunder shall include, but shall not be limited to (f) compensating the Indemnified Parties for Damages arising out of Indemnified Matters within ten (10) days after written demand from an Indemnified Party and (g) providing a defense, with counsel reasonably satisfactory to the Indemnified Party, at Tenant's sole expense, within ten (10) days after written demand from the Indemnified Party, of any claims, action or proceeding arising out of or relating to an Indemnified Matter whether or not litigated or reduced to judgment and whether or not well founded. If Tenant is obligated to compensate an Indemnified Party for Damages arising out of an Indemnified Matter, Landlord shall have the immediate and unconditional right, but not the obligation, without notice or demand to Tenant, to pay the Damages, and Tenant shall, upon ten (10) days' advance written notice from Landlord, reimburse Landlord for the costs incurred by Landlord. By way of example, and not limitation, Landlord shall have the immediate and unconditional right to cause any Damages to the Common Areas, another tenant's premises or to any other part of the Project to be repaired and to compensate other tenants of the Project or other persons or entities for Damages arising out of an Indemnified Matter. The Indemnified Parties need not first pay any Damages to be indemnified hereunder. Tenant's obligations under this section shall not be released, reduced or otherwise limited because one or more of the Indemnified Parties are or may be actively or passively negligent with respect to an Indemnified Matter or because an Indemnified Party is or was partially responsible for the Damages incurred. This indemnity is intended to apply to the fullest extent permitted by applicable law. Tenant's obligations under this section shall survive the expiration or termination of this Lease unless specifically waived in writing by Landlord after said expiration or termination. Notwithstanding anything to the contrary contained in this section, Tenant shall not be obligated to indemnify an Indemnified Party from liability to the extent such liability arises out of the Indemnified Party's negligence. Notwithstanding the forgoing, Landlord shall indemnify, defend and hold Tenant harmless from any loss, cost, liability, damage or expense (collectively "**Claims**") Tenant may incur to any person or entity resulting from the gross negligence or willful misconduct of Landlord or its agents or employees in connection with Landlord's activities at the Project. Nothing contained in this Section 19 shall relieve any insurance carrier of its obligations under policies required to be carried by Landlord or Tenant pursuant to the provisions of the Lease to the extent that such policies cover the results of such acts or conduct. Notwithstanding the foregoing, in no event shall the foregoing indemnity by Landlord obligate Landlord to compensate Tenant for consequential damages, lost profits or punitive damages.

20.    **EXEMPTION OF LANDLORD FROM LIABILITY**. Tenant hereby agrees that Landlord Parties shall not be liable for injury to Tenant's business or any loss of income therefrom or for loss of or damage to the merchandise, tenant improvements, fixtures, furniture, equipment, computers, files, automobiles, or other property of Tenant, Tenant's employees, agents, contractors or invitees, or any other person in or about the Project, nor shall Landlord Parties be liable for injury to the person of Tenant, Tenant's employees, agents, contractors or invitees, whether such damage or injury is caused by or results from any cause whatsoever including, but not limited to, theft, criminal activity at the Project, negligent security measures, bombings or bomb scares, acts of terrorism, Hazardous Materials, fire, steam, electricity, gas, water or rain, flooding, breakage of pipes, sprinklers, plumbing, air conditioning or lighting fixtures, or from any other cause, whether said damage or injury results from conditions arising upon the Premises or upon other portions of the Project, or from other sources or places, or from new construction or the repair, alteration or improvement of any part of the Project, and regardless of whether the cause of the damage or injury arises

19

out of the active negligence, passive negligence or intentional acts of Landlord Parties. Landlord Parties shall not be liable for any damages arising from any act or neglect of any employees, agents, contractors or invitees of any other tenant, occupant or user of the Project, nor from the failure of Landlord Parties to enforce the provisions of the lease of any other tenant of the Project. Tenant, as a material part of the consideration to Landlord hereunder, hereby assumes all risk of damage to Tenant's property or business or injury to persons, in, upon or about the Project arising from any cause, including the active or passive negligence of Landlord Parties, and Tenant hereby waives all claims in respect thereof against Landlord Parties. Except to the extent covered by Tenant's insurance and waiver of subrogation provided in the Lease, the limitations on Landlord's liability contained in this Section 20 shall not apply to injury or damage which results from the gross negligence or willful misconduct of Landlord, its agents, employees, contractors, subcontractors or assigns; provided, however, in no event shall Landlord be liable to Tenant for consequential damages (including, but not limited to, lost profits).

21.    *LANDLORD'S LIABILITY.*  Tenant acknowledges that Landlord shall have the right to transfer all or any portion of its interest in the Project and to assign this Lease to the transferee. Tenant agrees that in the event of such a transfer Landlord shall automatically be released from all liability under this Lease to the extent the same is assumed by the transferee or arises after the date of such transfer; and Tenant hereby agrees to look solely to Landlord's transferee for the performance of Landlord's obligations hereunder after the date of the transfer. Upon such a transfer, Landlord shall, at its option, return Tenant's security deposit to Tenant or transfer Tenant's security deposit to Landlord's transferee and, in either event, Landlord shall have no further liability to Tenant for the return of its security deposit. Subject to the rights of any lender holding a mortgage or deed of trust encumbering all or part of the Project, Tenant agrees to look solely to Landlord's equity interest in the Project for the collection of any judgment requiring the payment of money by Landlord arising out of (a) Landlord's failure to perform its obligations under this Lease or (b) the negligence or willful misconduct of Landlord, its partners, employees and agents. No other property or assets of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of any judgment or writ obtained by Tenant against Landlord. No partner, employee or agent of Landlord shall be personally liable for the performance of Landlord's obligations hereunder or be named as a party in any lawsuit arising out of or related to, directly or indirectly, this Lease and the obligations of Landlord hereunder. The obligations under this Lease do not constitute personal obligations of the individual partners of Landlord, if any, and Tenant shall not seek recourse against the individual partners of Landlord or their assets.

22.    *SIGNS.*  Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners or painting, or erect or install any signs, windows or door lettering, placards, decorations or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion. Upon vacation of the Premises, Tenant shall remove all signs and repair, paint and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for signs and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements.

23.    *PARKING.*  During the term and subject to the rules and regulations attached hereto as Exhibit "C," as modified by Landlord from time to time (the "**Rules**"), Tenant shall be entitled to use the number of parking spaces set forth in Section 1.13 in the Common Area parking lot of the Project, at no charge. Tenant's parking rights are in common with the parking rights of any other tenants of the Project, and all of Tenant's parking spaces are unreserved parking spaces. Landlord reserves the right at any time to designate areas in the Common Areas where Tenant may or may not park. If Tenant commits or allows in the parking lot any of the activities prohibited by the Lease or the Rules, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable by Tenant upon demand by Landlord. Tenant's parking rights are the personal rights of Tenant, and Tenant shall not transfer, assign or otherwise convey its parking rights separate and apart from this Lease. All parking spaces may only be used for parking vehicles no larger than full-size passenger automobiles or pick-up trucks. Landlord, in addition to its other remedies, shall have the right to remove or tow away any other vehicles. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties. Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers or invitees to be loaded, unloaded or parked in areas other than those designated by Landlord for such activities.

24.    *BROKER'S FEE.*  Tenant and Landlord each represent and warrant to the other that neither has had any dealings or entered into any agreements with any person, entity, broker or finder other than the persons, if any, listed in Section 1.14, in connection with the negotiation of this Lease, and no other broker, person, or entity is entitled to any commission or finder's fee in connection with the negotiation of this Lease, and Tenant and Landlord each agree to indemnify, defend and hold the other harmless from and against any claims, damages, costs, expenses, attorneys' fees or liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings, actions or agreements of the indemnifying party. The commission payable to Landlord's broker with respect to this Lease shall be pursuant to the terms of the separate commission agreement in effect between Landlord and Landlord's broker. Landlord's broker shall pay a portion of its commission to Tenant's broker, if so provided in any agreement between Landlord's broker and Tenant's broker. Nothing in this Lease shall impose any obligation on Landlord to pay a commission or fee to any party other than Landlord's broker.

25.    *ESTOPPEL CERTIFICATE.*

25.1    *DELIVERY OF CERTIFICATE.*  Tenant shall from time to time, upon not less than ten (10) days' prior written notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing certifying such information as Landlord may reasonably request including, but not limited to, the following: (a) that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect), (b) the date to which the Base Rent and other charges are paid in advance and the amounts so payable, (c) that there are not, to Tenant's knowledge, any uncured defaults or unfulfilled obligations on the part of Landlord, or specifying such defaults or unfulfilled obligations, if any are claimed, (d) that all tenant improvements to be constructed by Landlord, if any, have been completed in accordance with Landlord's obligations, and (e) that Tenant has taken possession of the Premises.  Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Project.

25.2    *FAILURE TO DELIVER CERTIFICATE.*  At Landlord's option, the failure of Tenant to deliver such statement within such time shall constitute a default of Tenant hereunder, or it shall be conclusive upon Tenant that (a) this Lease is in full force and effect, without modification except as may be represented by Landlord, (b) there are no uncured defaults in Landlord's performance, (c) not more than one month's Base Rent has been paid in advance, (d) all tenant improvements to be constructed by Landlord, if any, have been completed in accordance with Landlord's obligations, and (e) Tenant has taken possession of the Premises.

26.    *FINANCIAL INFORMATION.*  From time to time, at Landlord's request, but not more often than once in any calendar year, Tenant shall cause the following financial information to be delivered to Landlord, at Tenant's sole cost and expense, upon not less than ten (10) days' advance written notice from Landlord: (a) a current financial statement for Tenant and Tenant's financial statements for the previous two accounting years, (b) a current financial statement for any guarantor(s) of this Lease and the guarantor's(s) financial statements for the previous two accounting years and (c) such other financial information pertaining to Tenant or any guarantor as Landlord or any lender or purchaser of Landlord may reasonably request. Notwithstanding the forgoing limitation, Landlord shall have the right at any time to receive the forgoing information if Landlord requests the information in connection with the financing or sale of the Project.  All financial statements shall be prepared in accordance with generally accepted accounting principles consistently applied and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant.  Tenant hereby authorizes Landlord, from time to time, without notice to Tenant, to obtain a credit report or credit history on Tenant from any credit reporting company.

27.    *ENVIRONMENTAL MATTERS/HAZARDOUS MATERIALS.*

27.1    *HAZARDOUS MATERIALS DISCLOSURE CERTIFICATE.*  Prior to executing this Lease, Tenant has delivered to Landlord Tenant's executed initial Hazardous Materials Disclosure Certificate (the "**Initial HazMat Certificate**"), a copy of which is attached hereto as Exhibit D.  Tenant covenants, represents and warrants to Landlord that the information in the Initial HazMat Certificate is true and correct and accurately describes the use(s) of Hazardous Materials which will be made and/or used on the Premises by Tenant.  Tenant shall, commencing with the date which is one year from the Commencement Date and continuing every year thereafter, deliver to Landlord an executed Hazardous Materials Disclosure Certificate (the "**HazMat Certificate**") describing Tenant's then-present use of Hazardous Materials on the Premises, and any other reasonably necessary documents and information as requested by Landlord.  The HazMat Certificates required hereunder shall be in substantially the form attached hereto as Exhibit D.

27.2    *DEFINITION OF HAZARDOUS MATERIALS.*  As used in this Lease, the term "**Hazardous Materials**" shall mean and include (a) any hazardous or toxic wastes, materials or substances, and other pollutants or contaminants, which are or become regulated by any Environmental Laws (defined below); (b) petroleum, petroleum by-products, gasoline, diesel fuel, crude oil or any fraction thereof; (c) asbestos and asbestos-containing material, in any form, whether friable or non-friable; (d) polychlorinated biphenyls; (e) radioactive materials; (f) lead and lead-containing materials; (g) any other material, waste or substance displaying toxic, reactive, ignitable or corrosive characteristics, as all such terms are used in their broadest sense, and are defined or become defined by any Environmental Law; or (h) any materials which cause or threaten to cause a nuisance upon or waste to any portion of the Project or any surrounding property; or poses or threatens to pose a hazard to the health and safety of persons on the Premises, any other portion of the Project or any surrounding property.  For purposes of this Lease, the term "Hazardous Materials" shall not include nominal amounts of ordinary household cleaners, office supplies and janitorial supplies which are not actionable under any Environmental Laws.

27.3    *PROHIBITION; ENVIRONMENTAL LAWS.*  Tenant shall not be entitled to use or store any Hazardous Materials on, in, or about any portion of the Premises and the Project without, in each instance, obtaining Landlord's prior written consent thereto.  If Landlord, in its sole discretion, consents to any such usage or storage, then Tenant shall be permitted to use and/or store only those Hazardous Materials that are necessary for Tenant's business and to the extent disclosed in the HazMat Certificate and as expressly approved by Landlord in writing.  Any such usage and storage may only be to the extent of the quantities of Hazardous Materials as specified in the then-applicable HazMat Certificate as expressly approved by Landlord.  In all events such usage and storage must at all times be in full compliance with any and all local, state and federal environmental, health and/or safety-related laws, statutes, orders, standards, courts' decisions, ordinances, rules and regulations (as interpreted by judicial and administrative decisions), decrees, directives, guidelines, permits or permit conditions, currently existing and as amended, enacted, issued or adopted in the future which are or become applicable to Tenant or all or any portion of the Premises (collectively, the "**Environmental Laws**") and in compliance with the recommendations of Landlord's consultants.

21

Tenant agrees that any changes to the type and/or quantities of Hazardous Materials specified in the most recent HazMat Certificate may be implemented only with the prior written consent of Landlord, which consent may be given or withheld in Landlord's sole discretion. Tenant shall not be entitled nor permitted to install any tanks under, on or about the Premises for the storage of Hazardous Materials without the express written consent of Landlord, which may be given or withheld in Landlord's sole discretion. Landlord shall have the right, in Landlord's sole discretion, at all times during the Term of this Lease to (i) inspect the Premises, (ii) conduct tests and investigations to determine whether Tenant is in compliance with the provisions of this Section 27 or to determine if Hazardous Materials are present in, on or about the Project, (iii) request lists of all Hazardous Materials used, stored or otherwise located on, under or about any portion of the Premises and/or the Common Areas, and (iv) to require Tenant to complete a survey of its use, storage and handling of Hazardous Materials in the Premises, using a form and following procedures designated by Landlord, in Landlord's sole discretion (the "**Survey**"). Tenant shall reimburse Landlord for the cost of all such inspections, tests and investigations, and all costs associated with any Survey. If as a result of an inspection, test or Survey Landlord determines, in Landlord's sole discretion, that Tenant should implement or perform safety, security or compliance measures, Tenant shall within thirty (30) days after written request by Landlord perform such measures, at Tenant's sole cost and expense. The aforementioned rights granted herein to Landlord and its representatives shall not create (a) a duty on Landlord's part to inspect, test, investigate, monitor or otherwise observe the Premises or the activities of Tenant and Tenant Parties with respect to Hazardous Materials, including without limitation, Tenant's operation, use and any remediation relating thereto, or (b) liability on the part of Landlord and its representatives for Tenant's use, storage, disposal or remediation of Hazardous Materials, it being understood that Tenant shall be solely responsible for all liability in connection therewith.

27.4    *TENANT'S ENVIRONMENTAL OBLIGATIONS.* Tenant shall give to Landlord immediate verbal and follow-up written notice of any spills, releases, discharges, disposals, emissions, migrations, removals or transportation of Hazardous Materials on, under or about any portion of the Premises or in any Common Areas; provided that Tenant has actual, implied or constructive knowledge of such event(s). Tenant, at its sole cost and expense, covenants and warrants to promptly investigate, clean up, remove, restore and otherwise remediate (including, without limitation, preparation of any feasibility studies or reports and the performance of any and all closures) any spill, release, discharge, disposal, emission, migration or transportation of Hazardous Materials arising from or related to the intentional or negligent acts or omissions of Tenant or Tenant Parties such that the affected portions of the Project and any adjacent property are returned to the condition existing prior to the appearance of such Hazardous Materials. Any such investigation, clean up, removal, restoration and other remediation shall only be performed after Tenant has obtained Landlord's prior written consent, which consent shall not be unreasonably withheld so long as such actions would not potentially have a material adverse long-term or short-term effect on any portion of the Project. Notwithstanding the foregoing, Tenant shall be entitled to respond immediately to an emergency without first obtaining Landlord's prior written consent. Tenant, at its sole cost and expense, shall conduct and perform, or cause to be conducted and performed, all closures as required by any Environmental Laws or any agencies or other governmental authorities having jurisdiction thereof. If Tenant fails to so promptly investigate, clean up, remove, restore, provide closure or otherwise so remediate, Landlord may, but without obligation to do so, take any and all steps necessary to rectify the same, and Tenant shall promptly reimburse Landlord, upon demand, for all costs and expenses to Landlord of performing investigation, cleanup, removal, restoration, closure and remediation work. All such work undertaken by Tenant, as required herein, shall be performed in such a manner so as to enable Landlord to make full economic use of the Premises and other portions of the Project after the satisfactory completion of such work.

27.5    *ENVIRONMENTAL INDEMNITY.* In addition to Tenant's other indemnity obligations under this Lease, Tenant agrees to, and shall, protect, indemnify, defend (with counsel acceptable to Landlord) and hold Landlord and the other Landlord Parties harmless from and against any and all loss, cost, damage, liability or expense (including, without limitation, diminution in value of any portion of the Premises or the Project, damages for the loss of or restriction on the use of leasable or usable space, and from any adverse impact of Landlord's marketing of any space within the Project) arising at any time during or after the term of this Lease in connection with or related to, directly or indirectly, the use, presence, transportation, storage, disposal, migration, removal, spill, release or discharge of Hazardous Materials on, in or about any portion of the Project as a result (directly or indirectly) of the intentional or negligent acts or omissions of Tenant or Tenant Parties. Neither the written consent of Landlord to the presence, use or storage of Hazardous Materials in, on, under or about any portion of the Project nor the strict compliance by Tenant with all Environmental Laws shall excuse Tenant from its obligations of indemnification pursuant hereto. Tenant shall not be relieved of its indemnification obligations under the provisions of this Section 27.5 due to Landlord's status as either an "owner" or "operator" under any Environmental Laws.

27.6    *SURVIVAL.* Tenant's obligations and liabilities pursuant to the provisions of this Section 27 shall survive the expiration or earlier termination of this Lease. If it is determined by Landlord that the condition of all or any portion of the Project is not in compliance with the provisions of this Lease with respect to Hazardous Materials, including without limitation, all Environmental Laws at the expiration or earlier termination of this Lease, then Landlord may require Tenant to hold over possession of the Premises until Tenant can surrender the Premises to Landlord in the condition in which the Premises existed as of the Commencement Date and prior to the appearance of such Hazardous Materials except for reasonable wear and tear, including without limitation, the conduct or performance of any closures as required by any Environmental Laws. The burden of proof hereunder shall be upon Tenant. For purposes hereof, the term "reasonable wear and tear" shall not include any deterioration in the condition or diminution of the value of any portion of the Project in any manner whatsoever related to, directly or indirectly, Hazardous Materials. Any such holdover by Tenant will be with Landlord's consent, will not be terminable by Tenant in any event or circumstance and will otherwise be subject to the provisions of Section 33 of this Lease.

22

27.7    *No Liability for Acts of Others*. Notwithstanding anything to the contrary contained in this Lease, Tenant shall only be liable pursuant to this Section 27 for the acts of Tenant and Tenant Parties, and Tenant shall not be liable for the acts of persons or entities other than Tenant and Tenant Parties nor shall Tenant be responsible or liable for contamination that existed at the Premises on the Commencement Date or for contamination emanating from neighboring land.

28.    *Subordination*.

28.1    *Effect of Subordination*. This Lease, and any Option (as defined below) granted hereby, upon Landlord's written election, shall be subject and subordinate to any ground lease, mortgage, deed of trust or any other hypothecation or security now or hereafter placed upon the Project and to any and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding such subordination, Tenant's right to quiet possession of the Premises shall not be disturbed if Tenant is not in default and so long as Tenant shall pay the rent and observe and perform all of the provisions of this Lease, unless this Lease is otherwise terminated pursuant to its terms. At the request of any mortgagee, trustee or ground lessor, Tenant shall attorn to such person or entity. If any mortgagee, trustee or ground lessor shall elect to have this Lease and any Options granted hereby prior to the lien of its mortgage, deed of trust or ground lease, and shall give written notice thereof to Tenant, this Lease and such Options shall be deemed prior to such mortgage, deed of trust or ground lease, whether this Lease or such Options are dated prior or subsequent to the date of said mortgage, deed of trust or ground lease or the date of recording thereof. In the event of the foreclosure of a security device, the new owner shall not (a) be liable for any act or omission of any prior landlord or with respect to events occurring prior to its acquisition of title, (b) be liable for the breach of this Lease by any prior landlord, (c) be subject to any offsets or defenses which Tenant may have against the prior landlord or (d) be liable to Tenant for the return of its security deposit.

28.2    *Execution of Documents*. Tenant agrees to execute and acknowledge any documents Landlord reasonably requests that Tenant execute to effectuate an attornment, a subordination, or to make this Lease or any Option granted herein prior to the lien of any mortgage, deed of trust or ground lease, as the case may be. Tenant's failure to execute such documents within ten (10) days after written demand shall constitute a default by Tenant hereunder or, at Landlord's option, Landlord shall have the right to execute such documents on behalf of Tenant as Tenant's attorney-in-fact. Tenant does hereby make, constitute and irrevocably appoint Landlord as Tenant's attorney-in-fact and in Tenant's name, place and stead to execute such documents in accordance with this section.

28.3    *Subordination by Tenant*. Notwithstanding anything to the contrary contained in the Lease, Tenant shall not be obligated to subordinate its interest in the Lease to a future mortgage or deed of trust obtained by Landlord unless the lender provides Tenant with a commercially reasonable nondisturbance agreement.

29.    *Options*.

29.1    *Definition*. As used in this Lease, the word "**Option**" has the following meaning: (1) the right or option to extend the term of this Lease or to renew this Lease, (2) the option or right of first refusal to lease the Premises or the right of first offer to lease the Premises or the right of first refusal to lease other space within the Project or the right of first offer to lease other space within the Project, and (3) the right or option to terminate this Lease prior to its expiration date or to reduce the size of the Premises. Any Option granted to Tenant by Landlord must be evidenced by a written option agreement attached to this Lease as a rider or addendum or said option shall be of no force or effect. For purposes of this section, an Option shall also include any Option contained in any subsequent amendment to this Lease.

29.2    *Options Personal*. Each Option granted to Tenant in this Lease, if any, is personal to the original Tenant and may be exercised only by the original Tenant while occupying the entire Premises and may not be exercised or be assigned, voluntarily or involuntarily, by or to any person or entity other than Tenant, including, without limitation, any permitted transferee as defined in Section 16. The Options, if any, herein granted to Tenant are not assignable separate and apart from this Lease, nor may any Option be separated from this Lease in any manner, either by reservation or otherwise. If at any time an Option is exercisable by Tenant, the Lease has been assigned or a sublease exists as to any portion of the Premises, the Option shall be deemed null and void and neither Tenant nor any assignee or subtenant shall have the right to exercise the Option.

29.3    *Multiple Options*. In the event that Tenant has multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Option to extend or renew this Lease has been so exercised.

29.4    *Effect of Default on Options*. Tenant shall have no right to exercise an Option (i) during the time commencing from the date Landlord gives to Tenant a notice of default pursuant to Section 17.1 and continuing until the noncompliance alleged in said notice of default is cured, or (ii) if Tenant is in default of any of the terms, covenants or conditions of this Lease. The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise an Option because of the provisions of this section.

29.5    *Limitations on Options*. Notwithstanding anything to the contrary contained in any rider or addendum to this Lease, any options, rights of first refusal or rights of first offer granted hereunder shall be subject and secondary to Landlord's right to first offer and lease any such space to any tenant who is then occupying or leasing such space at the time the space becomes available for leasing and shall be subject and subordinated to any other options, rights of first refusal or rights of first offer previously given to any other person or entity.

29.6    *GUARANTEES.* Notwithstanding anything to the contrary contained in any rider or addendum to this Lease, Tenant's right to exercise and the effectiveness of an Option is conditioned upon Landlord's receipt from any prior tenant that has not been expressly released from liability under this Lease, and any guarantor of any obligation of Tenant under this Lease, of a written agreement satisfactory to Landlord, in Landlord's sole discretion, reaffirming such person's obligations under this Lease or the guaranty, as modified by Tenant's exercise of the Option.

29.7    *NOTICE OF EXERCISE OF OPTION.* Notwithstanding anything to the contrary contained in Section 43, Tenant shall give written notice exercising the Option using certified mail return receipt requested or some other method where the person delivering the package containing the notice obtains a signature of the person accepting the package containing the notice (e.g., by FedEx with the requirement that the FedEx delivery person obtain a signature from the person accepting the package). It shall be the obligation of Tenant to prove that Landlord received the notice exercising the Option in a timely manner.

30.    *LANDLORD RESERVATIONS.* Landlord shall have the right: (a) to change the name and address of the Project or Building upon not less than ninety (90) days prior written notice; (b) to permit any tenant the exclusive right to conduct any business as long as such exclusive right does not conflict with any rights expressly given herein; and (c) to place signs, notices or displays upon the roof, interior or exterior of the Building or Common Areas of the Project. Landlord reserves the right to use the exterior walls of the Premises, and the area beneath, adjacent to and above the Premises together with the right to install, use, maintain and replace equipment, machinery, pipes, conduits and wiring through the Premises, which serve other parts of the Project provided that Landlord's use does not unreasonably interfere with Tenant's use of the Premises.

31.    *CHANGES TO PROJECT.* Landlord shall have the right, in Landlord's sole discretion, from time to time, to make changes to the size, shape, location, number and extent of the improvements comprising the Project (hereinafter referred to as "**Changes**") including, but not limited to, the interior and exterior of buildings, the Common Areas, HVAC, electrical systems, communication systems, fire protection and detection systems, plumbing systems, security systems, parking control systems, driveways, entrances, parking spaces, parking areas and landscaped areas; provided, however, that Changes shall not eliminate all access to the Premises. In connection with the Changes, Landlord may, among other things, erect scaffolding or other necessary structures at the Project, limit or eliminate access to portions of the Project, including portions of the Common Areas, or perform work in the Building, which work may create noise, dust or leave debris in the Building. Tenant hereby agrees that such Changes and Landlord's actions in connection with such Changes shall in no way constitute a constructive eviction of Tenant or entitle Tenant to any abatement of rent. Landlord shall have no responsibility or for any reason be liable to Tenant for any direct or indirect injury to or interference with Tenant's business arising from the Changes, nor shall Tenant be entitled to any compensation or damages from Landlord for any inconvenience or annoyance occasioned by such Changes or Landlord's actions in connection with such Changes. Landlord shall use commercially reasonable efforts to minimize disruption to Tenant's business operations caused by Changes.

32.    Intentionally omitted.

33.    *HOLDING OVER.* If Tenant remains in possession of the Premises or any part thereof after the expiration or earlier termination of the term hereof with Landlord's consent, such occupancy shall be a tenancy from month to month upon all the terms and conditions of this Lease pertaining to the obligations of Tenant, except that the Base Rent payable shall be one hundred fifty percent (150%) of the Base Rent payable immediately preceding the termination date of this Lease, and all Options, if any, shall be deemed terminated and be of no further effect. If Tenant remains in possession of the Premises or any part thereof, after the expiration of the term hereof without Landlord's consent, Tenant shall, at Landlord's option, be treated as a tenant at sufferance or a trespasser, and the Base Rent shall be increased to one hundred fifty percent (150%) of the Base Rent payable immediately preceding the termination date of this Lease. Nothing contained herein shall be construed to constitute Landlord's consent to Tenant holding over at the expiration or earlier termination of the Lease term or to give Tenant the right to hold over after the expiration or earlier termination of the Lease term. Tenant hereby agrees to indemnify, hold harmless and defend Landlord from any cost, loss, claim or liability (including attorneys' fees) Landlord may incur as a result of Tenant's failure to surrender possession of the Premises to Landlord upon the termination of this Lease.

34.    *LANDLORD'S ACCESS.*

34.1    *ACCESS.* Landlord and Landlord's agents, contractors and employees shall have the right to enter the Premises at reasonable times upon reasonable advance written or telephonic notice to Tenant (except in the case of any emergency, where no advance notice shall be required) for the purpose of inspecting the Premises, performing any services required of Landlord, showing the Premises to prospective purchasers, lenders or tenants, undertaking safety measures and making alterations, repairs, improvements or additions to the Premises or to the Project; provided, however, that Landlord shall only have the right to show the Premises to prospective tenants during the last one hundred eighty (180) days of the term of this Lease. In the event of an emergency, Landlord may gain access to the Premises by any reasonable means, and Landlord shall not be liable to Tenant for damage to the Premises or to Tenant's property resulting from such access. Landlord may at any time place on or about the Building or the Project for sale or for lease signs.

34.2    *KEYS.* Landlord shall have the right to retain keys to the locks on the entry doors to the Premises and all interior doors at the Premises.

35.     *SECURITY MEASURES.*  Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises or the Project, and Landlord shall have no liability to Tenant due to its failure to provide such services. Tenant assumes all responsibility for the protection of Tenant, its agents, employees, contractors and invitees and the property of Tenant and of Tenant's agents, employees, contractors and invitees from acts of third parties. Nothing herein contained shall prevent Landlord, at Landlord's sole option, from implementing security measures for the Project or any part thereof, in which event Tenant shall participate in such security measures and the cost thereof shall be included within the definition of Operating Expenses, and Landlord shall have no liability to Tenant and its agents, employees, contractors and invitees arising out of Landlord's negligent provision of security measures. Landlord shall have the right, but not the obligation, to require all persons entering or leaving the Project to identify themselves to a security guard and to reasonably establish that such person should be permitted access to the Project. In no event shall Tenant or its employees, agents or contractors bring firearms or other weapons to the Project or the Premises, and Tenant shall not have the right to employ armed security guards.

36.     *EASEMENTS.*  Landlord reserves to itself the right, from time to time, to grant such easements, rights and dedications that Landlord deems necessary or desirable, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Tenant. Tenant shall sign any of the aforementioned documents within ten (10) days after Landlord's request, and Tenant's failure to do so shall constitute a default by Tenant. The obstruction of Tenant's view, air or light by any structure erected in the vicinity of the Project, whether by Landlord or third parties, shall in no way affect this Lease or impose any liability upon Landlord.

37.     *TRANSPORTATION MANAGEMENT.*  Tenant shall fully comply at its sole expense with all present or future programs implemented or required by any governmental or quasi-governmental entity or Landlord to manage parking, transportation, air pollution or traffic in and around the Project or the metropolitan area in which the Project is located.

38.     *SEVERABILITY.*  The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no way affect the validity of any other provision hereof.

39.     *TIME OF ESSENCE.*  Time is of the essence with respect to each of the obligations to be performed by Tenant and Landlord under this Lease.

40.     *DEFINITION OF ADDITIONAL RENT.*  All monetary obligations of Tenant to Landlord under the terms of this Lease, including, but not limited to, Base Rent, Tenant's Percentage Share of Operating Expenses and late charges shall be deemed to be rent.

41.     *INCORPORATION OF PRIOR AGREEMENTS.*  This Lease and the attachments listed in Section 1.15 contain all agreements of the parties with respect to the lease of the Premises and any other matter mentioned herein. No prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective. Except as otherwise stated in this Lease, Tenant hereby acknowledges that no real estate broker nor Landlord nor any employee or agents of any of said persons has made any oral or written warranties or representations to Tenant concerning the condition or use by Tenant of the Premises or the Project or concerning any other matter addressed by this Lease.

42.     *AMENDMENTS.*  This Lease may be modified in writing only, signed by the parties in interest at the time of the modification. One or more emails signed by one or more parties shall never constitute a writing signed by the parties that is capable of amending or modifying the Lease.

43.     *NOTICES.*  All notices required or permitted by this Lease shall be in writing and may be delivered (a) in person (by hand, by messenger or by courier service), (b) by U.S. Postal Service regular mail, (c) by U.S. Postal Service certified mail, return receipt requested or (d) by U.S. Postal Service Express Mail, Federal Express or other overnight courier, and shall be deemed sufficiently given if served in a manner specified in this section. Notices may not be given by email, and email notices shall not be binding on Landlord or Tenant for any purpose. Any notice permitted or required hereunder, and any notice to pay rent or quit or similar notice, shall be deemed personally delivered to Tenant on the date the notice is personally delivered to any employee of Tenant at the Premises. The addresses set forth in Section 1.16 of this Lease shall be the address of each party for notice purposes. Landlord or Tenant may by written notice to the other specify a different address for notice purposes, except that upon Tenant's taking possession of the Premises, the Premises shall constitute Tenant's address for the purpose of mailing or delivering notices to Tenant. A copy of all notices required or permitted to be given to Landlord hereunder shall be concurrently transmitted to such party or parties at such addresses as Landlord may from time to time hereinafter designate by written notice to Tenant. Any notice sent by regular mail or by certified mail, return receipt requested, shall be deemed given three (3) days after deposited with the U.S. Postal Service. Notices delivered by U.S. Express Mail, Federal Express or other courier shall be deemed given on the date delivered by the carrier to the appropriate party's address for notice purposes. If notice is received on Saturday, Sunday or a legal holiday, it shall be deemed received on the next business day. Nothing contained herein shall be construed to limit Landlord's right to serve any notice to pay rent or quit or similar notice by any method permitted by applicable law, and any such notice shall be effective if served in accordance with any method permitted by applicable law whether or not the requirements of this section have been met.

44.     *WAIVERS.*  No waiver by Landlord or Tenant of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Landlord or Tenant of the same or any other provision. Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any

25

43

subsequent act by Tenant. The acceptance of rent hereunder by Landlord shall not be a waiver of any preceding breach by Tenant of any provision hereof, other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. No acceptance by Landlord of partial payment of any sum due from Tenant shall be deemed a waiver by Landlord of its right to receive the full amount due, nor shall any endorsement or statement on any check or accompanying letter from Tenant be deemed an accord and satisfaction. Tenant hereby waives California Code of Civil Procedure Section 1179 and Civil Code section 3275 which allow tenants to obtain relief from the forfeiture of a lease, and Tenant hereby waives any claim it may have against Landlord based on Landlord's failure to comply with Section 1938 of the California Civil Code. Tenant hereby waives for Tenant and all those claiming under Tenant all rights now or hereafter existing to redeem by order or judgment of any court or by legal process or writ Tenant's right of occupancy of the Premises after any termination of this Lease.

45.     COVENANTS. This Lease shall be construed as though Landlord's covenants contained herein are independent and not dependent and Tenant hereby waives the benefit of any statute to the contrary. All provisions of this Lease to be observed or performed by Tenant are both covenants and conditions.

46.     BINDING EFFECT; CHOICE OF LAW. Subject to any provision hereof restricting assignment or subletting by Tenant, this Lease shall bind the parties, their heirs, personal representatives, successors and assigns. This Lease shall be governed by the laws of the state in which the Project is located, and any litigation concerning this Lease between the parties hereto shall be initiated in the county in which the Project is located.

47.     ATTORNEYS' FEES. If Landlord or Tenant brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, or appeal thereon, shall be entitled to its reasonable attorneys' fees and court costs to be paid by the losing party as fixed by the court in the same or separate suit, and whether or not such action is pursued to decision or judgment. The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees and court costs reasonably incurred in good faith. Landlord shall be entitled to reasonable attorneys' fees and all other costs and expenses incurred in the preparation and service of notices of default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such default. Landlord and Tenant agree that attorneys' fees incurred with respect to defaults and bankruptcy are actual pecuniary losses within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code or any successor statute.

48.     AUCTIONS. Tenant shall not conduct, nor permit to be conducted, either voluntarily or involuntarily, any auction or going-out-of-business sale upon the Premises or the Common Areas.

49.     MERGER. The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, or a termination by Landlord, shall not result in the merger of Landlord's and Tenant's estates and shall, at the option of Landlord, terminate all or any existing subtenancies or may, at the option of Landlord, operate as an assignment to Landlord of any or all of such subtenancies.

50.     QUIET POSSESSION. Subject to the other terms and conditions of this Lease, and the rights of any lender, and provided Tenant is not in default hereunder, Tenant shall have quiet possession of the Premises for the entire term hereof subject to all of the provisions of this Lease.

51.     AUTHORITY. If Tenant is a corporation, trust, limited liability company, limited liability partnership or general or limited partnership, Tenant, and each individual executing this Lease on behalf of such entity, represents and warrants that such individual is duly authorized to execute and deliver this Lease on behalf of said entity, that said entity is duly authorized to enter into this Lease, and that this Lease is enforceable against said entity in accordance with its terms. If Tenant is a corporation, trust, limited liability company, limited liability partnership or other partnership, Tenant shall deliver to Landlord upon demand evidence of such authority satisfactory to Landlord.

52.     CONFLICT. Any conflict between the type written provisions of this Lease and handwritten provisions, if any, shall be controlled by the handwritten provisions; provided, however, handwritten provisions shall have no force or effect unless separately initialed by both Landlord and Tenant.

53.     MULTIPLE PARTIES. If more than one person or entity is named as Tenant herein, the obligations of Tenant shall be the joint and several responsibility of all persons or entities named herein as Tenant. Service of a notice in accordance with Section 43 on one Tenant shall be deemed service of notice on all Tenants.

54.     INTERPRETATION. This Lease shall be interpreted as if it was prepared by both parties, and ambiguities shall not be resolved in favor of Tenant because all or a portion of this Lease was prepared by Landlord. The captions contained in this Lease are for convenience only and shall not be deemed to limit or alter the meaning of this Lease. As used in this Lease, the words tenant and landlord include the plural as well as the singular. Words used in the neuter gender include the masculine and feminine gender.

55.     PROHIBITION AGAINST RECORDING. Neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant. Landlord shall have the right to

record a memorandum of this Lease, and Tenant shall execute, acknowledge and deliver to Landlord for recording any memorandum prepared by Landlord.

56.    *RELATIONSHIP OF PARTIES*.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant.

57.    *RULES AND REGULATIONS*.  Tenant agrees to abide by and conform to the Rules and to cause its employees, suppliers, customers and invitees to so abide and conform.  Landlord shall have the right, from time to time, to modify, amend and enforce the Rules in a nondiscriminatory manner.  Landlord shall not be responsible to Tenant for the failure of other persons, including, but not limited to, other tenants, their agents, employees and invitees, to comply with the Rules.

58.    *RIGHT TO LEASE*.  Landlord reserves the absolute right to effect such other tenancies in the Project as Landlord in its sole discretion shall determine, and Tenant is not relying on any representation that any specific tenant or number of tenants will occupy the Project.

59.    *PATRIOT ACT*.  Tenant represents to Landlord that, (i) neither Tenant nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is a person or entity (each, a "**Prohibited Person**") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under Executive Order 13224 (the "**Executive Order**") signed on September 24, 2001, and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism," or other governmental action, (ii) Tenant's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "**Money Laundering Act**") and (iii) throughout the term of this Lease, Tenant shall comply with the Executive Order and with the Money Laundering Act.

60.    *CONFIDENTIALITY*.  Tenant acknowledges and agrees that the terms of this Lease are confidential and constitute proprietary information of Landlord.  Disclosure of the terms hereof could adversely affect the ability of Landlord to negotiate other leases with respect to the Project and may impair Landlord's relationship with other tenants of the Project.  Tenant agrees that it and its partners, officers, directors, employees, brokers, and attorneys, if any, shall not disclose the terms and conditions of this Lease to any other person or entity without the prior written consent of Landlord, which may be given or withheld by Landlord, in Landlord's sole discretion.  It is understood and agreed that damages alone would be an inadequate remedy for the breach of this provision by Tenant, and Landlord shall also have the right to seek specific performance of this provision and to seek injunctive relief to prevent its breach or continued breach.

61.    *WAIVER OF JURY TRIAL*.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, LANDLORD AND TENANT HEREBY WAIVE THEIR RESPECTIVE RIGHT TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION, PROCEEDING AND/OR HEARING BROUGHT BY EITHER LANDLORD AGAINST TENANT OR TENANT AGAINST LANDLORD ON ANY MATTER WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, OR ANY CLAIM OF INJURY OR DAMAGE, OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY LAW, STATUTE, OR REGULATION, EMERGENCY OR OTHERWISE, NOW OR HEREAFTER IN EFFECT.

62.    *EXECUTION*.

62.1    *COUNTERPARTS*.  This Lease and any documents or addenda attached hereto (collectively, the "**Documents**") may be executed in two or more counterpart copies, each of which shall be deemed to be an original and all of which together shall have the same force and effect as if the parties had executed a single copy of the Document.

62.2    *ELECTRONIC SIGNATURES*.  Landlord shall have the right, in Landlord's sole discretion, to insert the name of the person executing a Document on behalf of Landlord in Landlord's signature block using an electronic signature (an "**Electronic Signature**"), and in this event the Document delivered to Tenant will not include an original ink signature and Landlord shall have no obligation to provide a copy of such Document to Tenant with Landlord's original ink signature.  A Document delivered to Tenant by Landlord with an Electronic Signature shall be binding on Landlord as if the Document had been originally executed by Landlord with an ink signature.  Without the prior written consent of Landlord, which may be withheld in Landlord's sole discretion, Tenant shall not have the right to insert the name of the person executing the Document on behalf of Tenant using an Electronic Signature and all Documents shall be originally executed by Tenant using an ink signature.

62.3    *ELECTRONIC FORMAT*.  A Document executed by Landlord or Tenant and delivered to the other party in PDF, facsimile or similar electronic format (collectively, "**Electronic Format**") shall be binding on the party delivering the executed Document with the same force and effect as the delivery of a printed copy of the Document with an original ink signature.  At any time upon Landlord's written request, Tenant shall provide Landlord with a printed copy of the Document with an original ink signature.

62.4    *GENERALLY.* This Section describes the only ways in which Documents may be executed and delivered by the parties.   An email from Landlord, its agents, brokers, attorneys, employees or other representatives shall never constitute Landlord's Electronic Signature or be otherwise binding on Landlord.  Subject to the limitations set forth above, the parties agree that a Document executed using an Electronic Signature and/or delivered in Electronic Format may be introduced into evidence in a proceeding arising out of or related to the Document as if it was a printed copy of the Document executed by the parties with original ink signatures.  Landlord shall have no obligation to retain copies of Documents with original ink signatures, and Landlord shall have the right, in its sole discretion, to elect to discard originals and to retain only copies of Documents in Electronic Format.

LANDLORD AND TENANT ACKNOWLEDGE THAT THEY HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.   THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LANDLORD AND TENANT WITH RESPECT TO THE PREMISES.  TENANT ACKNOWLEDGES THAT IT HAS BEEN GIVEN THE OPPORTUNITY TO HAVE THIS LEASE REVIEWED BY ITS LEGAL COUNSEL PRIOR TO ITS EXECUTION. PREPARATION OF THIS LEASE BY LANDLORD OR LANDLORD'S AGENT AND SUBMISSION OF SAME TO TENANT SHALL NOT BE DEEMED AN OFFER BY LANDLORD TO LEASE THE PREMISES TO TENANT OR THE GRANT OF AN OPTION TO TENANT TO LEASE THE PREMISES.  THIS LEASE SHALL BECOME BINDING UPON LANDLORD ONLY WHEN FULLY EXECUTED BY BOTH PARTIES AND WHEN LANDLORD HAS DELIVERED A FULLY EXECUTED COPY OF THIS LEASE TO TENANT IN THE MANNER SET FORTH IN THIS LEASE.  THE DELIVERY OF A DRAFT OF THIS LEASE TO TENANT SHALL NOT CONSTITUTE AN AGREEMENT BY LANDLORD TO NEGOTIATE IN GOOD FAITH, AND LANDLORD EXPRESSLY DISCLAIMS ANY LEGAL OBLIGATION TO NEGOTIATE IN GOOD FAITH.

[Remainder of this page left intentionally blank.]

LANDLORD:

The Realty Associates Fund XI Portfolio, L.P.,
a Delaware limited partnership

By:    The Realty Associates Fund XI, L.P.,
        a Delaware limited partnership, general partner

        By:    Realty Associates Fund XI, LLC,
               a Delaware limited liability company, general partner

               Jim Harper
               Dec 28 2018 2:12 PM

        By:    _____
             Name:
             Title:

TENANT:

MASH Studios, Inc.,
a California corporation

By:    _____

        (print name)

Its:    _____
        (print title)

By:    _____

    Diane Robert
        (print name)

Its:    CFO
        (print title)

EXHIBIT A

PREMISES

Exhibit A is intended only to show the general layout of the Premises, and shall not be interpreted to increase or decrease the size of the Premises beyond the number of leasable square feet set forth in Section 1.5.  Exhibit A is not to be scaled and any measurements or distances shown on Exhibit A are approximates only.



30

48

EXHIBIT B

VERIFICATION LETTER

MASH Studios, Inc., a California corporation ("Tenant"), hereby certifies that it has entered into a lease with The Realty Associates Fund XI Portfolio, L.P., a Delaware limited partnership ("Landlord"), and verifies the following information as of the _ day of _____, 20__:

| | |
|---|---|
| Address of Premises: | _____ |
| | _____ |
| Leasable Area of Premises: | _____ |
| Commencement Date: | _____ |
| Lease Termination Date: | _____ |
| Initial Base Rent: | _____ |
| Billing Address for Tenant: | _____ |
| | _____ |
| Attention: | _____ |
| Telephone Number: | _____ |
| Federal Tax ID No.: | _____ |

Tenant acknowledges and agrees that all tenant improvements Landlord is obligated to make to the Premises, if any, have been completed to Tenant's satisfaction, that Tenant has accepted possession of the Premises, and that as of the date hereof there exist no offsets or defenses to the obligations of Tenant under the Lease.

TENANT:

MASH Studios, Inc.,
a California corporation

By:    _____

       _____
       (print name)

Its:   _____
       (print title)


By:    _____

       _____
       (print name)

Its:   _____
       (print title)

49

EXHIBIT C

RULES AND REGULATIONS

GENERAL RULES

Tenant shall faithfully observe and comply with the following Rules and Regulations:

1.      Tenant shall not alter any locks or install any new or additional locks or bolts on any doors or windows of the Premises without obtaining Landlord's prior written consent.  Tenant shall bear the cost of any lock changes or repairs required by Tenant.

2.      Access to the Project may be refused unless the person seeking access has proper identification or has a previously received authorization for access to the Project.  Landlord and its agents shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Project of any person.  In case of invasion, mob, riot, public excitement or other commotion, Landlord reserves the right to prevent access to the Project during the continuance thereof by any means it deems appropriate for the safety and protection of life and property.

3.      No cooking shall be done or permitted on the Premises, nor shall the Premises be used for any improper, objectionable or immoral purposes.  Notwithstanding the foregoing, Underwriters' Laboratory-approved equipment and microwave ovens may be used in the Premises for heating food and brewing coffee, tea, hot chocolate and similar beverages for employees and visitors of Tenant, provided that such use is in accordance with all applicable federal, state and city laws, codes, ordinances, rules and regulations; and provided further that such cooking does not result in odors escaping from the Premises.

4.      No boring or cutting for wires shall be allowed without the consent of Landlord.  Tenant shall not install any radio or television antenna, satellite dish, loudspeaker or other device on the roof or exterior walls of the Building.  Tenant shall not interfere with broadcasting or reception from or in the Project or elsewhere.

5.      Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of these Rules and Regulations.

6.      Tenant shall store all its trash and garbage within the interior of the Premises or in other locations approved by Landlord, in Landlord's sole discretion.  No material shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash in the vicinity of the Project without violation of any law or ordinance governing such disposal.  If Landlord provides trash receptacles for the use of tenants, Tenant shall only place trash and garbage in the Project's trash receptacles if the trash or garbage was generated by Tenant's office operations actually conducted in the Premises.  By way of example, and not limitation, Tenant shall not place trash or garbage in the Project's trash receptacles if the trash or garbage was generated by Tenant's non-office operations (e.g., manufacturing operations) or garbage or trash created at a location other than the Project (e.g., an off-site office or construction site).

7.      Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

PARKING RULES

1.      Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers or invitees to be loaded, unloaded or parked in areas other than those designated by Landlord for such activities and at times approved by Landlord.  Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking. Tenant and its customers, employees, shippers and invitees shall comply with all rules and regulations adopted by Landlord from time to time relating to truck parking and/or truck loading and unloading.

2.      Landlord reserves the right to relocate all or a part of parking spaces within the parking area.  If access to the parking areas are not now controlled with gates or similar devices, Landlord shall have the right, but not the obligation, to install gates or other devices to control access to the parking areas, and Tenant shall comply with all of Landlord's rules and regulations relating to access to the parking areas.

3.      Landlord will not be responsible for any damage to vehicles, injury to persons or loss of property, all of which risks are assumed by the party using the parking area.

4.      The maintenance, washing, waxing or cleaning of vehicles in the parking area or Common Areas is prohibited.

5.      Tenant shall be responsible for seeing that all of its employees, agents, contractors and invitees comply with the applicable parking rules, regulations, laws and agreements.

6.      At Landlord's request, Tenant shall provide Landlord with a list which includes the name of each person using the parking facilities based on Tenant's parking rights under this Lease and the license plate number of the vehicle being used by that person. Tenant shall provide Landlord with an updated list within five (5) days after any part of the list becomes inaccurate. No vehicles shall be parked in the parking areas overnight.

## ELECTRIC VEHICLE CHARGING STATIONS

1.      If, and only if, Section 1952.7 of the California Civil Code ("**Section 1952.7**") applies to the Building's parking area where Tenant's parking spaces are located and gives Tenant the legal right to install electric vehicle charging stations ("**Tenant Charging Stations**"), Tenant shall have the right to install Tenant Charging Stations in its parking spaces subject to all of the following terms and conditions and Tenant hereby acknowledges and agrees that all of the following terms and conditions are reasonable restrictions on the installation of the Tenant Charging Stations:

        (a)      Prior to installing, modifying, replacing or removing any Charging Station Improvements (as defined below) Tenant shall obtain the prior written approval of Landlord. For purposes of this Section, "**Charging Station Improvements**" shall mean the Tenant Charging Stations, the Charging Station Parking Spaces (as defined below), all other improvements or alterations made to the Project as part of the installation of the Tenant Charging Stations or any modifications to any of the foregoing. Landlord shall provide its written approval or disapproval of Tenant's request to install or modify the Charging Station Improvements within thirty (30) days after Landlord has received the Charging Station Plans (as defined below).    Nothing contained in this Section shall be interpreted as granting Tenant the right to alter any aspect of the parking spaces including, but not limited to, the size or location of parking spaces, and Tenant shall not have the right to alter the parking spaces at the Project.

        (b)      Tenant may install the greater of the following number of Tenant Charging Stations: (i) one (1) and (ii) the number derived by dividing the leasable area of the Premises by 12,500 and rounding the resulting quotient to the nearest whole number; provided, however, in no event shall Tenant be permitted to install more Tenant Charging Stations than the lesser of the number of parking spaces (A) it is entitled to use pursuant to Section 1.13 of the Lease and (B) that are permitted by Section 1952.7. To the extent Section 1952.7 permits Tenant to install without Landlord's approval a greater number of Tenant Charging Stations than provided above, Tenant shall be entitled to install the smallest number of Tenant Charging Stations it is permitted to install without Landlord's approval by Section 1952.7. The parking spaces used when vehicles are being charged at the Tenant Charging Stations are hereinafter collectively referred to as the "**Charging Station Parking Spaces**".  Charging Station Parking Spaces shall be included in the number of parking spaces Tenant is entitled to use pursuant to Section 1.13 of the Lease.

        (c)      Landlord may determine the location of the Tenant Charging Stations, the Charging Station Parking Spaces and the other Charging Station Improvements in its sole discretion provided that they are located in the Building's and/or Project's parking area.

        (d)      In addition to all other amounts payable by Tenant pursuant to this Section and the Lease, Tenant shall pay to Landlord its prevailing reserved parking charge for each Charging Station Parking Space, as such rate is increased by Landlord from time to time (the "**Parking Charges**"); provided, however, if Landlord does not have a standard reserved parking rate the Parking Charges shall be a monthly rental amount determined by Landlord. The Parking Charges shall be due and payable on the first day of each calendar month and shall constitute additional rent.

        (e)      The Charging Station Improvements shall comply with all Federal, State and local laws and regulations and all covenants, conditions and restrictions applicable to the Project including, but not limited to, applicable health, safety, zoning and land use laws (collectively, "**Applicable Requirements**").

        (f)      At Tenant's sole cost and expense, Tenant may place a sign in front of each Charging Station Parking Space stating that the Charging Station Parking Space is reserved for use by Tenant (the "**Charging Station Signs**"). Landlord shall have the right to approve in its sole discretion the size, content, color, design, materials and method of attachment of the Charging Station Signs. The Charging Station Signs shall be maintained by Tenant in good condition and repair at Tenant's sole cost and expense.

        (g)      The Tenant Charging Stations may only be used by Tenant's employees while working at the Premises, no other person or entity shall have the right to use the Tenant Charging Stations, and Tenant shall not permit any other person or

entity to use the Tenant Charging Stations. Landlord shall not be responsible for the security or use of the Tenant Charging Stations or for preventing other persons or entities from using the Tenant Charging Stations or from parking in the Charging Station Parking Spaces.

(h)    Tenant shall pay, at Tenant's sole cost and expense, any cost or expense related directly or indirectly to the existence of the Charging Station Improvements, including, but not limited to, all costs associated with the ownership, design, purchase, installation, maintenance, repair, operation and removal of the Charging Station Improvements (collectively, "**Charging Station Expenses**"). Landlord shall have no obligation to pay any Charging Station Expense. If Tenant fails to pay any Charging Station Expense or if Tenant fails to perform any obligation it has under this Section (collectively, a "**Tenant Obligation**"), Landlord shall have the right, but not the obligation, to complete the Tenant Obligation (e.g., by paying the Charging Station Expense or performing the Tenant obligation), and Tenant shall reimburse Landlord for the costs incurred by Landlord plus and amount equal to ten percent (10%) of such costs within ten (10) days after written demand.

(i)    At all times Tenant shall, at Tenant's sole cost and expense, maintain the Charging Station Improvements in good condition and repair and in compliance with all Applicable Requirements. Tenant shall keep the area around the Tenant Charging Stations and the Charging Station Parking Spaces in neat and clean condition, at Tenant's sole expense.

(j)    Tenant shall employ qualified engineers and architects approved by Landlord, in Landlord's reasonable discretion, to prepare detailed plans and specifications for the installation and any subsequent modification of the Charging Station Improvements (the "**Charging Station Plans**"). Landlord shall have the right to approve the Charging Station Plans including, but not limited to, the type and size of the charging stations Tenant desires to install and all electrical infrastructure. Once Landlord has approved the Charging Station Plans, Tenant shall obtain all required permits and other governmental approvals needed in order to install or modify the Charging Station Improvements pursuant to the approved Charging Station Plans, at Tenant's sole cost and expense. Tenant shall provide copies of the permits to Landlord prior to commencing the construction or modification of the Charging Station Improvements. Landlord shall have the right to approve in its sole discretion any conditions imposed by applicable governmental agencies on the installation or modification of the Charging Station Improvements. In addition, Landlord shall have the right to approve in its sole discretion the methods and procedures used to complete any trenching, landscaping repairs and/or asphalt and concrete repairs.

(k)    Landlord shall have the right to approve in advance the contractors (the "**Contractors**") used by Tenant to construct, install and/or modify the Charging Station Improvements, in Landlord's reasonable discretion; provided, however, any work on the Project's electrical systems, plumbing systems, life/fire/safety systems, any modifications to concrete or asphalt areas or any modifications to landscaped areas shall be performed by contractors designated by Landlord. The Contractors shall carry worker's compensation insurance covering all of their respective employees, and shall also carry public liability insurance, including property damage, all with limits, in form and with companies as are acceptable to Landlord, in Landlord's reasonable discretion. Certificates for all insurance carried pursuant to this Section shall be delivered to Landlord before the commencement of the construction or modification of the Charging Station Improvements. All such policies of insurance shall name Landlord and its property manager as an additional insured. Prior to commencing construction or modification of the Charging Station Improvements, Tenant shall provide Landlord with copies of the final contract entered into with each Contactor.

(l)    The Contractors shall comply with Landlord's construction rules and procedures (the "**Construction Procedures**"), and if any Contractor fails to comply with the Construction Procedures after Landlord has provided the Contractor with written notice of its non-compliance, Landlord shall have the right to prohibit such Contractor from performing any further work at the Project, and Landlord shall have no liability to Tenant do to such prohibition. Tenant and the Contractors shall not have the right, at any time, to disrupt any Building or Project service (e.g., electrical, plumbing etc.) to the Common Areas or to another tenant's premises or to interfere with the use of the Project's parking area. Tenant and the Contractors shall not store construction materials at the Project and the Contractors shall not dispose of their refuse or construction materials in the Project's trash receptacles. Tenant shall reimburse Landlord for the cost of repairing any damage to the Project caused by the construction or modification of the Charging Station Improvements, plus an amount equal to ten percent (10%) of such cost, within ten (10) days after written request by Landlord. Landlord shall have the right to inspect the Charging Station Improvements at all times. Landlord shall have the right to receive a fee to reimburse it for its costs in providing approvals hereunder and in monitoring the construction or modification of the Charging Station Improvements in an amount equal to ten percent (10%) of the total cost of constructing, installing and/or modifying the Charging Station Improvements (the "**Charging Station Landlord Fee**"). Tenant shall pay the Charging Station Landlord Fee to Landlord within ten (10) days after written demand.

(m)    All electricity used by the Tenant Charging Stations shall be paid by Tenant, at Tenant's sole cost and expense. The electricity used by the Tenant Charging Stations shall be separately metered by the applicable public utility and Tenant shall pay the electricity charges directly to the applicable public utility. All costs associated with metering the electricity used by the Tenant Charging Stations, bringing electricity to the Tenant Charging Stations (e.g., the cost of metering devices, the cost of modifications to the Project's electrical system, the cost of bringing electrical lines to the Tenant Charging Stations etc.) and all design and construction costs associated with bringing electricity to the Tenant Charging Stations shall be paid by

Tenant, at Tenant's sole cost and expense.  Landlord shall determine in its sole discretion what electrical improvements need to be made to bring the electricity to the Tenant Charging Stations, and where such electrical improvements will be located, and all such electrical improvements shall be included in the Charging Station Plans.

(n)     Upon the termination of the Lease or upon Tenant's election to no longer use the Tenant Charging Stations, Tenant shall remove the Charging Station Improvements and shall return the Project to the condition it was in prior to the installation of the Charging Station Improvements, at Tenant's sole cost and expense.  At Landlord's option, Landlord may require Tenant to leave some or all of the Charging Station Improvements in place upon the termination of the Lease or upon Tenant's election to no longer use the Tenant Charging Stations, and in this event, the Charging Station Improvements left by Tenant shall be the property of Landlord.  At Landlord's option, Tenant shall execute a bill of sale confirming that it has conveyed title to the Charging Station Improvements to Landlord free of all liens and encumbrances within ten (10) days after Landlord's written request.

(o)     Prior to and as condition to Tenant's right to install Tenant Charging Stations, Landlord may require Tenant to provide to Landlord an additional security deposit in an amount equal to Landlord's estimate of the cost of removing the Charging Station Improvements and returning the Project to the condition it was in prior to the installation of the Charging Station Improvements (the "**Charging Station Deposit**").  The Charging Station Deposit shall be held by Landlord pursuant to the terms of Section 7 of the Lease, and shall be paid by Tenant in addition to any other security deposit required by Landlord.

(p)     The Charging Station Improvements shall be considered a use of the Premises pursuant to Section 19 of the Lease, and pursuant to Section 19 Tenant shall indemnify, defend and hold harmless the Indemnified Parties (as defined in Section 19) from any Damages (as defined in Section 19) arising out of or in any way related to the installation, use, repair, maintenance and removal of the Charging Station Improvements.  The insurance purchased by Tenant pursuant to Section 10.1 of the Lease shall apply to the Charging Station Improvements, and within fourteen (14) days after Landlord approves the installation of the Tenant Charging Stations Tenant shall provide Landlord with a certificates of insurance meeting the requirements of Section 10.3 of the Lease showing that the insurance described above is in place with respect to the Charging Station Improvements.

(q)     Landlord shall have the right at any time, in Landlord's sole discretion, to elect to relocate some or all of the Charging Station Improvements to another area of the Project (a "**Relocation**").  In the event of a Relocation, Landlord shall pay for the cost of the Relocation at Landlord's sole cost and expense.  After the Relocation, all of the terms and conditions of this Section shall continue to apply to the Charging Station Improvements.

(r)     If as a result of the construction or the existence of the Charging Station Improvements, Landlord is obligated to comply with the Americans With Disabilities Act or any other law or regulation and such compliance requires Landlord to make any improvements or alterations to any portion of the Project (an "**Additional Alteration**"), Landlord shall have the right to make the Additional Alteration and in this event Tenant shall reimburse Landlord for the cost of the Additional Alteration plus ten percent (10%) of the cost of the Additional Alteration within ten (10) days after written demand.

(s)     At Landlord's option and in addition to all of Landlord's other rights under this Section, Landlord may require Tenant to comply with some or all of the items described on the "Permitting Checklist" of the "Zero-Emission Vehicles in California:  Community Readiness Guidebook" referred to in Section 1952.7, at Tenant's sole cost and expense.

(t)     If any provision of this Section is determined to conflict with the requirements of Section 1952.7, the provision shall be modified to the least extent possible to comply with the requirements of Section 1952.7 and except as modified such provision shall remain in full force and effect.

GENERALLY

Landlord reserves the right at any time to change or rescind any one or more of these Rules and Regulations, or to make such other and further reasonable Rules and Regulations as in Landlord's judgment may from time to time be necessary for the management, safety, care and cleanliness of the Project, and for the preservation of good order therein, as well as for the convenience of other occupants and tenants therein.  Landlord may waive any one or more of these Rules and Regulations for the benefit of any particular tenant, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant, nor prevent Landlord from thereafter enforcing any such Rules or Regulations against any or all tenants of the Project.  Tenant shall be deemed to have read these Rules and Regulations and to have agreed to abide by them as a condition of its occupancy of the Premises.

EXHIBIT D

Form of HazMat Certificate

General Information

Name of Responding Company: _____

Mailing Address: _____

Signature: _____

Title: _____    Phone: _____

Date: _____   Age of Facility: _____   Length of Occupancy: _____

Major products manufactured and/or activities conducted on the property: _____
_____
_____

Type of Business Activity(ies):
(check all that apply)

_____ machine shop
_____ light assembly
_____ research and development
_____ product service or repair
_____ photo processing
_____ automotive service and repair
_____ manufacturing
_____ warehouse
_____ integrated/printed circuit
_____ chemical/pharmaceutical product

Hazardous Materials Activities:
(check all that apply)

_____ degreasing – chlorinated solvent?___Y___N
_____ chemical/etching/milling
_____ wastewater treatment
_____ painting
_____ striping
_____ cleaning
_____ printing.  Water based?___Y____N
_____ analytical lab
_____ plating
_____ chemical/missing/synthesis
_____ silkscreen
_____ lathe/mill machining
_____ deionizer water product
_____ photo masking
_____ wave solder
_____ metal finishing

## HAZARDOUS MATERIALS/WASTE HANDLING AND STORAGE

A.    Are hazardous materials handled on any of your shipping and receiving docks in container quantities greater than one gallon? _____ Yes    _____ No

B.    If Hazardous materials or waste are stored on the premises, please check off the nature of the storage and type(s) of materials below:

Types of Storage Container
(list above-ground storage only)

_____ 1 gallon or 3 liter bottles/cans
_____ 5 to 30 gallon carboys
_____ 55 gallon drums
_____ tanks

Type of Hazardous Materials and/or Waste Stored

_____ acid
_____ phenol
_____ caustic/alkaline cleaner
_____ cyanide
_____ photo resist stripper
_____ paint
_____ flammable solvent
_____ gasoline/diesel fuel
_____ chlorinated solvent
_____ oil/cutting fluid

Are the hazardous materials being used/mixed on site or just stored for distribution?_____

If drums or tanks are used specify what materials are stored in the 55-gallon drums or tanks _____

If chlorinated solvents are used please specify which chlorinated solvents are used, how they are used and in what volumes_____

C.    Do you accumulate hazardous waste onsite? _____ Yes    _____ No

    If yes, how is it being handled?

    _____ on-site treatment or recovery
    _____ discharged to sewer
    _____ hauled offsite    If hauled offsite, by whom _____
    _____ incineration

D.    Indicate your hazardous waste storage status:
    _____ generator ____SQG _____LQG
    _____ interim status facility
    _____ permitted TSDF
    _____ none of the above

### WASTEWATER TREATMENT/DISCHARGE

A.    Do you discharge industrial wastewater to:

    _____ sewer
    _____ storm drain
    _____ surface water
    _____ no industrial discharge

B.    Is your industrial wastewater treated before discharge?    _____ Yes _____ No

    If yes, what type of treatment is being conducted?

    _____ neutralization
    _____ metal hydroxide formation
    _____ closed-loop treatment
    _____ cyanide destruct
    _____ HF treatment
    _____ other

C.    Do you have an oil/water separator or clarifier?    _____ Yes _____ No

### SUBSURFACE CONTAINMENT OF HAZARDOUS MATERIALS/WASTES

A.    Are buried tanks/sumps being used for any of the following:

    _____ hazardous waste storage
    _____ chemical storage
    _____ gasoline/diesel fuel storage
    _____ waste treatment
    _____ wastewater neutralization
    _____ industrial wastewater treatment
    _____ none of the above

B.     If buried tanks are located onsite, indicate their construction:

_____ steel          _____ fiberglass          _____ concrete
_____ inside open vault      _____ double walled

C.     Are hazardous materials or untreated industrial wastewater transported via buried piping to tanks, process areas or treatment areas? _____ Yes _____ No

D.     Do you have wet floors in your process areas? _____ Yes _____ No

       If yes, name processes: _____

E.     Are abandoned underground tanks or sumps located on the property? _____ Yes _____ No

<u>HAZARDOUS MATERIALS SPILLS</u>

A.     Have hazardous materials ever spilled to:

_____ the sewer
_____ the storm drain
_____ onto the property
_____ no spills have occurred

B.     Have you experienced any leaking underground tanks or sumps? _____ Yes _____ No

C.     If spills have occurred, were they reported? _____ Yes _____ No

       Check which the government agencies that you contacted regarding the spill(s):

_____ Department of Health Services
_____ Department of Fish and Game
_____ Environmental Protection Agency
_____ Regional Water Quality Control Board
_____ Fire Department

D.     Have you been contacted by a government agency regarding soil or groundwater contamination on your site?

_____ Yes _____ No

       Do you have exploratory or monitoring wells onsite? _____ Yes _____ No

       If yes, indicate the following:

       Number of wells: _____      Approximate depth of wells: _____ Well diameters: _____

PLEASE ATTACH ENVIRONMENTAL REGULATORY PERMITS, AGENCY REPORTS THAT APPLY TO YOUR OPERATION AND HAZARDOUS WASTE MANIFESTS.

Check off those enclosed:

_____ Hazardous Materials Inventory Statement, HMIS
_____ Hazardous Materials Management Plan, HMMP
_____ Regulatory Agency , Facility Inspection Report
_____ Underground Tank Registrations
_____ Industrial Wastewater Discharge Permit
_____ Hazardous Waste Manifest

Exhibit E

**Addendum to Standard Industrial Lease (the "Lease")
Between The Realty Associates Fund XI Portfolio, L.P. ("Landlord")
and MASH Studios, Inc. ("Tenant")**

It is hereby agreed by Landlord and Tenant that the provisions of this Addendum are a part of the Lease. If there is a conflict between the terms and conditions of this Addendum and the terms and conditions of the Lease, the terms and conditions of this Addendum shall control. Capitalized terms in this Addendum shall have the same meaning as capitalized terms in the Lease, and, if a Work Letter Agreement is attached to this Lease, as those terms have been defined in the Work Letter Agreement.

1.      Termination of Existing Tenant's Lease.   Landlord's obligations under this Lease are contingent and conditioned upon Landlord entering into a written agreement with the existing tenant of the Premises (the "**Existing Tenant**") whereby the Existing Tenant agrees to terminate its lease of the Premises (the "**Termination Agreement**"). The terms and conditions of the Termination Agreement shall be satisfactory to Landlord in Landlord's sole and absolute discretion. Landlord makes no representation or warranty to Tenant that an acceptable Termination Agreement will be entered into by Landlord and the Existing Tenant. If a Termination Agreement is not entered into on or before December 15, 2018, Landlord shall have the right, in Landlord's sole discretion, to elect upon written notice to Tenant to terminate this Lease. In the event of such a termination, this Lease shall terminate, Landlord shall return to Tenant its advance Base Rent, security deposit and the L/C (as defined below) and Landlord and Tenant shall thereafter have no further liability to each other under this Lease.

2.      Abatement of Rent. Landlord hereby agrees to conditionally waive all of the Base Rent due for the second, third, fourth and fifth full calendar months of the initial Lease term and $1,564.50 of the Base Rent due for the sixth full calendar month of the initial Lease term (i.e., in the sixth month, Tenant will pay Base Rent in the amount of $48,903.00). No amounts due to Landlord under the Lease other than the Base Rent referred to above shall be conditionally waived. In the event Tenant commits a default as defined in the Lease, Base Rent coming due thereafter shall not be waived, and all Base Rent that Landlord conditionally waived in the past shall be immediately due and payable by Tenant to Landlord without notice or demand from Landlord. If the Lease expires in accordance with its terms, and does not terminate as a result of a default by Tenant, Landlord agrees to permanently waive the Base Rent it has conditionally waived.

3.      Security Deposit.

(a)      Security Deposit. Tenant is obligated to provide to Landlord a security deposit in the amount of $268,275.53 (the "**Security Deposit**").

(b)      Application to Base Rent. Provided that Landlord has received the Security Deposit, Tenant has not provided an L/C to Landlord in accordance with Addendum Section 4 below and that the Reduction Conditions (as defined below) have all been satisfied, (a) on the date that is twelve (12) full calendar months after the Commencement Date, Landlord shall credit $28,571.43 of the Security Deposit towards payment of the Base Rent due for the thirteenth (13th) full calendar month of the initial term of the Lease, (b) on the date that is twenty four (24) full calendar months after the Commencement Date, Landlord shall credit $28,571.43 of the Security Deposit towards payment of the Base Rent due for the twenty fifty (25th) full calendar month of the initial term of the Lease, (c) on the date that is thirty six (36) full calendar months after the Commencement Date, Landlord shall credit $28,571.43 of the Security Deposit towards payment of the Base Rent due for the thirty seventy (37th) full calendar month of the initial term of the Lease, (d) on the date that is forty eight (48) full calendar months after the Commencement Date, Landlord shall credit $28,571.43 of the Security Deposit towards payment of the Base Rent due for the forty ninth (49th) full calendar month of the initial term of the Lease, (e) on the date that is sixty (60) full calendar months after the Commencement Date, Landlord shall credit $28,571.43 of the Security Deposit towards payment of the Base Rent due for the sixty-first (61st) full calendar month of the initial term of the Lease, (f) on the date that is seventy-two (72) full calendar months after the Commencement Date, Landlord shall credit $28,571.43 of the Security Deposit towards payment of the Base Rent due for the seventy-third (73rd) full calendar month of the initial term of the Lease and (g) on the date that is eighty-four (84) full calendar months after the Commencement Date, Landlord shall credit $28,571.43 of the Security Deposit towards payment of the Base Rent due for the eighty-fifth (85th) full calendar month of the initial term of the Lease. Tenant acknowledges and agrees that the forgoing credits are only partial payments of the Base Rent due in each month to which a credit is applied and that Tenant shall remain responsible for the payment of the remaining Base Rent due that month in a timely manner in accordance with all of the requirements of the Lease. The remaining balance of the Security Deposit after all of the credits to Base Rent are applied (i.e., $68,275.53) shall continue to be treated as a security deposit in accordance with Section 7 of the Lease. The "**Reduction Conditions**" shall mean that at the time of each reduction in the Security Deposit all of the following are true: (1) Tenant has not committed a default as defined in Section 17 of the Lease, (2) no Bankruptcy Event has occurred and (3) Tenant has not assigned the Lease or subleased substantially all of the Premises for substantially all of the remaining term of the Lease. From and after the date that one or more of the Reduction Conditions is not true, Tenant shall no longer have the right to credit the Security Deposit to the payment of Base Rent as provided in this Addendum Section.

39

57

(c) <u>Delivery of L/C</u>. If Tenant provides the L/C to Landlord in accordance with all of the requirements of Addendum Section 4 below, and provided that the Reduction Conditions have all been satisfied, within thirty (30) days after receiving the L/C, Landlord shall refund to Tenant $200,000.00 of the Security Deposit, and in this event, no portion of the remaining Security Deposit (i.e., $68,275.53) shall be credited to the payment of Base Rent as provided in Addendum Section 3(b).

4.   <u>Letter of Credit</u>.

(a) <u>Delivery of Letter of Credit</u>. Tenant shall have the right at any time on or before June 30, 2019, time being of the essence, to deliver to Landlord at Tenant's sole cost and expense an irrevocable standby letter of credit (the "**L/C**") in the form of, and upon all of the terms and conditions contained in Exhibit 1 attached hereto and incorporated herein by reference. The L/C shall be issued by Citizens Business Bank or by another state or national bank chartered in the United States that is acceptable to Landlord in Landlord's sole and absolute discretion, having a place of business where the L/C can be presented for payment in Los Angeles, California (hereinafter the "**Original Issuing Bank**"). The L/C shall provide for one (1) or more draws by Landlord or its transferee up to the aggregate amount of US $200,000.00 (the "**L/C Amount**") on the terms and conditions of Exhibit 1. If Tenant provides the L/C to Landlord, Addendum Sections (b) through (f) below shall apply to the L/C.

(b) <u>Renewal of L/C</u>. Tenant shall, at Tenant's sole cost and expense, maintain the L/C in effect from the date of Tenant's execution of this Lease until the date which is sixty (60) days after Tenant shall have performed all of its obligations under the Lease (said period is hereinafter referred to as the "**L/C Term**"). If the expiration date of the L/C (or any renewal or replacement L/C provided pursuant to this Addendum section) occurs prior to the end of the L/C Term, then Tenant shall deliver to Landlord a renewal of the L/C or a replacement L/C meeting all of the terms and conditions of this Addendum section, not later than sixty (60) days prior to the then-applicable expiration date. Each L/C provided pursuant to this Addendum section shall have an expiration date which is at least one (1) year from such L/C's date of issue except where the then-applicable expiration date of the L/C is less than one (1) year from the end of the L/C Term, in which case the renewal or replacement L/C shall be for such lesser period. The issuing bank's agreement to place an automatic renewal provision in the L/C, as required pursuant to said Exhibit 1, shall not relieve or release Tenant from its obligation to provide a renewal or replacement L/C on the terms hereinabove stated, it being understood that any such automatic renewal is an independent obligation of the issuing bank which is intended for Landlord's sole benefit. If Tenant fails to provide the renewal or replacement L/C not later than sixty (60) days prior to the then-applicable, stated expiration date (excluding automatic renewal provisions), such failure shall be a default by Tenant, and Landlord shall have the right, without notice or demand, on one or more occasions, to draw upon all or any part of the remaining proceeds of the L/C.

(c) <u>Draw on Letter of Credit</u>. Landlord may elect from time to time, in Landlord's sole discretion, without notice or demand to Tenant, to draw upon all or any part of the remaining proceeds of the L/C upon the occurrence of one or more of the following events: (i) Tenant fails to perform any of its obligations under the Lease (including, but not limited to, its obligations under this Addendum section), whether or not such failure constitutes a default by Tenant as defined in the Lease or (ii) Tenant makes any assignment for the benefit of creditors, Tenant declares bankruptcy or is the subject of an involuntary bankruptcy proceeding, a trustee or receiver is appointed to take possession of some or all of Tenant's assets or, in Landlord's reasonable judgment, Tenant is insolvent (collectively, a "**Bankruptcy Event**").

(d) <u>Application of L/C Proceeds</u>. Landlord may elect, from time to time, upon written notice to Tenant, in Landlord's sole discretion, to apply the proceeds it receives from a draw on the L/C in one or more of the following manners: (i) as payment for some or all of the Base Rent, Operating Expenses, Real Property Taxes or other amounts owed by Tenant under the Lease but unpaid on the date of such draw, (ii) as payment for some or all of the future amounts of Base Rent, Operating Expenses, Real Property Taxes or other amounts that Landlord estimates will be due and payable under the Lease after the date of the draw, (iii) as payment for some or all of the damage Landlord may suffer as a result of Tenant's failure to perform its obligations under the Lease, (iv) as collateral for lease obligations of Tenant and/or (v) in any other manner permitted by the Lease or applicable law. Landlord may make one or more partial draws under the L/C and shall have the right, upon written notice to Tenant, to treat each draw or a portion thereof in one or more of the ways described in the previous sentence. This L/C and it proceeds shall not be treated as a security deposit within the meaning of Section 1950.7 of the California Civil Code, and Tenant hereby waives Section 1950.7 of the California Civil Code and any other law or regulation that may be inconsistent with the terms and conditions of this Addendum section. Tenant acknowledges and agrees that Tenant has no interest in any L/C proceeds received by Landlord including, but not limited to, any reversionary or contingent interest.

(e) <u>Enforcement</u>. Tenant's obligation to furnish the L/C shall not be released, modified or affected by any failure or delay on the part of Landlord to enforce or assert any of its rights or remedies under the Lease or this Addendum section, whether pursuant to the terms thereof or at law or in equity. Landlord's right to draw upon the L/C shall be without prejudice or limitation to Landlord's right to draw upon any security deposit provided by Tenant to Landlord or to avail itself of any other rights or remedies available to Landlord under the Lease or at law or equity.

(f)      Deterioration of Financial Condition of Initial Issuing Bank. The Capital Ratios (as defined below) of the Initial Issuing Bank on the date the L/C is first issued are hereinafter referred to as the "**Initial Capital Ratios**". If following the issuance of the L/C, (i) either of the Initial Capital Ratios decrease by more than ten percent (10%) or (ii) any other measure of capital or solvency of the Initial Issuing Bank falls below the minimum requirements of the governmental regulatory agencies with jurisdiction over the Initial Issuing Bank, at Landlord's option, Landlord may require Tenant to replace the existing L/C with a new L/C (the "**New L/C**") from a new bank (the "**New Bank**"). The New Bank's Capital Ratios shall be the same or better than the Initial Capital Ratios and the New Bank shall be in compliance with all other capital and solvency requirements of the governmental regulatory agencies with jurisdiction over the New Bank. Tenant shall replace the existing L/C with a New L/C in the form of Exhibit 1 within thirty (30) days after Landlord's written request. For purposes of this Section, "**Capital Ratios**" shall mean the Tier 1 and Tier 2 capital ratios calculated by a bank to determine if the bank satisfies certain capital requirements of the governmental regulatory agencies with jurisdiction over the bank. For example, assume that the Tier 1 capital ratio of the Initial Issuing Bank was 10% and it decreases to 8.9%. In this event the Landlord would have the right to require Tenant to provide a New L/C.

(g)      Event of Default. Tenant's failure to perform its obligations under this Addendum section (time being of the essence) shall constitute an event of default under the Lease, and shall entitle Landlord to immediately exercise all of its rights and remedies under the Lease (including, but not limited to, rights and remedies under this Addendum section) or at law or in equity without notice or demand to Tenant.

(h)      Conflict. If there is any conflict between the terms and conditions of this Addendum section and the terms and conditions of the Lease, the terms of this Addendum section shall control.

(i)      Reduction in Amount of L/C. Provided that the Reduction Conditions (as defined below) have all been satisfied, on the first day of the thirteenth (13th) full calendar month of the initial term of this Lease, Tenant shall have the right to reduce the L/C Amount by $28,571.43 (i.e., a remaining L/C balance of $171,428,57), on the first day of the twenty-fifth (25th) full calendar month of the initial term of the Lease, Tenant shall have the right to reduce the L/C Amount by $28,571.43, on the first day of the thirty-seventh (37th) full calendar month of the initial term of the Lease, Tenant shall have the right to reduce the L/C Amount by $28,571.43, on the first day of the forth-ninth (49th) full calendar month of the initial term of the Lease, Tenant shall have the right to reduce the L/C Amount by $28,571.43, on the first day of the sixty-first (61st) full calendar month of the initial term of the Lease, Tenant shall have the right to reduce the L/C Amount by $28,571.43, on the first day of the seventy-third (73rd) full calendar month of the initial term of the Lease, Tenant shall have the right to reduce the L/C Amount by $28,571.43 and on the first day of the eighty-fifth (85th) full calendar month of the initial term of the Lease Tenant shall have the right to reduce the L/C Amount by $28,571.42. The "**Reduction Conditions**" shall mean that at the time of each reduction in the L/C Amount all of the following are true: (1) Tenant has not committed a default as defined in Section 17 of the Lease, (2) no Bankruptcy Event has occurred and (3) Tenant has not assigned the Lease or subleased substantially all of the Premises for substantially all of the remaining term of the Lease. The documents evidencing the reduction of the L/C Amount shall be satisfactory to Landlord, in Landlord's sole discretion. From and after the date that one or more of the Reduction Conditions is not true, Tenant shall no longer have the right to reduce the L/C Amount as provided in this Section (i).

5.      Option to Extend. Landlord hereby grants to Tenant the option to extend the term of the Lease for one (1) five (5)-year period (the "**Extension Option**") commencing when the initial lease term expires upon each and all of the following terms and conditions:

(a)      On a date which is prior to the date that the option period would commence (if exercised) by at least one hundred eighty (180) days and not more than three hundred sixty (360) days, Landlord shall have received from Tenant a written notice of the exercise of the option to extend the Lease for said additional term (an "**Exercise Notice**"), time being of the essence. If the Exercise Notice is not so given and received, the Extension Option shall automatically expire, Tenant shall no longer have the right to give an Exercise Notice and this section shall be of no further force or effect. Tenant shall give the Exercise Notice using certified mail return receipt requested or some other method where the person delivering the package containing the Exercise Notice obtains a signature of the person accepting the package containing the Exercise Notice (e.g., by FedEx with the requirement that the FedEx delivery person obtain a signature from the person accepting the package). It shall be the obligation of Tenant to prove that Landlord received the Exercise Notice in a timely manner.

(b)      All of the terms and conditions of the Lease except where specifically modified by this section shall apply.

(c)      The monthly Base Rent payable during the option term shall be the Market Rate on the date the option term commences.

(d)      The term "**Market Rate**" shall mean the annual amount per rentable square foot that a willing, comparable renewal tenant would pay and a willing, comparable landlord of a similar industrial building would accept at arm's

length for similar space, giving appropriate consideration to the following matters: (i) annual rental rates per rentable square foot; (ii) the type of escalation clauses (including, but without limitation, operating expense, real estate taxes, and CPI) and the extent of liability under the escalation clauses (i.e., whether determined on a "net lease" basis or by increases over a particular base year or base dollar amount); (iii) rent abatement provisions reflecting free rent and/or no rent during the lease term; (iv) length of lease term; (v) size and location of premises being leased; and (vi) other generally applicable terms and conditions of tenancy for similar space; provided, however, Tenant shall not be entitled to any tenant improvement allowance.  If renewal tenants exercising similar market rate extension options are receiving a tenant improvement allowance, this fact shall be taken into consideration in determining the Market Rate.  The Market Rate may also designate periodic rental increases and similar economic adjustments.

(e)      If Tenant exercises the Extension Option, Landlord shall determine the Market Rate by using its good faith judgment.  Landlord shall provide Tenant with written notice of such amount on or before the date that is ninety (90) days prior to the date that the term of the Extension Option will commence.  Tenant shall have fifteen (15) days ("**Tenant's Review Period**") after receipt of Landlord's notice of the new rental within which to accept such rental.  In the event Tenant fails to accept in writing such rental proposal by Landlord, then such proposal shall be deemed rejected, and Landlord and Tenant shall attempt to agree upon such Market Rate, using their best good faith efforts.  If Landlord and Tenant fail to reach agreement within fifteen (15) days following Tenant's Review Period ("**Outside Agreement Date**"), then each party shall place in a separate sealed envelope their final proposal as to the Market Rate, and such determination shall be submitted to arbitration in accordance with subsections (i) through (v) below.

(i)      Landlord and Tenant shall meet with each other within five (5) business days after the Outside Agreement Date and exchange their sealed envelopes and then open such envelopes in each other's presence.  If Landlord and Tenant do not mutually agree upon the Market Rate within one (1) business day of the exchange and opening of envelopes, then, within ten (10) business days of the exchange and opening of envelopes, Landlord and Tenant shall agree upon and jointly appoint a single arbitrator who shall by profession be a real estate broker or agent who shall have been active over the five (5) year period ending on the date of such appointment in the leasing of similar buildings in the geographical area of the Premises.  Neither Landlord nor Tenant shall consult with such broker or agent as to his or her opinion as to the Market Rate prior to the appointment.  The determination of the arbitrator shall be limited solely to the issue of whether Landlord's or Tenant's submitted Market Rate for the Premises is the closest to the actual Market Rate for the Premises as determined by the arbitrator, taking into account the requirements for determining Market Rate set forth herein.  Such arbitrator may hold such hearings and require such briefs as the arbitrator, in his or her sole discretion, determines is necessary.  In addition, Landlord or Tenant may submit to the arbitrator with a copy to the other party within five (5) business days after the appointment of the arbitrator any market data and additional information such party deems relevant to the determination of the Market Rate ("**MR Data**"), and the other party may submit a reply in writing within five (5) business days after receipt of such MR Data.

(ii)      The arbitrator shall, within thirty (30) days of his or her appointment, reach a decision as to whether the parties shall use Landlord's or Tenant's submitted Market Rate and shall notify Landlord and Tenant of such determination.

(iii)      The decision of the arbitrator shall be final and binding upon Landlord and Tenant.

(iv)      If Landlord and Tenant fail to agree upon and appoint an arbitrator, then the appointment of the arbitrator shall be made by the presiding judge of the Superior Court for the county in which the Premises is located, or, if he or she refuses to act, by any judge having jurisdiction over the parties.

(v)      The cost of the arbitration shall be paid by Landlord and Tenant equally.

(vi)      Landlord shall have the right to require Tenant to execute and to deliver to Landlord an amendment to the Lease that accurately sets forth the extended term of the Lease and the new Base Rent and other economic terms, if any.  Within ten (10) days after Landlord provides the amendment to Tenant, Tenant shall execute the amendment and deliver the amendment to Landlord.  Landlord's election not to require Tenant to execute an amendment shall not invalidate Tenant's exercise of the Extension Option.

6.      Access to Premises - 365 Days Per Year.  Subject to the other terms and conditions of the Lease, Landlord shall use reasonable efforts to provide Tenant's employees with access to the Premises twenty-four (24) hours a day, three hundred sixty-five (365) days per year.  Notwithstanding the foregoing, Tenant acknowledges and agrees that repairs, hazardous conditions and circumstances beyond Landlord's control may prevent access to the Premises from time to time.

7.      Building Signage.  Subject to the following terms and conditions, Landlord shall permit Tenant to install, at Tenant's sole cost and expense, one (1) exterior building sign (the "**Building Sign**") containing Tenant's name on the Building:

42

60

(a)     The location, size, design, color and construction of the Building Sign shall be acceptable to Landlord, in Landlord's sole and absolute discretion;

(b)     The cost of designing, fabricating, installing and obtaining governmental approvals for the Building Sign shall be paid by Tenant, at Tenant's sole cost and expense. Landlord shall have the right to approve the contractor that installs the Building Sign and the contractor shall comply with all of Landlord's policies and procedures relating to construction performed at the Project (e.g., insurance, safety etc.);

(c)     Tenant shall maintain the Building Sign in good order and repair, at Tenant's sole cost and expense;

(d)     Tenant's right to install the Building Sign is subject to Tenant obtaining all required governmental approvals and permits for the installation of the Building Sign, and Tenant's compliance with the terms and conditions of any covenants, conditions or restrictions applicable to the Building Sign. Landlord makes no representation or warranty that Tenant will be able to obtain the required approvals and permits for the installation of the Building Sign, and Tenant's obligations under this Lease are not conditioned upon Tenant's ability to obtain the approvals and permits or upon Tenant's ability to install the Building Sign or any other sign;

(e)     Any modification of the Building Sign shall be considered to be an "Alteration" within the meaning of Section 13.1 of the Lease, and shall be governed by the provisions thereof. Notwithstanding anything to the contrary contained in Section 13.1, any modification or alteration of the Building Sign shall require Landlord's prior approval, which may be given or withheld by Landlord in Landlord's sole discretion;

(f)     The Building Sign shall be considered a use of the Premises pursuant to Section 19 of the Lease, and Tenant shall defend and indemnify Landlord to the extent provided in Section 19;

(g)     Tenant shall remove the Building Sign and repair any damage to the Project, at Tenant's sole cost and expense, upon the termination or expiration of the Lease term;

(h)     The insurance purchased by Tenant pursuant to Section 10.1 of the Lease shall apply to the Building Sign;

(i)     Should the Building Sign be electrically illuminated, Tenant agrees to pay to Landlord, upon demand, the costs of such power as determined by persons skilled in the field, and utilize those estimates in billing Tenant for the power consumed; however, Tenant shall also have the right to install, at Tenant's sole cost and expense, electrical meters which shall measure the actual amount of power consumed;

(j)     If at any time Tenant has assigned this Lease or has subleased more than twenty five percent (25%) of the usable square feet in the Premises, Landlord shall have the right, at Landlord's option, at any time, upon not less than ninety (90) days advance written notice to Tenant, to require Tenant to permanently remove the Building Sign and to repair any damage to the Building caused by such removal, at Tenant's sole cost and expense. From and after the date of such removal, Tenant shall no longer have the right to place the Building Sign on the Building, and except for Tenant's obligation to remove the Building Sign and to repair any damage to the Building, this Section shall be of no further force or effect;

(k)     If Tenant has not installed the Building Sign on or before June 30, 2019, Tenant shall no longer have the right to install a Building Sign, and this Section shall be of no further force or effect; and

(l)     Landlord shall continue to have the right to install one or more additional signs on the exterior of the Building, and no exclusive sign rights have been granted hereunder.

8.      **Landlord Improvements**. Prior to the Commencement Date, Landlord shall substantially complete the following improvements to the Premises using building standard materials and procedures at Landlord's sole cost and expense (the "**Improvements**"):

(a)     Paint the painted walls in the interior of the office area of the Premises with one color of building standard paint;

(b)     Replace the existing carpet in the office area of the Premises with one color of new building standard carpet; and

(c)     Complete the modifications to the overhead lighting in the warehouse area of the Premises as described on Exhibit 2 attached hereto.

[Remainder of page left intentionally blank.]

43

IN WITNESS WHEREOF, the parties hereto have respectively executed this Addendum.

LANDLORD:

The Realty Associates Fund XI Portfolio, L.P.,
a Delaware limited partnership

By:    The Realty Associates Fund XI, L.P.,
       a Delaware limited partnership, general partner

       By:    Realty Associates Fund XI, LLC,
              a Delaware limited liability company, general partner

                                             Jim Harper
                                             Dec 28 2018 2:12 PM
              By:    _____
                     Name:
                     Title:

TENANT:

MASH Studios, Inc.,
a California corporation

By:    _____
       (print name)

Its:   _____
       (print title)

By:    _____
       (print name)

Its:   _____
       (print title)

44

62

Exhibit 1 to Addendum to Lease

[NAME OF BANK]
IRREVOCABLE STANDBY LETTER OF CREDIT

Date of Issue: _____          No. _____

BENEFICIARY:

The Realty Associates Fund XI Portfolio, L.P.
c/o TA Realty
28 State Street, 10th Floor
Boston, MA 02109
Attention:  Lease Administrator

APPLICANT:

MASH Studios, Inc.

_____
_____

AMOUNT:      $200,000.00

At the request and for the account of MASH Studios, Inc., (the "**Account Party**"), we hereby establish in your favor our Irrevocable Letter of Credit no. _____ in the amount of Two Hundred Thousand Dollars ($200,000.00).

This Letter of Credit is issued with respect to that certain lease agreement, by and between you, as Landlord, and the Account Party, as Tenant.  Said lease agreement, and any amendments or modifications thereof, is hereinafter referred to as the "**Lease**".  Our obligations under this Letter of Credit are solely as set forth herein and are completely independent of the obligations of the Account Party under the Lease.  We do not undertake any obligation under the Lease, nor do we undertake any responsibility to ascertain any facts, or to take any other action, with respect to the Lease, and we acknowledge that our obligations under this Letter of Credit shall not be affected by any circumstance, claim or defense of any party as to the enforceability of the Lease or any dispute as to the accuracy of the Statement (as defined below).

Funds under this Letter of Credit are available to you against presentation of the following documents at our office at _____ prior to close of business on the expiration date set forth below.

1.      The original of this Letter of Credit.

2.      Your sight draft on us in an amount not exceeding the amount of this Letter of Credit (less sums previously paid by us hereunder) executed by the person executing the Statement and bearing the number of this Letter of Credit; and

3.      A statement (the "**Statement**") executed by a natural person, stating that such person is your duly authorized representative, and that you are entitled to draw upon this Letter of Credit.

Facsimile demands are permitted by the delivery to us of facsimile copies of the documents described in 1 through 3 above.  Facsimile demands shall be sent to us at the following facsimile number: _____.  If a demand is made by facsimile, the original letter of credit is not required.

The expiration date of this Letter of Credit is _____, provided, however, that the expiration date of this Letter of Credit shall be automatically extended, without notice of amendment, for successive one (1) year periods, unless we give you written notice of our election not to extend the expiration date ("**Notice of Non-Renewal**") not later than sixty (60) days prior to the date this Letter of Credit is scheduled to expire.  A Notice of Non-Renewal shall be effective when actually delivered by certified mail, return receipt requested, or courier service to your address set forth above or such other address and/or person as you shall specify to us for such purpose by written notice received by us prior to the time the Notice of Non-Renewal is sent.

This Letter of Credit is transferable in its entirety through us.  Multiple transfers shall be permitted.  There will be no charge to Beneficiary or any transferee for the transfer of this Letter of Credit.  We will honor complying drafts presented hereunder by a transferee (and cease to honor drafts presented hereunder by you) upon our receipt of the fully executed transfer form attached

45

hereto as Exhibit A.  We will not reduce or curtail any terms or conditions of this Letter of Credit upon a transfer.    Transfers of this Letter of Credit shall be on the terms of this Letter of Credit as the same may be amended.

This Letter of Credit may be drawn upon in one or more drafts not exceeding in the aggregate, the amount available hereunder. Partial draws shall be permitted.

We hereby issue this Letter of Credit in your favor, and we hereby undertake to honor all drafts drawn under and in compliance with the terms of this Letter of Credit.

To the extent not inconsistent with the terms and conditions of this Letter of Credit, this Letter of Credit shall be governed by and construed in accordance with the Uniform Customs and Practices for Documentary Credits (_____ Revision) International Chamber of Commerce Publication 590 and the laws of the State of California.


_____
Authorized Signature

EXHIBIT A to Letter of Credit

DATE:

TO:    _____ Bank
       _____
       _____

Letter of Credit No.:    _____

Letter of Credit Amount:    $_____

GENTLEMEN:

FOR VALUE RECEIVED, THE UNDERSIGNED BENEFICIARY HEREBY IRREVOCABLY TRANSFERS TO:

(NAME OF TRANSFEREE)
(ADDRESS)

ALL RIGHTS OF THE UNDERSIGNED BENEFICIARY TO DRAW UNDER THE ABOVE LETTER OF CREDIT UP TO ITS AVAILABLE AMOUNT AS SHOWN ABOVE AS OF THE DATE OF THIS TRANSFER.

BY THIS TRANSFER, ALL RIGHTS OF THE UNDERSIGNED BENEFICIARY IN SUCH LETTER OF CREDIT ARE TRANSFERRED TO THE TRANSFEREE. TRANSFEREE SHALL HAVE THE SOLE RIGHTS AS BENEFICIARY THEREOF, INCLUDING SOLE RIGHTS RELATING TO ANY AMENDMENTS, WHETHER INCREASES OR EXTENSIONS OR OTHER AMENDMENTS, AND WHETHER NOW EXISTING OR HEREAFTER MADE. ALL AMENDMENTS ARE TO BE ADVISED DIRECT TO THE TRANSFEREE WITHOUT NECESSITY OF ANY CONSENT OF OR NOTICE TO THE UNDERSIGNED BENEFICIARY.

THE ORIGINAL OF SUCH LETTER OF CREDIT IS RETURNED HEREWITH, AND WE ASK YOU TO ENDORSE THE TRANSFER ON THE REVERSE THEREOF, AND FORWARD IT DIRECTLY TO THE TRANSFEREE WITH YOUR CUSTOMARY NOTICE OF TRANSFER.

SINCERELY,

_____
  (BENEFICIARY'S NAME)

_____
  SIGNATURE OF BENEFICIARY

Exhibit 2 to Addendum to Lease

(Lighting Modifications)

### Scope of Work: (1)

1) Repair a total of (27) 4 lamp T8 light fixtures with miscellaneous outages and discolored lamps.
2) Repair (1) 4 lamp T5 warehouse ceiling light fixtures that are currently nonoperational.
3) Repair (4) 6 lamp T5 warehouse ceiling light fixtures that currently have miscellaneous lamps that are out.

**\*Includes all high reach equipment.**

### Materials and Labor

| | | | | |
|---|---|---|---|---|
| 108 | F32/T8/841 lamps | $ 3.25 each | $ | 351.00 |
| 34 | F54/T5/CW/HO lamps | $ 5.95 each | $ | 202.30 |
| 1 | EPA required lamp disposal | | $ | 284.00 |
| 1 | High reach scissor lift equipment | | $ | 585.00 |
| | | | Labor $ | 795.00 |
| | | | **Total $** | **2,217.30** |

**\*In the event that ballast replacement is required, which cannot be determined until the lamps have been replaced, the cost for ballast replacement will run $98.90 each parts and labor.**

### Scope of Work: (2) Option

Install (15) T5 high bay ceiling light fixtures located at miscellaneous selective areas of the warehouse. Install all conduit and wire as needed.

**\*Total job cost is $7,775.00 parts and labor.**

48

EXHIBIT "2"

## FIRST AMENDMENT TO STANDARD INDUSTRIAL LEASE

THIS FIRST AMENDMENT TO STANDARD INDUSTRIAL LEASE (this "**Amendment**") is made and entered into as of September **24**, 2024, by and between BSP VBP Propco, LLC, a Delaware limited liability company ("**Landlord**"), MASH Studios, Inc., a California corporation ("**Original Tenant**"), and MASHindustries, Inc., a California corporation ("**Tenant**").

## R E C I T A L S :

A.     The Realty Associates Funds XI Portfolio, L.P., a Delaware limited partnership ("**Original Landlord**") and Original Tenant entered into that certain Standard Industrial Lease dated as of December 17, 2018 (as amended, modified, or supplemented, the "**Current Lease**"), pursuant to which Original Landlord leased to Original Tenant, and Original Tenant leased from Original Landlord, those certain premises (the "**Premises**") containing approximately 67,290 rentable square feet located at 7150 Village Drive, Buena Park, California 90621.

B.     Landlord succeeded to the interests of Original Landlord as landlord under the Current Lease.

C.     Tenant claims that it has continuously possessed the Premises since the Delivery Date (as that term is defined in the Current Lease) of April 1, 2019, with the knowledge of Original Landlord and Landlord, and, as a result, claims that it succeeded to the interests of Original Tenant as tenant under the Current Lease.

D.     The term of the Current Lease is 87 months, and the Current Lease expires on June 30, 2026 (the "**Expiration Date**").

E.     Landlord is currently holding a security deposit in the amount of $268,275.53 that was originally given to Original Landlord pursuant to the Current Lease (the "**Security Deposit**").

F.     On April 24, 2024 (the "**Petition Date**"), Tenant filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"), commencing the bankruptcy case captioned as *In re MASHindustries, Inc.* and bearing Case No. 8:24-bk-11046-TA (the "**Bankruptcy Case**").

G.     The outstanding amounts owing to Landlord under the Current Lease as of the Petition Date total no less than $629,433.68 (the "**Prepetition Arrears**"), which excludes $203,432.50 in free rent credited to Original Tenant under the Current Lease that would otherwise be due and payable under the Current Lease in the event of a default.

H.     In connection with the anticipated assumption of the Current Lease in the Bankruptcy Case, Landlord and Tenant now desire to amend the Current Lease to: (i) ratify

Tenant as the tenant under the Current Lease; (ii) revise the Expiration Date under the Current Lease; (iii) set forth a schedule for the cure of the Prepetition Arrears; and (iv) modify various terms and provisions of the Current Lease, all as hereinafter provided.

I.    Except as otherwise expressly provided herein to the contrary, all capitalized terms used in this Amendment shall have the same meaning given such terms in the Current Lease. The term "**Lease**" where used in the Current Lease and this Amendment shall herein and hereafter refer to the Current Lease, as amended by this Amendment.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Conditions to Effectiveness</u>. The terms and conditions of this Amendment are conditioned on, and shall become effective on the date (the "**Effective Date**") that is the latest of, (a) the execution of this Amendment by the Parties; (b) the entry of a final, non-appealable order (the "**Assumption Order**") in form and substance acceptable to Landlord, which provides for, among other things, approval of the assumption of the Lease (i.e., the Current Lease, as amended by this Amendment), approval of this Amendment pursuant to Federal Rule of Bankruptcy Procedure 9019, and the Bankruptcy Court retaining exclusive jurisdiction over any disputes relating to the Lease or possession of the Premises (including, if Landlord establishes appropriate cause, entering a surrender order as permitted by *Anderson v. Elm Inn, Inc. (In re Elm Inn, Inc.),* 942 F.2d 630 (9th Cir. 1991)); (c) the execution of a personal guaranty by Bernard Michael Brucha ("**Brucha**"), in form and substance acceptable to Landlord, that provides for Brucha's guaranty of payment of the Prepetition Arrears owed under the Lease (the "**Brucha Guaranty**"); and (d) the execution of a personal guaranty by Original Tenant, in form and substance acceptable to Landlord, that provides for Original Tenant's guaranty of payment of the Prepetition Arrears owed under the Lease (the "**Studios Guaranty**"). If these conditions are not satisfied, this Amendment shall be deemed null and void and of no force and effect, and all parties to this Amendment shall retain all rights, claims, or defenses that they may have against each other. In no event shall the Effective Date be a date that is later than November 1, 2024, unless that date is extended by Landlord.

2.    <u>Tenant</u>. Tenant (i.e., MASHindustries, Inc.) shall be deemed the "Tenant" under the Lease for all purposes as of April 1, 2019. The address for Tenant for notice purposes shall be as follows:

MASHindustries, Inc.
7150 Village Drive
Buena Park, California 90621
Attn: Bernard Brucha

with an additional copy to:

BG Law
21650 Oxnard Street, Suite 500
Woodland Hills, California 91367
Attn: Susan K. Seflin

3.    Expiration Date.  The Expiration Date under the Lease, which is currently scheduled to occur on June 30, 2026, is hereby revised to be **June 30, 2025**.  Tenant shall continue to be obligated to pay to Landlord Base Rent, Tenant's Percentage Share of the Operating Expenses, and all other charges and amounts payable under the Lease through and including the Expiration Date as revised pursuant to the terms of this Section 3 hereinabove, in accordance with the terms and provisions of the Lease.  On or prior to the Expiration Date as revised pursuant to this Section 3 hereinabove, Tenant shall vacate and surrender to Landlord exclusive possession of the Premises in the condition in which the Premises is required to be vacated and surrendered by Tenant pursuant to the Lease.  If Tenant fails to vacate and surrender exclusive possession of the Premises to Landlord on or prior to the Expiration Date as revised pursuant to this Section 3 hereinabove in accordance with the terms of this Section 3, then the applicable indemnification provisions and the holdover provisions of the Lease shall apply.

4.    Security Deposit.  The Security Deposit held by Landlord shall be deemed the Security Deposit given by Tenant under the Lease.  Original Tenant assigns to Tenant all right, title, and interest in the Security Deposit that Original Tenant has held or may have held.

5.    Cure Payments.  The Prepetition Arrears shall, in connection with the assumption of the Lease, be paid to Landlord as follows (collectively, the "**Cure Payments**"): (a) Tenant shall make eight monthly installment payments of $37,500.00 each, payable on the first business day of each month, from November 1, 2024, to June 30, 2025, (b) Original Tenant shall make four monthly installment payments of $20,000.00 each, payable on the first day of each month, from January 1, 2025, through April 30, 2025, (c) Original Tenant shall make a payment of $11,433.68, payable on May 1, 2025, and (d) Tenant shall make a payment of $238,000.00, payable on June 15, 2025 (the "**Final Cure Payment**").  Landlord may apply the Security Deposit to the Final Cure Payment without further order from the Bankruptcy Court.  Landlord shall forbear from exercising its remedies against Original Tenant to recover any amounts owed under the Current Lease, including enforcing any money judgments entered against Original Tenant, provided that all payments due under the Lease, including any Cure Payments, are timely received by Landlord.  The provisions of this Section 5 shall survive the termination of the Lease.

6.    Condition of Premises.  Tenant is currently in possession of the Premises and shall continue to accept the Premises in its current "AS-IS" condition existing as of the Effective Date without any agreements, representations, understandings or obligations on the part of Landlord to perform or pay for any alterations, repairs or improvements to the Premises, except as otherwise provided in the Lease.

7.    Brokers.  Landlord and Tenant each hereby represents and warrants to the other party that it has had no dealings with any real estate broker or agent in connection with the negotiation of this Amendment, and that it knows of no real estate broker or agent who is entitled to a commission in connection with this Amendment.  Each party agrees to indemnify and

defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, and costs and expenses (including, without limitation, reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing in connection with this Amendment on account of any breach of the foregoing representation and warranty by the indemnifying party.

8.    No Further Modification.  Except as set forth in this Amendment, all of the terms and provisions of the Lease shall remain unmodified and in full force and effect.

9.    Counterparts.  This Amendment may be executed in multiple counterparts, each of which is to be deemed original for all purposes, but all of which together shall constitute one and the same instrument.

10.    Electronic Signatures.  Each of the parties to this Amendment (i) has agreed to permit the use from time to time, where appropriate, of telecopy or other electronic signatures (including, without limitation, DocuSign) in order to expedite the transaction contemplated by this Amendment, (ii) intends to be bound by its respective telecopy or other electronic signature, (iii) is aware that the other will rely on such telecopied or other electronically transmitted signature, and (iv) acknowledges such reliance and waives any defenses to the enforcement of this Amendment and the documents affecting the transaction contemplated by this Amendment based on the fact that a signature was sent by telecopy or electronic transmission only.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have caused this Amendment to be duly executed by their duly authorized representatives as of the date first above written.


LANDLORD:                                    BSP VBP PROPCO, LLC,
                                             a Delaware limited liability company
                                             By:_____  KK
                                                  Name:_Timothy J. Ballard_
                                                  Its:_President_


ORIGINAL TENANT:                             MASH STUDIOS, INC.,
                                             a California corporation
                                             By:_____
                                                  Name: Bernard Brucha
                                                  Its: Chief Executive Officer


TENANT:                                      MASHINDUSTRIES, INC.,
                                             a California corporation
                                             By:_____
                                                  Name: Bernard Brucha
                                                  Its: Chief Executive Officer

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367.**

A true and correct copy of the foregoing document entitled**: MOTION FOR ENTRY OF AN ORDER: (1) APPROVING COMPROMISE PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; AND (2) AUTHORIZING DEBTOR TO ASSUME LEASE PURSUANT TO 11 U.S.C. § 365; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF BERNARD BRUCHA IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On **September 27, 2024,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Michele S Assayag     massayag@swlaw.com, kroger@swlaw.com
- Shawn M Christianson     cmcintire@buchalter.com, schristianson@buchalter.com
- Michael J Hauser     michael.hauser@usdoj.gov
- Gregory Kent Jones (TR)     gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com;cpesis@stradlinglaw.com
- Anne C Manalili     anne.manalili@sba.gov
- David W. Meadows     david@davidwmeadowslaw.com
- Elissa Miller     elissa.miller@gmlaw.com, emillersk@ecf.courtdrive.com;cheryl.caldwell@gmlaw.com
- Alan Novodor     novodor@msn.com
- Matthew D Pham     mpham@allenmatkins.com, mdiaz@allenmatkins.com
- David M Poitras     dpoitras@bg.law
- Susan K Seflin     sseflin@bg.law
- Alan G Tippie     Alan.Tippie@gmlaw.com, atippie@ecf.courtdrive.com;Karen.Files@gmlaw.com,patricia.dillamar@gmlaw.com,denise.walker@gmlaw.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov
- Jessica Wellington     jwellington@bg.law, ecf@bg.law

☐    Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**THE REQUIREMENT OF LBR 5005-2(d) TO PROVIDE JUDGES COPIES IS SUSPENDED AT THIS TIME.**

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____**, 2024,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 27, 2024 | JESSICA STUDLEY | /s/ Jessica Studley |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.